**RECORD NO. 15-1401**

In The

# United States Court Of Appeals

## For The Fourth Circuit

# GILDAN USA INC.,

*Plaintiff – Appellant,*

v.

# DILLARD'S INC.,

*Defendant – Appellee.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
AT CHARLOTTE**

———————————

**JOINT APPENDIX
Volume I of II
(Pages 1 - 339)**

———————————

Larry C. Jones
ALSTON & BIRD, LLP
Bank of America Plaza
101 South Tryon Street
Suite 4000
Charlotte, NC  28280
(704) 444-1019

Uly S. Gunn, III
ALSTON & BIRD, LLP
1 Atlantic Center
1201 West Peachtree Street
Atlanta, GA  30309
(404) 881-7000

W. Thad Adams, III
Samuel A. Long, Jr.
SHUMAKER LOOP
  & KENDRICK, LLP
First Citizen's Bank Building
128 South Tryon Street
Suite 1800
Charlotte, NC  28202
(704) 375-0057

*Counsel for Appellant*

*Counsel for Appellant*

*Counsel for Appellee*

*GibsonMoore Appellate Services, LLC*
421 East Franklin Street  ♦  Suite 230  ♦  Richmond, VA  23219
804-249-7770  ♦  www.gibsonmoore.net

# TABLE OF CONTENTS
## Volume I of II

Page:

Docket Entries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Complaint and Jury Trial Demand
     filed October 22, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Defendant's Answer to Complaint
     filed November 19, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Plaintiff's Motion for Preliminary Injunction,
with Exhibits,
     filed December 17, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

    Exhibits:

    A.   Declaration of Patricia McHale,
        with Exhibits,
            sworn on December 17, 2014 . . . . . . . . . . . . . . . . . . . . . . . 30

    Exhibits:

        A.   Photograph Depecting the Retail Packaging of
            GOLDTOE Men's Heritage Athletic Socks . . . . . . . . . 38

        B.   Photograph Depicting the Retail Packaging of
            GOLDTOE Men's Premier Athletic Socks . . . . . . . . . . 40

        C.   Photograph Depicting the Retail Packaging of
            GOLDTOE Men's Heritage Dress/Casual Socks . . . . 42

<u>**Exhibits**</u> **to**
**Plaintiff's Motion for Preliminary Injunction**
      **filed December 17, 2014, Continued:**

<u>**Exhibits:**</u>

**A.**    **Declaration of Patricia McHale,**
      **with Exhibits,**
            **sworn on December 17, 2014, Continued:**

      **D.**    **Photograph Depicting the Retail Packaging of**
            **GOLDTOE Men's Premier Dress/Casual Socks** . . . . .  **44**

      **E.**    **Photograph Depicting the Retail Packaging of**
            **GOLDTOE Men's (Regular) Dress/Casual Socks** . . . .  **46**

      **F.**    **Photograph Depicting the Retail Packaging of**
            **GOLDTOE Women's Heritage Dress/Casual Socks**  .  **48**

      **G.**    **Photograph Depicting the Retail Packaging of**
            **GOLDTOE Women's Heritage Dress/Casual Socks**  .  **50**

      **H.**    **Photograph Depicting the Retail Packaging of**
            **GOLDTOE Women's Premier Dress/Casual Socks**  . .  **52**

**B.**    **Declaration of Larry C. Jones,**
      **with Exhibits,**
            **sworn on December 9, 2014**  . . . . . . . . . . . . . . . . . . . . . . . **54**

      <u>**Exhibits:**</u>

      **A.**    **Dillard's Investor Relations Website**
            **https://investor.shareholder.com/dillards** . . . . . . . . . . . **57**

**Plaintiff's Motion for Preliminary Injunction,**
**with Exhibits,**
> **filed December 17, 2014, Continued:**

> **B.**    **Declaration of Larry C. Jones,**
>          **with Exhibits,**
> > **sworn on December 9, 2014, Continued:**

> > **Exhibits:**

> > **B.**    **Photographs of Retail Display** . . . . . . . . . . . . . . . . . . . . . . **62**

**Exhibits to**
**Plaintiff's Supplemental Memorandum in Support of**
**Motion for Preliminary Injunction**
> **filed January 30, 3015:**

> **C.**    **Declaration of Seldon Wolff**
> > **sworn on January 30, 2015** . . . . . . . . . . . . . . . . . . . . . . . . . **72**

> **D.**    **Declaration of Viraf Pudumjee**
> > **sworn on January 30, 2015** . . . . . . . . . . . . . . . . . . . . . . . . . **76**

> **E.**    **Declaration of Patricia McHale**
> > **sworn on January 30, 2015** . . . . . . . . . . . . . . . . . . . . . . . . . **80**

**Scheduling Order of**
**The Honorable Max O. Cogburn, Jr.**
> **filed February 13, 2015** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **84**

<u>Exhibits</u> to
**Defendant Dillard's Memorandum of Law in
Opposition to Plaintiff's Motion for Preliminary Injunction**
         filed February 13, 2015:

**Exhibit List** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

4.      **Collection of Third Party Users** . . . . . . . . . . . . . . . . . . . . . . . . . 87

5.      **GOLDTOE and Design Registration** . . . . . . . . . . . . . . . . . . . . 139

6.      **Illustrated Comparison of
         Gildan Trade Dress Definitions** . . . . . . . . . . . . . . . . . . . . . . . 142

7.      **Comparison of Gildan and Dillard's Packaging** . . . . . . . . . 152

8.      **All Gold Toe Sock Screen Shots** . . . . . . . . . . . . . . . . . . . . . . . 155

9.      **Dillard's Gold Label Packages for Other Products** . . . . . . . 189

10.     **Gildan's Cease and Desist Letter
         dated September 23, 2014** . . . . . . . . . . . . . . . . . . . . . . . . 193

11.     **Dillard's Response to Cease and Desist Letter
         dated September 30, 2014** . . . . . . . . . . . . . . . . . . . . . . . 202

12.     **Table of Gildan's Registrations** . . . . . . . . . . . . . . . . . . . . . . . 206

13.     **Gildan's Gold Toe Design
         Registration Nos. 308,608 and 2,056,422** . . . . . . . . . . . . . . . . 212

14.     **Gold Toe and Gold Label Comparison** . . . . . . . . . . . . . . . . . 215

<u>Exhibits</u> to
**Defendant Dillard's Memorandum of Law in**
**Opposition to Plaintiff's Motion for Preliminary Injunction**
      **filed February 13, 2015, Continued:**

15.     **Images of Gold Toe Socks** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **218**

16.     **Gildan Press Release** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **223**

17.     **Declaration of Cecilia M. Sidebottom**
          **sworn on February 13, 2015** . . . . . . . . . . . . . . . . . . . . . . . **229**

18.     **Gildan's Responses to Dillard's Requests for**
     **Production of Documents** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **233**

19.     **Physical Exemplars** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **256**

**Transcript of Preliminary Injunction Hearing Before**
**The Honorable Max O. Cogburn, Jr.**
      **On March 11, 2015** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **257**

**Order of**
**The Honorable Max O. Cogburn, Jr.**
**Denying Plaintiff's Motion for Preliminary Injunction**
      **filed March 23, 2015** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **325**

**Plaintiff's Notice of Appeal**
      **filed April 16, 2015** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **338**

## <u>TABLE OF CONTENTS</u>
### Volume II of II - Under Seal

Page:

<u>Exhibits</u> to
Defendant Dillard's Memorandum of Law in
Opposition to Plaintiff's Motion for Preliminary Injunction
      filed January 5, 2015:

    1.    Declaration of William Shields
           sworn on January 5, 2015 . . . . . . . . . . . . . . . . . . . . . . . . . 340

    2.    Declaration of Kelly McElyea
           sworn on January 2, 2015 . . . . . . . . . . . . . . . . . . . . . . . . . 348

    3.    Dillard's Gold Label Designs . . . . . . . . . . . . . . . . . . . . . . . . 352

<u>Exhibits</u> to
Plaintiff's Supplemental Memorandum in Support of
Motion for Preliminary Injunction
      filed January 30, 3015:

    A.    Transcript of Deposition of William Shields,
        with Exhibits,
           taken on January 27, 2015 . . . . . . . . . . . . . . . . . . . . . . . . 379

    <u>Exhibits</u>:

      19.    Declaration of William Sheilds
              dated January 5, 2015 . . . . . . . . . . . . . . . . . . . . . . . . 445

<u>**Exhibits**</u> **to**
**Transcript of Deposition of William Shields**
     **taken on January 27, 2015, Continued:**

       20.    **Email String Between Tracy Jones,**
             **Angela Quintana and Jennifer Incera**
                 **dated May 6, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . **452**

       21.    **Email String Between Tracy Jones and Chris Jackson**
                 **various dates** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **456**

       22.    **Planogram** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **462**

       23.    **Email String Between Kenny Wilsey and**
             **Hugo Nakai**
                 **various dates** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **513**

   **B.**    **Transcript of Deposition of Kelly McElyea,**
       **with Exhibits,**
             **taken on January 27, 2015** . . . . . . . . . . . . . . . . . . . . . . **517**

     <u>**Exhibits:**</u>

       9.    **Gold Label Athletic Socks** . . . . . . . . . . . . . . . . . . . . . . **649**

       10.    **Gold Label Athletic Socks** . . . . . . . . . . . . . . . . . . . . . . **652**

       11.    **Gold Label Athletic Socks** . . . . . . . . . . . . . . . . . . . . . . **655**

       12.    **GOLDTOE Athletic Socks** . . . . . . . . . . . . . . . . . . . . . . **658**

<u>Exhibits</u> to
Transcript of Deposition of Kelly McElyea
     taken on January 27, 2015, Continued:

13.    Declaration of Kelly McElyea
        dated January 2, 2015 . . . . . . . . . . . . . . . . . . . . . . . 661

14.    Confidential - Exhibit 3 . . . . . . . . . . . . . . . . . . . . . . . . 665

15.    Highly Confidential Exhibit 3 . . . . . . . . . . . . . . . . . . . . 694

16.    Email String Between John Faul and
Tracy Jones
        various dates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 722

17.    Email String Between Tracy Jones and
Gloria White
        various dates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 730

18.    Gold Label Dress Sock Packaging . . . . . . . . . . . . . . . . 733

<u>Exhibits</u> to
Defendant's Response in Opposition to
Defendant's Motion for Preliminary Injunction
     filed February 13, 2015:

1.    Declaration of William Shields
        sworn on January 5, 2015 . . . . . . . . . . . . . . . . . . . . . . 735

<u>Exhibits</u> to
Defendant's Response in Opposition to
Defendant's Motion for Preliminary Injunction
 filed February 13, 2015, Continued:

2.    Declaration of Kelly McElyea
 sworn on January 2, 2015 . . . . . . . . . . . . . . . . . . . . . . . . 743

3.    Dillard's Gold Label Designs . . . . . . . . . . . . . . . . . . . . . . . 747

Defendant Dillard's PowerPoint Presentation from
Preliminary Injunction Hearing Before
The Honorable Max O. Cogburn, Jr.
 on March 11, 2015  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 774

APPEAL,IAC

# U.S. District Court
## Western District of North Carolina (Charlotte)
## CIVIL DOCKET FOR CASE #: 3:14-cv-00590-MOC-DSC

| | |
|---|---|
| Gildan USA Inc. v. Dillard's, Inc. | Date Filed: 10/22/2014 |
| Assigned to: District Judge Max O. Cogburn, Jr | Jury Demand: Plaintiff |
| Referred to: Magistrate Judge David S. Cayer | Nature of Suit: 840 Trademark |
| Case in other court: FCCA, 15--1401 | Jurisdiction: Federal Question |
| Cause: 15:1125 Trademark Infringement (Lanham Act) | |

**Plaintiff**

**Gildan USA Inc.**                    represented by    **Larry Currell Jones**
Alston & Bird, LLP
Alston & Bird LLP
101 S. Tryon Street
Suite 4000
Charlotte, NC 28280-4000
704-444-1019
Fax: 704-444-1111
Email: larry.jones@alston.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Uly Samuel Gunn , III**
Alston & Bird LLP
1201 West Peachtree Street Northwest
Atlanta, GA 30309
404-881-7000
Fax: 404-881-7777
Email: sam.gunn@alston.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Carla Hermida Clements**
Alston & Bird LLP
101 S. Tryon Street, Suite 4000
Charlotte, NC 28280
704-444-1169
Email: carla.clements@alston.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Dillard's, Inc.**                    represented by  **Samuel Alexander Long , Jr.**
Shumaker Loop & Kendrick
128 S. Tryon Street, Suite 1800
Charlotte, NC 28202
704-945-2911
Email: along@slk-law.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**W. Thad Adams , III**
Shumaker, Loop & Kendrick, LLP
First Citizens Bank Plaza, Suite 1800
128 South Tryon Street
Charlotte, NC 28202-5013
704/ 375-0057
Fax: 704/ 332-1197
Email: tadams@slk-law.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/22/2014 | 1 | COMPLAINT against Dillard's Inc. with Jury Demand ( Filing fee $ 400 receipt number 0419-2461365), filed by Gildan USA Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Jones, Larry) Modified text on 10/22/2014 (jlk). Modified on 10/22/2014 to correct text (ssh). Modified text on 10/22/2014 (jlk). (Entered: 10/22/2014) |
| 10/22/2014 | 2 | Corporate Disclosure Statement by Gildan USA Inc. (Jones, Larry) Modified text on 10/22/2014 (jlk). (Entered: 10/22/2014) |
| 10/22/2014 | 3 | MOTION for Leave to Appear Pro Hac Vice as to Uly Samuel Gunn III Filing fee $ 276, receipt number 0419-2461445. by Gildan USA Inc.. (Jones, Larry) Modified text on 10/22/2014 (jlk). (Entered: 10/22/2014) |
| 10/22/2014 | 4 | NOTICE of Appearance by Carla Hermida Clements on behalf of Gildan USA Inc. (Clements, Carla) (Entered: 10/22/2014) |
| 10/23/2014 | | Case assigned to District Judge Max O. Cogburn, Jr and Magistrate Judge David S. Cayer. Notice: You must click this link to retrieve the **Case Assignment Packet**. Motions referred to David S. Cayer: 3 MOTION for Leave to Appear Pro Hac Vice as to Uly Samuel Gunn III Filing fee $ 276, receipt number 0419-2461445. *This is your only notice - you will not receive a separate document.* (eef) (Entered: 10/23/2014) |
| 10/23/2014 | 5 | REPORT on the Filing of an action regarding patent and/or trademark numbers contained in complaint. (eef) (Entered: 10/23/2014) |
| 10/23/2014 | 6 | **ORDER granting 3 Motion for Leave to Appear Pro Hac Vice added Uly Samuel Gunn, III for Gildan USA Inc.. Signed by Magistrate Judge David S. Cayer on 10/23/2014. (eef)** (Entered: 10/23/2014) |

| | | |
|---|---|---|
| 10/23/2014 | | Notice to Uly Samuel Gunn, III: Pursuant to Local Rule 83.1 you are required to **Register** for ECF at www.ncwd.uscourts.gov. Deadline by 11/3/2014. (eef) (Entered: 10/23/2014) |
| 10/29/2014 | 7 | Summons Issued Electronically as to Dillard's, Inc.. **NOTICE: Counsel shall print the summons and serve with other case opening documents in accordance with Fed.R.Civ.P.4** . (eef) (Entered: 10/29/2014) |
| 11/05/2014 | 8 | NOTICE of Appearance by W. Thad Adams, III on behalf of Dillard's, Inc. (Adams, W.) (Entered: 11/05/2014) |
| 11/05/2014 | 9 | NOTICE of Appearance by Samuel Alexander Long, Jr on behalf of Dillard's, Inc. (Long, Samuel) (Entered: 11/05/2014) |
| 11/06/2014 | 10 | SUMMONS Returned Executed by Gildan USA Inc.. Dillard's, Inc. served on 10/29/2014, answer due 11/19/2014. (Jones, Larry) (Entered: 11/06/2014) |
| 11/19/2014 | 11 | ANSWER to 1 Complaint, with Jury Demand by Dillard's, Inc..(Adams, W.) (Entered: 11/19/2014) |
| 11/19/2014 | 12 | Corporate Disclosure Statement by Dillard's, Inc. (Adams, W.) (Entered: 11/19/2014) |
| 11/20/2014 | | NOTICE pursuant to Local Rule 16.1 you are **required** to conduct an Initial Attorney's Conference within 14 days. At the conference, the parties are **required** to discuss the issue of consent to jurisdiction of a magistrate judge in accordance with Local Rules 16.1(A) and 73.1(C). The **Certificate of Initial Attorneys Conference** should be filed within 7 days of the conference. If appropriate, a party may file a Motion to Stay the Initial Attorney's Conference. (chh) (Entered: 11/20/2014) |
| 12/05/2014 | 13 | CERTIFICATION of initial attorney conference and discovery plan (Adams, W.) (Entered: 12/05/2014) |
| 12/05/2014 | 14 | Joint MOTION for Protective Order by Dillard's, Inc.. Responses due by 12/22/2014 (Attachments: # 1 Proposed Order)(Adams, W.). Motions referred to David S. Cayer. (Entered: 12/05/2014) |
| 12/10/2014 | 15 | **STIPULATED PROTECTIVE ORDER PURSUANT TO FED. R. CIV. P. 26(c). Signed by Magistrate Judge David S. Cayer on 12/10/2014.** (eef) (Entered: 12/10/2014) |
| 12/17/2014 | 16 | MOTION for Preliminary Injunction by Gildan USA Inc.. Responses due by 1/5/2015 (Attachments: # 1 Memorandum in Support of Preliminary Injunction Motion, # 2 Index of Exhibits, # 3 Exhibit A - Declaration of Patricia McHale, # 4 Exhibit B - Declaration of Larry Jones, # 5 Proposed Order)(Gunn, Uly) (Entered: 12/17/2014) |
| 12/17/2014 | 17 | MOTION for Discovery *(Limited Accelerated Discovery)* by Gildan USA Inc.. Responses due by 1/5/2015 (Attachments: # 1 Proposed Order)(Gunn, Uly). Motions referred to David S. Cayer. (Entered: 12/17/2014) |
| 12/22/2014 | 18 | MOTION for Extension of Time to File Response/Reply re: 16 MOTION for Preliminary Injunction by Dillard's, Inc.. Responses due by 1/8/2015 |

| | | (Attachments: # 1 Proposed Order, # 2 Proposed Order Alternative Proposed Order.)(Adams, W.). Motions referred to David S. Cayer. (Entered: 12/22/2014) |
|---|---|---|
| 01/02/2015 | 19 | RESPONSE to Motion re 18 MOTION for Extension of Time to File Response/Reply re: 16 MOTION for Preliminary Injunction by Gildan USA Inc.. Replies due by 1/12/2015 (Attachments: # 1 Exhibit A)(Gunn, Uly) (Entered: 01/02/2015) |
| 01/05/2015 | 20 | Consent MOTION to Seal *Dillard's Memorandum of Law in Opposition to Plaintiff's Motion for Preliminary Injunction and Exhibits 1-3* by Dillard's, Inc.. Responses due by 1/23/2015 (Attachments: # 1 Proposed Order)(Adams, W.). Motions referred to David S. Cayer. (Entered: 01/05/2015) |
| 01/05/2015 | 21 | MEMORANDUM in Support re 20 Consent MOTION to Seal *Dillard's Memorandum of Law in Opposition to Plaintiff's Motion for Preliminary Injunction and Exhibits 1-3* by Dillard's, Inc.. (Adams, W.) (Entered: 01/05/2015) |
| 01/05/2015 | 22 | SEALED RESPONSE *(Sealed - Attorney)* to Motion re: 16 Motion for Preliminary Injunction, 20 Motion to Seal, by Dillard's, Inc.; (available to Dillard's, Inc., Gildan USA Inc.) Replies due by 1/15/2015 (Attachments: # 1 Exhibit 1. Declaration of William Michael Shields, # 2 Exhibit 2. Declaration of Kelly McElyea, # 3 Exhibit 3. Dillard's Gold Label Designs)(Adams, W.) (Entered: 01/05/2015) |
| 01/05/2015 | 23 | Exhibit by Dillard's, Inc.. Exhibit to 22 Sealed Response to Motion, *4. Collection of Third Party Uses* (Adams, W.) (Entered: 01/05/2015) |
| 01/05/2015 | 24 | Exhibit by Dillard's, Inc.. Exhibit to 22 Sealed Response to Motion, *5. GOLDTOE and Design Registration.* (Adams, W.) (Entered: 01/05/2015) |
| 01/05/2015 | 25 | Exhibit by Dillard's, Inc.. Exhibit to 22 Sealed Response to Motion, *6. Illustrated Comparison of Gildan's Trade Dress Definitions* (Adams, W.) (Entered: 01/05/2015) |
| 01/05/2015 | 26 | Exhibit by Dillard's, Inc.. Exhibit to 22 Sealed Response to Motion, *7. Comparison of Gildan and Dillard's Packaging.* (Adams, W.) (Entered: 01/05/2015) |
| 01/05/2015 | 27 | Exhibit by Dillard's, Inc.. Exhibit to 22 Sealed Response to Motion, *8. Goldtoe website pages.* (Adams, W.) (Entered: 01/05/2015) |
| 01/06/2015 | | **TEXT-ONLY ORDER granting 20 Motion to Seal. Entered by Magistrate Judge David S. Cayer on January 6, 2015. (DSC) (Entered: 01/06/2015)** |
| 01/06/2015 | 28 | **ORDER granting 17 Motion for Discovery; granting 18 Motion for Extension of Time to File Response/Reply re 16 MOTION for Preliminary Injunction ( Responses due by 2/13/2015). Signed by District Judge Max O. Cogburn, Jr on 1/6/2015. (eef) (Entered: 01/06/2015)** |
| 01/30/2015 | 29 | Sealed Document *(Sealed - Attorney)*: Supplemental Memorandum in Support of Motion for Preliminary Injunction re: 16 MOTION for Preliminary Injunction by Gildan USA Inc.; (available to Dillard's, Inc., Gildan USA Inc.) (Attachments: # 1 Index of Exhibits, # 2 Exhibit A-1 - Deposition of William |

| | | |
|---|---|---|
| | | Michael Shields (Rough Draft Transcript) (Part 1), # [3] Exhibit A-2 - Deposition of William Michael Shields (Rough Draft Transcript) (Part 2), # [4] Exhibit A-3 - Deposition of William Michael Shields (Rough Draft Transcript) (Part 3), # [5] Exhibit B-1 Deposition of Joel Kelly McElyea (Rough Transcript) (Part 1), # [6] Exhibit B-2 Deposition of Joel Kelly McElyea (Rough Transcript) (Part 2), # [7] Exhibit B-3 Deposition of Joel Kelly McElyea (Rough Transcript) (Part 3)) (Gunn, Uly) (Entered: 01/30/2015) |
| 01/30/2015 | [30] | Exhibit by Gildan USA Inc.. Exhibit to [29] Sealed Document,,, *Exhibit C - Declaration of Sheldon Wolff* (Gunn, Uly) (Entered: 01/30/2015) |
| 01/30/2015 | [31] | Exhibit by Gildan USA Inc.. Exhibit to [29] Sealed Document,,, *Exhibit D - Declaration of Viraf Pudumjee* (Gunn, Uly) (Entered: 01/30/2015) |
| 01/30/2015 | [32] | Exhibit by Gildan USA Inc.. Exhibit to [29] Sealed Document,,, *Exhibit E - Supplemental Declaration of Patricia McHale* (Gunn, Uly) (Entered: 01/30/2015) |
| 01/30/2015 | [33] | Miscellaneous Filing by Gildan USA Inc.. re: [29] Sealed Document,,, *Proposed Preliminary Injunction Order* (Gunn, Uly) (Entered: 01/30/2015) |
| 02/13/2015 | [34] | **ORDER re [16] MOTION for Preliminary Injunction . Signed by District Judge Max O. Cogburn, Jr on 2/13/2015. (eef)** (Entered: 02/13/2015) |
| 02/13/2015 | [35] | SEALED RESPONSE *(Sealed - Attorney)* to Motion re: [16] Motion for Preliminary Injunction, by Defendant, Dillard's, Inc.; (available to Dillard's, Inc., Gildan USA Inc.) Replies due by 2/23/2015 (Attachments: # [1] Exhibit 1. Declaration of William Michael Shields., # [2] Exhibit 2. Declaration of Kelly McElyea., # [3] Exhibit 3. Dillard's Gold Label Designs.)(Adams, W.) (Entered: 02/13/2015) |
| 02/13/2015 | [36] | Attachment by Dillard's, Inc.. Attachment to [35] Sealed Response to Motion, *including Exhibit List with Unsealed Exhibits 4-19.* (Attachments: # [1] Exhibit 4. Collection of Third Party Uses., # [2] Exhibit 5. GOLDTOE and Design Registrationl., # [3] Exhibit 6. Illustrated Comparison of Gildan Trade Dress definitions., # [4] Exhibit 7. Comparison of Gildan and Dillard's packaging., # [5] Exhibit 8. All Gold Toe Sock Screen Shots from website., # [6] Exhibit 9. Dillard's Gold Label packages for other products., # [7] Exhibit 10. Gildan's Cease and Desist Letter., # [8] Exhibit 11. Dillard's Response to Cease and Desist Letter., # [9] Exhibit 12. Table of Gildan's Registrations., # [10] Exhibit 13. Gildan's Gold Toe Design Registration Nos. 308,608 and 2,056,422., # [11] Exhibit 14. Gold Toe and Gold Label comparison., # [12] Exhibit 15. Images of Gold Toe Socks., # [13] Exhibit 16. Gildan Press Release., # [14] Exhibit 17. Declaration of Cecilia M. Sidebottom., # [15] Exhibit 18. Gildan's Responses to Dillard's Requests for Production of Documents., # [16] Exhibit 19. Physical Exemplars submitted to Court.)(Adams, W.) (Entered: 02/13/2015) |
| 02/16/2015 | [37] | NOTICE by Gildan USA Inc. *Withdrawal of Counsel* (Clements, Carla) (Entered: 02/16/2015) |
| 02/17/2015 | | NOTICE of Hearing on Motion re: [16] MOTION for Preliminary Injunction : Motion Hearing set for 3/11/2015 09:30 AM in Courtroom, 401 W Trade St, |

| | | |
|---|---|---|
| | | Charlotte, NC 28202 before District Judge Max O. Cogburn Jr. *This is your only notice - you will not receive a separate document.*(chh) (Entered: 02/17/2015) |
| 03/11/2015 | | Minute Entry: MOTION HEARING held before District Judge Max O. Cogburn, Jr. Re 16 MOTION for Preliminary Injunction . Motion taken under advisement, order to issue. Plaintiffs attorney: Larry Jones, Uly Gunn. Defendants attorney: Samuel Long Jr., Thad Adams III. Court reporter: Jill Turner. (chh) (Entered: 03/11/2015) |
| 03/19/2015 | 39 | TRANSCRIPT of Motion for Preliminary Injunction held on 3/11/2015 before Judge Max O. Cogburn, Jr. **NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have 5 business days to file a *Notice of Intent to Request Redaction* and 21 calendar days to file a *Redaction Request*. If no notice is filed, this transcript will be made electronically available to the public without redaction after 90 calendar days. Transcript may be viewed at the court public terminal or purchased through the court reporter before the 90 day deadline. After that date it may be obtained through PACER. Policy at www.ncwd.uscourts.gov** Release of Transcript Restriction set for 6/18/2015. (Reporter: Jill Turner, 704-350-7495) (Entered: 03/19/2015) |
| 03/23/2015 | 40 | **ORDER denying 16 Motion for Preliminary Injunction. Signed by District Judge Max O. Cogburn, Jr on 3/20/2015. (tmg)** (Entered: 03/23/2015) |
| 03/30/2015 | 41 | MOTION Entry of Discovery Plan by Dillard's, Inc.. Responses due by 4/16/2015 (Attachments: # 1 Exhibit 1. Proposed Discovery Plan)(Adams, W.) (Entered: 03/30/2015) |
| 04/16/2015 | 42 | NOTICE OF INTERLOCUTORY APPEAL as to 40 Order on Motion for Preliminary Injunction by Gildan USA Inc.. Filing fee $ 505, receipt number 0419-2618836. *Use this link www.ca4.uscourts.gov to retrieve 4th Circuit case opening documents, i.e. Appearance of Counsel, Docketing Statement, Disclosure Statement, and Transcript Order Form.* Note: Your Transcript Order Form must be served on the District Court as well as the Circuit Court. (Gunn, Uly) (Entered: 04/16/2015) |
| 04/16/2015 | 43 | MOTION to Stay re 42 Notice of Interlocutory Appeal,, by Gildan USA Inc.. Responses due by 5/4/2015 (Attachments: # 1 Proposed Order)(Gunn, Uly). Motions referred to David S. Cayer. (Entered: 04/16/2015) |
| 04/16/2015 | 44 | Transmission of Notice of Appeal to US Court of Appeals re 42 Notice of Interlocutory Appeal,, (chh) (Entered: 04/16/2015) |
| 04/16/2015 | 45 | RESPONSE to Motion re 41 MOTION Entry of Discovery Plan by Gildan USA Inc.. Replies due by 4/27/2015 (Gunn, Uly) (Entered: 04/16/2015) |
| 04/17/2015 | 46 | USCA Case Number 15--1401 for 42 Notice of Interlocutory Appeal,, USCA Case Manager: S. Wiley. (chh) (Entered: 04/17/2015) |
| 04/27/2015 | 47 | RESPONSE in Opposition re 43 MOTION to Stay re 42 Notice of Interlocutory Appeal,, by Dillard's, Inc.. Replies due by 5/7/2015 (Adams, W.) (Entered: 04/27/2015) |
| 04/29/2015 | 48 | NOTICE by Gildan USA Inc. *re: FRAP 10(b)(1)(B) Certificate Regarding Transcript* (Gunn, Uly) (Entered: 04/29/2015) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 04/30/2015 15:21:14 | | | |
| **PACER Login:** | tmstuckey:2830027:0 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 3:14-cv-00590-MOC-DSC |
| **Billable Pages:** | 5 | **Cost:** | 0.50 |

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| GILDAN USA INC., | |
|      Plaintiff, | |
| v. | CIVIL ACTION NO.  3:14-cv-00590 |
| DILLARD'S, INC., | |
|      Defendant. | |

## COMPLAINT AND JURY TRIAL DEMAND

Plaintiff Gildan USA Inc. ("Plaintiff" or "Gildan"), by and for its complaint against Dillard's, Inc. ("Defendant" or "Dillard's"), alleges as follows:

## INTRODUCTION

1.      This action arises out of Dillard's knowing and intentional copying of Gildan's packaging for its GOLDTOE men's athletic socks.  Specifically, this is an action for:  trade dress infringement, unfair competition, and false designation of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); unfair competition in violation of North Carolina common law; and unfair and deceptive trade practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq.*

## PARTIES

2.      Gildan is a Delaware corporation with its principal place of business at 1980 Clements Ferry Road, Charleston, South Carolina 29492.

3.      Dillard's is a Delaware corporation with its principal place of business at 1600 Cantrell Road, Little Rock, Arkansas 72201.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this case pursuant to 15 U.S.C.

§ 1121 and 28 U.S.C. §§ 1331, 1338 and 1367.

5.      This Court has personal jurisdiction over Dillard's because it has committed

tortious acts within this judicial district, has transacted business within this judicial district

(including operating department stores selling the infringing merchandise within this judicial

district), and has otherwise made or established contacts with this judicial district sufficient to

permit the exercise of personal jurisdiction by this Court over it.

6.      Venue is proper within this Court pursuant to 28 U.S.C. § 1391(b) because a

substantial part of the events and injury giving rise to Gildan's claims is occurring within this

judicial district, and because Dillard's is subject to personal jurisdiction within this judicial

district.

## GILDAN'S GOLDTOE TRADE DRESS

7.      Gildan is a subsidiary of Gildan Activewear Inc. ("Gildan Activewear"), a leading

manufacturer and marketer of branded apparel.  In fiscal year 2013, Gildan Activewear had

consolidated net sales totaling over 2.1 billion dollars.  In the United States, Gildan is one of the

largest suppliers of branded athletic, casual and dress socks to a broad spectrum of retailers.

8.      Among Gildan's apparel products are socks marketed under the GOLDTOE

trademark.

9.      Gildan has adopted a distinctive packaging design (the "GOLDTOE Trade

Dress") for its GOLDTOE men's athletic socks, which trade dress is comprised of: 1) a blue

band with contrasting gold elements and white lettering for its word mark having two

components, the first of which is the term "GOLD"; 2) a gold, partially-serrated rectangle on the

2

upper-right side of the front of the packaging informing consumers how many pairs of socks are included in the package; and 3) side panels which incorporate the color gold. The GOLDTOE Trade Dress is depicted in **Exhibit 1** attached hereto.

10.     The GOLDTOE Trade Dress is inherently distinctive. Alternatively, and in any event, the GOLDTOE Trade Dress has acquired distinctiveness (which acquired distinctiveness is sometimes referred to as "secondary meaning") as a branding device for Gildan's GOLDTOE brand men's athletic socks.

11.     Upon information and belief, at the time Gildan adopted the GOLDTOE Trade Dress, no other sock manufacturer, marketer, or retailer sold socks in the United States in a package having the constituent elements of the GOLDTOE Trade Dress.

12.     Gildan sells socks in the GOLDTOE Trade Dress packaging in numerous major retail stores throughout the United States, including Kohl's, JC Penney, Belk, Dillard's, Steinmart, and TJ Maxx, among others.

13.     More than 91 million pairs of Gildan's GOLDTOE men's athletic socks in the GOLDTOE Trade Dress packaging have been purchased in the United States, generating over 260 million dollars in retail sales.

14.     By virtue of its continuous and extensive use of the GOLDTOE Trade Dress in commerce since at least as early as March of 2011, Gildan owns common law rights in its GOLDTOE Trade Dress.

15.     Through the extensive, continuous use and promotion of the GOLDTOE Trade Dress, Gildan has developed substantial goodwill in that trade dress, and the GOLDTOE Trade Dress is associated exclusively with the men's athletic socks offered by Gildan under its GOLDTOE mark.

## DILLARD'S INFRINGEMENT OF THE GOLDTOE TRADE DRESS

16.    As noted above, Gildan's GOLDTOE men's athletic socks are sold in the GOLDTOE Trade Dress packaging in Dillard's department stores.

17.    Dillard's also sells its own men's athletic socks under the trademark GOLD LABEL.

18.    Recently, Dillard's began selling its GOLD LABEL socks in interstate commerce in packaging (the "Infringing GOLD LABEL Packaging") that copies all of the key elements of the GOLDTOE Trade Dress.  Specifically, Dillard's GOLD LABEL socks are being sold in a package that features:  1) a blue band with contrasting gold elements and white lettering for its word mark having two components, the first of which is the term "GOLD"; 2) a gold, partially-serrated rectangle on the upper-right side of the front of the packaging informing consumers how many pairs of socks are included in the package; and 3) side panels which incorporate the color gold.  The Infringing GOLD LABEL Packaging is depicted in **Exhibit 2** attached hereto.

19.    Dillard's socks in the Infringing GOLD LABEL Packaging and Gildan's GOLDTOE men's athletic socks are marketed through the same channels of trade and to the same consumers.

20.    Dillard's adoption of the Infringing GOLD LABEL Packaging for similar goods as Gildan is likely to cause consumers to be mistaken, confused or deceived into thinking that Dillard's socks originate from, or are associated or affiliated with or sponsored or endorsed by, Gildan and/or its GOLDTOE socks.

21.    Additionally, and further exacerbating the likelihood of confusion arising from the imitative Infringing GOLD LABEL Packaging, Dillard's has displayed for sale both

4

GOLDTOE and GOLD LABEL men's athletic socks in retail displays that bear a sign with the GOLD LABEL mark at the top.  (See images attached as **Exhibit 3**).

22.     Gildan has not licensed or otherwise authorized Dillard's to use or mimic the GOLDTOE Trade Dress.

23.     Dillard's recently has reduced its orders for Gildan's GOLDTOE socks.  Having been a retailer of Gildan's GOLDTOE men's athletic socks, Dillard's is well aware of the GOLDTOE Trade Dress and, upon information and belief, Dillard's has intentionally copied the GOLDTOE Trade Dress in order to transition its customers away from the well-known GOLDTOE brand and to Dillard's GOLD LABEL socks.

**FIRST CLAIM FOR RELIEF**
**(TRADE DRESS INFRINGEMENT, FALSE DESIGNATION OF ORIGIN AND UNFAIR COMPETITION UNDER 15 U.S.C. § 1125(a),** *et seq.***)**

24.     Gildan repeats and incorporates by reference, as though specifically pleaded herein, the allegations of paragraphs 1 through 23 of this complaint.

25.     The GOLDTOE Trade Dress is nonfunctional and inherently distinctive.

26.     In addition, Gildan established secondary meaning in the GOLDTOE Trade Dress in connection with its men's athletic socks before Dillard's first use of the Infringing GOLD LABEL Packaging.

27.     Dillard's use in commerce of a trade dress that is confusingly similar to the GOLDTOE Trade Dress in connection with Dillard's GOLD LABEL socks constitutes a use in interstate commerce that is likely to cause confusion, mistake or deception among consumers as to the source or origin of Dillard's GOLD LABEL socks, such that consumers may believe that Dillard's GOLD LABEL socks are sponsored by, endorsed by, approved by, licensed by, authorized by, or affiliated or connected with Gildan and/or its GOLDTOE men's athletic socks.

5

28.     As such, Dillard's manufacture, distribution and sale of its GOLD LABEL socks in the Infringing GOLD LABEL Packaging violates 15 U.S.C. § 1125(a).

29.     Upon information and belief, Dillard's has intentionally, knowingly and willfully adopted and used the Infringing GOLD LABEL Packaging.

30.     As a result of these wrongful acts, Gildan is entitled to recover actual and treble damages, reasonable attorneys' fees, and the costs of this litigation pursuant to 15 U.S.C. § 1117.

31.     In addition, Dillard's acts are causing and continue to cause Gildan harm in the nature of not only lost sales and revenue, but also irreparable harm by virtue of the loss of control over its reputation, the destruction of the distinctiveness of its packaging trade dress, and the loss of substantial consumer goodwill.  This irreparable harm to Gildan will continue, without any adequate remedy at law, unless and until Dillard's unlawful conduct is enjoined by this Court.

## SECOND CLAIM FOR RELIEF
### (COMMON LAW UNFAIR COMPETITION)

32.     Gildan repeats and incorporates by reference, as though specifically pleaded herein, the allegations of paragraphs 1 through 31 of this complaint.

33.     Dillard's use of an imitation of the GOLDTOE Trade Dress in this state and elsewhere, without the authorization or consent of Gildan, in connection with Dillard's GOLD LABEL socks, is likely to cause confusion, mistake or deception among consumers as to the source, origin, sponsorship or affiliation of Dillard's GOLD LABEL socks and constitutes trade dress infringement, unfair competition, and misappropriation of Gildan's goodwill and reputation in violation of North Carolina common law.

34.     Upon information and belief, Dillard's use of its Infringing GOLD LABEL Packaging is a bad faith attempt to trade off the goodwill of Gildan.

6

35.    By virtue of the foregoing, Dillard's has caused Gildan to suffer injuries for which Gildan is entitled to recover substantial monetary remedies.  In addition, Dillard's acts are causing and continue to cause Gildan harm in the nature of not only lost sales and revenue, but also irreparable harm by virtue of the loss of control over its reputation, the destruction of the distinctiveness of its packaging trade dress, and the loss of substantial consumer goodwill.  This irreparable harm to Gildan will continue, without any adequate remedy at law, unless and until Dillard's unlawful conduct is enjoined by this Court.

<div align="center">

**THIRD CLAIM FOR RELIEF**
**(UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER N.C. GEN. STAT. § 75-1.1)**

</div>

36.    Gildan repeats and incorporates by reference, as though specifically pleaded herein, the allegations of paragraphs 1 through 35 of this complaint.

37.    There is invaluable goodwill in Gildan's GOLDTOE Trade Dress.  Gildan has expended considerable time and money advertising and promoting the GOLDTOE brand in conjunction with the GOLDTOE Trade Dress.

38.    Dillard's has actual knowledge of Gildan's rights in its GOLDTOE Trade Dress, as Gildan's GOLDTOE men's athletic socks are sold in Dillard's department stores.  Upon information and belief, Dillard's intentionally copied the distinctive elements of the GOLDTOE Trade Dress for use in its Infringing GOLD LABEL Packaging for its men's athletic socks.

39.    Upon information and belief, Dillard's has realized unjust profits, gains and advantages as a proximate result of its infringing conduct.

40.    Dillard's use of its Infringing GOLD LABEL Packaging, which incorporates the elements of Gildan's GOLDTOE Trade Dress, is use in commerce that is likely to cause consumers to be confused, mistaken or deceived as to the affiliation, connection or association of

LEGAL02/35132506v2

Dillard's with Gildan and/or its GOLDTOE men's athletic socks, or as to the origin, sponsorship or approval of Dillard's men's athletic socks by Gildan, in violation of N.C. Gen. Stat. § 75-1.1.

41.    Dillard's unfair and deceptive activities have damaged Gildan and, unless enjoined, will continue to damage Gildan, including causing irreparable injury to Gildan for which Gildan has no adequate remedy at law.

42.    Gildan is entitled to and seeks recovery from Dillard's of all damages caused by, and all profits earned unjustly by, Dillard's actions in violation of N.C. Gen. Stat. § 75-1.1, and to have such damages trebled pursuant to N.C. Gen. Stat. § 75-16.

43.    Gildan is also entitled to and seeks recovery of its reasonable attorneys' fees pursuant to N.C. Gen. Stat. § 75-16.1.

## PRAYER FOR RELIEF

WHEREFORE, Gildan demands a trial by jury on all issues so triable and judgment in its favor, and against Dillard's, for the following:

1.    That Dillard's be adjudged to have infringed Dillard's GOLDTOE Trade Dress;

2.    That Dillard's infringement and other wrongdoings be adjudged willful in nature;

3.    That, pursuant to 15 U.S.C. § 1116(a), Dillard's, its officers, agents, servants, employees, attorneys and those persons in active concert or participation with any of them, be preliminarily and permanently enjoined from directly or indirectly infringing or otherwise violating Gildan's GOLDTOE Trade Dress in this country by, among other things, the following:

a.    Manufacturing, having manufactured, marketing, promoting, printing, using, selling, distributing, or otherwise disseminating, either directly or indirectly in this country, any goods, services, packaging materials, labels, advertisements or promotional materials of any sort in any medium of communication, or reproducing or causing others

8

to reproduce any such materials, incorporating the GOLDTOE Trade Dress (unless such products are provided by Gildan), including, without limitation, the Infringing GOLD LABEL Packaging; and

   b.  Using any false or misleading designations of origin or false or misleading descriptions or representations of fact in this country in connection with the manufacture, production, distribution, circulation, sale, offering for sale, advertising, promotion, or display of its products or services under the GOLDTOE Trade Dress, including, without limitation, use of the Infringing GOLD LABEL Trade Dress;

   4.  That Dillard's, its officers, agents, servants, employees, attorneys and those persons in active concert or participation with any of them, be directed to file with this Court and serve on Plaintiff within thirty (30) days after service of the injunction, a report in writing and under oath, setting forth in detail the manner and form in which Dillard's has complied with the injunction;

   5.  That, pursuant to 15 U.S.C. § 1118, Dillard's be ordered to destroy all advertisements, packaging and promotional materials or any other materials bearing the GOLDTOE Trade Dress;

   6.  Pre-judgment and post-judgment interest and costs by virtue of Dillard's infringement of the GOLDTOE Trade Dress;

   7.  An award of damages and/or profits to compensate Gildan for Dillard's infringement, pursuant to 15 U.S.C. § 1117;

   8.  An award of three times the amount of damages and/or Dillard's profits to compensate Gildan for Dillard's deliberate and willful acts of infringement;

9

9.     An award of damages and/or Dillard's profits for unfair or deceptive trade practices under N.C. Gen. Stat. § 75-1.1 and that such damages and/or Dillard's profits be trebled in accordance with N.C. Gen. Stat. § 75-16;

10.     That Dillard's be directed to pay Gildan's reasonable costs and attorneys' fees incurred in connection with this lawsuit, pursuant to 15 U.S.C. § 1117 and N.C. Gen. Stat. § 75-16.1; and

11.     That Gildan be awarded such other and further relief as this Court may deem just and proper.

Respectfully submitted this 22nd day of October, 2014.

> *s/Larry C. Jones*
> Larry C. Jones
> larry.jones@alston.com
> Carla H. Clements
> carla.clements@alston.com
> ALSTON & BIRD LLP
> Bank of American Plaza
> 101 South Tryon Street, Suite 4000
> Charlotte, North Carolina 28280-4000
> Tel.: (704) 444-1000
> Fax: (704) 444-1111
>
> Of Counsel:
>
> Uly S. Gunn
> sam.gunn@alston.com
> ALSTON & BIRD LLP
> One Atlantic Center
> 1201 West Peachtree Street NE
> Atlanta, Georgia 30309-3424
> Tel.: (404) 881-7000
> Fax: (404) 881-7777
>
> *Counsel for Plaintiff Gildan USA Inc.*

10

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**

_____
                                                    )
GILDAN USA INC.,                                    )
                                                    )
                          Plaintiff,                )
                                                    )
            v.                                      )        Case No. 3:14-cv-00590
                                                    )
DILLARD'S, INC.,                                    )
                                                    )
                          Defendant.                )
_____ )


**DEFENDANT DILLARD'S, INC.'S ANSWER TO COMPLAINT**

As and for its Answer to the Complaint against it by Gildan USA Inc. ("Gildan"),

Dillard's, Inc. ("Dillard's") Answers and says:

1.      Dillard's admits that Gildan has asserted the specified claims against it, but denies

that any of the asserted claims have any basis in law or fact.

2.      Dillard's admits the allegations of Paragraph 2 of the Complaint upon information

and belief.

3.      Dillard's admits the allegations of Paragraph 3 of the Complaint.

4.      Dillard's admits the allegations of Paragraph 4 of the Complaint.

5.      Dillard's admits that it conducts business in this jurisdiction, and denies the

remaining allegations of Paragraph 5 of the Complaint.

6.      Dillard's admits that it is subject to personal jurisdiction in this Court, and denies

the remaining allegations of Paragraph 6 of the Complaint.

1

7.      Dillard's admits that Gildan is a marketer of branded apparel.  Dillard's is without sufficient knowledge to admit or deny the remaining allegations of Paragraph 7 of the Complaint, and therefore denies them.

8.      Dillard's admits the allegations of Paragraph 8 of the Complaint.

9.      Dillard's admits that Gildan has adopted and is using a label containing certain colors, color combinations and other materials, as recited.  Dillard's denies that the Gold Toe label is distinctive or has any trade dress significance.   Otherwise, Dillard's denies the allegations of Paragraph 9 of the Complaint.

10.      Dillard's denies the allegations of Paragraph 10 of the Complaint.

11.      Dillard's denies the allegations of Paragraph 11 of the Complaint.

12.      Dillard's admits the allegations of Paragraph 12 of the Complaint upon information and belief.

13.      Dillard's is without sufficient knowledge to admit or deny the remaining allegations of Paragraph 13 of the Complaint, and therefore denies them.

14.      Dillard's denies the allegations of Paragraph 14 of the Complaint.

15.      Dillard's denies the allegations of Paragraph 15 of the Complaint.

16.      Dillard's admits that Gildan's men's socks are sold at Dillard's, and otherwise denies the allegations of Paragraph 16.

17.      Dillard's admits the allegations of Paragraph 17.

18.      Dillard's admits that it sells GOLD LABEL™ brand hosiery in interstate commerce.  The appearance of the GOLD LABEL™ brand hosiery is a matter of public record.  Otherwise, the allegations of Paragraph 18 of the Complaint are denied.

2

19.    Dillard's admits that the GOLD LABEL™ brand hosiery products and Gold Toe hosiery products travel in the same channels of trade.  Otherwise, the allegations of Paragraph 19 of the Complaint are denied.

20.    Dillard's denies the allegations of Paragraph 20 of the Complaint.

21.    Dillard's admits the allegation relating to the GOLD LABEL™ signage, and otherwise denies the allegations of Paragraph 21 of the Complaint.

22.    Dillard's denies the allegations of Paragraph 22 of the Complaint, no license or other authorization from Gildan for Dillard's to carry out its lawful business activities being required.

23.    Dillard's denies the allegations of Paragraph 23 of the Complaint.

24.    Dillard's incorporates Paragraphs 1-23 of this Answer.

25.    Dillard's denies the allegations of Paragraph 25 of the Complaint.

26.    Dillard's denies the allegations of Paragraph 26 of the Complaint.

27.    Dillard's denies the allegations of Paragraph 27 of the Complaint.

28.    Dillard's denies the allegations of Paragraph 28 of the Complaint.

29.    Dillard's denies the allegations of Paragraph 29 of the Complaint.

30.    Dillard's denies the allegations of Paragraph 30 of the Complaint.

31.    Dillard's denies the allegations of Paragraph 31 of the Complaint.

32.    Dillard's incorporates Paragraphs 1-31 of this Answer.

33.    Dillard's denies the allegations of Paragraph 33 of the Complaint.

34.    Dillard's denies the allegations of Paragraph 34 of the Complaint.

35.    Dillard's denies the allegations of Paragraph 35 of the Complaint.

36.    Dillard's incorporates Paragraphs 1-35 of the Complaint.

3

37.    Dillard's denies the allegations of Paragraph 37 of the Complaint.

38.    Dillard's denies the allegations of Paragraph 38 of the Complaint.

39.    Dillard's denies the allegations of Paragraph 39 of the Complaint.

40.    Dillard's denies the allegations of Paragraph 40 of the Complaint.

41.    Dillard's denies the allegations of Paragraph 41 of the Complaint.

42.    Dillard's denies the allegations of Paragraph 42 of the Complaint.

43.    Dillard's denies the allegations of Paragraph 43 of the Complaint.


## AS AND FOR A FIRST AFFIRMATIVE DEFENSE
### Lack of Inherent Distinctiveness

44.    The trade dress asserted by Gildan is not inherently distinctive, but rather comprises only elements such as colors, common color combinations and admittedly functional elements that are incapable of being inherently distinctive, as a matter of law.


## AS AND FOR A SECOND AFFIRMATIVE DEFENSE
### Lack of Acquired Distinctiveness

45.    The trade dress asserted by Gildan has not acquired distinctiveness during its short period of use, but rather comprises only elements such as colors, common color combinations and admittedly functional elements that are incapable of acquiring distinctiveness, as a matter of law, even if such use was exclusive to Gildan.

46.    However, the trade dress asserted by Gildan has not been used exclusively by Gildan to indicate Gildan as the sole origin of the hosiery products bearing the elements for which Gildan asserts trade dress protection.  Rather, Gildan itself manufactures, sells and distributes hosiery products that are identical and very similar to the hosiery products labeled

according to the asserted trade dress with different labels bearing different colors, color combinations and admittedly functional elements that deprive Gildan of any claim of acquired distinctiveness.

47.    In addition to Gildan's own use of different colors, color combinations and admittedly functional elements to label identical and similar hosiery products, numerous third party manufacturers, sellers and distributors of hosiery products presently use, and have used from a time prior to Gildan's adoption and use of the elements for which it claims trade dress, the same and similar colors, combinations of colors and functional material which deprive Gildan of any legal basis for claiming that its asserted trade dress is so distinctive that it serves to indicate the origin of the products labeled with the asserted trade dress as being solely from Gildan.  Such colors and combinations of colors include the colors blue and gold.

<div align="center">

AS AND FOR A THIRD AFFIRMATIVE DEFENSE
**Lack of Confusing Similarity**

</div>

48.    Without regard to whether Gildan's combination of colors and other elements comprise protectable trade dress, Dillard's prominently displays its own hosiery products with labels that include its own GOLD LABEL[TM] and ROUNDTREE AND YORKE[®] trademarks together with different colors and color combinations, thus clearly and distinctly identifying to the consumer and others that the hosiery products originate from Dillard's, and only from Dillard's.  Therefore, the accused Dillard's hosiery products and their manner of display and distribution are not likely to cause confusion, mistake or to deceive as to the affiliation, connection or association with Gildan, or as to the origin, sponsorship or approval of Dillard's or Gildan's hosiery products, services or commercial activities in accordance with Section 43(a) of the Trademark Act, 15 U.S.C. § 1125(a).

<div align="center">5</div>

## AS AND FOR A FOURTH AFFIRMATIVE DEFENSE
### Functionality of the Asserted Trade Dress

48.     The asserted trade dress is functional within the meaning of Section 43(a)(3) of the Trademark Act, 15 U.S.C. § 1125(a)(3).   Because in this civil action for trade dress infringement Gildan does not assert ownership of a registration on the principal register of the asserted trade dress, Gildan has the burden of proving that the matter sought to be protected is not functional.  *Id.*  Gildan cannot carry this burden because the matter sought to be protected is, as a matter of fact and of law, functional, and therefore not protectable.

## AS AND FOR A FIFTH AFFIRMATIVE DEFENSE
### The State Claims are Preempted by and Duplicative of Federal Law

49.     The Second and Third Claims for Relief asserted by Gildan are preempted by Federal Statute, in that the acts complained of comprise offenses covered by Federal Statute and do not rise to the level of violations of either the Common Law or of North Carolina' s Unfair Competition Statute, §75-1.1, et seq.  Any alleged violation of law by Dillard's was and is inadvertent and not in bad faith.

## AS AND FOR A SIXTH AFFIRMATIVE DEFENSE
### No False Designation of Origin or Unfair Competition

50.     The label used by Dillard's to display its hosiery products accurately and truthfully represents the origin of the hosiery products displayed and offered for sale by Dillard's.  Further, the dominant appearance of the Gold Toe trademark on the Gildan products and the dominant appearance of Dillard's GOLD LABEL™ and ROUNDTREE AND YORKE® trademarks by themselves and in combination with other product features clearly indicate the different origins of Gildan's and Dillard's products.  To the extent that Gildan's and Dillard's

6

-23-

products are displayed in proximity to each other, the distinctively different overall appearance of the respective products is thereby more easily discerned by the consumer.

## PRAYER FOR RELIEF

WHEREFORE, Dillard's prays the Court to:

(1)      dismiss the Complaint in its entirety with prejudice;

(2)      award Dillard's a reasonable attorneys fee based on the frivolous and baseless allegations contained in the Complaint;

(3)      award Dillard's all other costs incurred by it in defending this action;

(4)      enjoin Gildan from making further frivolous and baseless allegations of the type contained in the Complaint;

(5)      that all issues so triable be tried to a jury; and

(6)      such other and further relief as the Court may determine is just and proper.

This the 19th day of November, 2014.

Respectfully submitted,

s/ W. Thad Adams, III
W. Thad Adams, III
North Carolina Bar Number 000020
Attorney for Defendant
tadams@slk-law.com

OF COUNSEL:

W. Thad Adams, III
(N.C. Bar Number 000020)
Samuel A. Long, Jr.
(N.C. Bar Number 46588)
SHUMAKER, LOOP & KENDRICK, LLP
First Citizens Bank Plaza
128 South Tryon Street

Suite 1800
Charlotte, NC  28202
Tel:  (704) 945-2901
Fax:  (704) 332-1197
Email:  tadams@slk-law.com
          along@slk-law.com

8

**-25-**

**CERTIFICATE OF SERVICE**

I hereby certify that on November 19, 2014, I caused the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

Respectfully submitted,

s/ W. Thad Adams, III
W. Thad Adams, III
North Carolina Bar Number 000020
Attorney for Defendant
tadams@slk-law.com

9

-26-

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**

GILDAN USA INC.,

      Plaintiff,

v.

DILLARD'S, INC.,

      Defendant.

CIVIL ACTION NO.  3:14-CV-00590-MOC-DSC

## <u>PLAINTIFF GILDAN USA INC.'S MOTION FOR PRELIMINARY INJUNCTION</u>

Pursuant to Fed.R.Civ.P. 65 and 15 U.S.C. § 1116(a), and upon the accompanying memorandum of law and declarations submitted concurrently herewith, and all pleadings in this action and exhibits thereto, Plaintiff Gildan USA Inc., by its attorneys, Alston & Bird LLP, hereby moves this Court for an order preliminarily enjoining Defendant Dillard's, Inc. from its use of packaging that infringes Plaintiff's GOLDTOE Trade Dress.  The specifics of the relief requested are detailed in the accompanying proposed preliminary injunction order.

Respectfully submitted this 17th day of December, 2014.

s/ Larry C. Jones
Larry C. Jones
larry.jones@alston.com
Carla H. Clements
carla.clements@alston.com
ALSTON & BIRD LLP
Bank of American Plaza
101 South Tryon Street, Suite 4000
Charlotte, North Carolina 28280-4000
Tel.: (704) 444-1000
Fax: (704) 444-1111


Uly S. Gunn (*admitted pro hac vice*)
sam.gunn@alston.com
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street NE
Atlanta, Georgia 30309-3424
Tel.: (404) 881-7000
Fax: (404) 881-7777

*Counsel for Plaintiff Gildan USA Inc.*


CERTIFICATE OF COMPLIANCE WITH
LCvR 7.1(B)

I hereby certify that, in compliance with LCvR 7.1(B), I conferred with Plaintiff's attorney, Thad Adams, and attempted in good faith, but without success, to resolve the issue raised in this motion.


s/ Larry C. Jones
Larry C. Jones

2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**

GILDAN USA INC.,

      Plaintiff,

v.

DILLARD'S, INC.,

      Defendant.

CIVIL ACTION NO.  3:14-CV-00590-MOC-DSC

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 17, 2014, I electronically filed the foregoing *Plaintiff Gildan USA Inc.'s Motion for Preliminary Injunction* with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to all attorneys of record.

                                   s/ Uly S. Gunn
                                   Uly S. Gunn

-29-

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA

GILDAN USA INC.,

    Plaintiff,

v.

                              CIVIL ACTION NO. 3:14-CV-00590-
                              MOC-DSC

DILLARD'S, INC.,

    Defendant.

## DECLARATION OF PATRICIA MCHALE IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

I, PATRICIA MCHALE, hereby declare as follows:

1.      My name is Patricia McHale. I am of legal age and under no legal disability. I have personal knowledge of the facts stated in this affidavit and know them to be true and correct.

2.      I currently hold the position of Vice President Marketing of Gildan USA Inc. ("Gildan"). In that position, I am in charge of the marketing of the GOLDTOE brand of socks. I have been responsible for the marketing of GOLDTOE socks since 2000 when I began working for one of Gildan's predecessors-in-interest, Great American Knitting Mills, Inc., and I have been in charge of the marketing of GOLDTOE socks continuously since that time.

3.      Gildan Activewear, Inc. ("Gildan Activewear") the parent company of Gildan, is a leading manufacturer and marketer of branded apparel.

4.      In fiscal year 2013, Gildan Activewear had consolidated net sales that totaled over 2.1 billion dollars.

5.      Gildan's GOLDTOE socks are among Gildan's most popular brands.

LEGAL02/35245683v1

**-30-**

6.    Gildan and its predecessors-in-interest have manufactured and sold GOLDTOE or GOLD TOE brand socks since at least as early as 1934.

7.    Today, GOLDTOE socks are sold through numerous retailers in the United States, including Macy's, Costco, Kohl's, JCPenney, Belk, Dillard's, Stein Mart, and T.J. Maxx.

8.    Millions of dollars are spent annually by Gildan in advertising and promoting GOLDTOE brand socks in this country.

9.    In 2010, Gildan decided to create a new, fresh and distinctive set of packaging for its GOLDTOE socks.

10.    That packaging was introduced in March 2011, and since then GOLDTOE brand men's and women's socks have been marketed and sold in packaging having certain graphic features.

11.    The distinctive packaging of GOLDTOE men's and women's socks is comprised of: 1) a colored band with contrasting white or gold lettering for its word mark having two components, the first of which is the term "GOLD"; 2) a rectangle of contrasting color in the upper-right portion of the front of the packaging; and 3) side panels which incorporate the color gold (hereinafter, the "GOLDTOE Trade Dress").

12.    To Gildan's knowledge, prior to the recent commencement of Dillard's mimicry, no other brand of socks, including men's athletic socks (aka "sport socks") or other socks, in this country was sold in packaging incorporating the combination of elements comprising the GOLDTOE Trade Dress.

13.    The GOLDTOE Trade Dress can be seen across the entire lines of men's and women's GOLDTOE socks.

14.    A photograph depicting the retail packaging of GOLDTOE men's Heritage athletic socks is attached hereto as Exhibit A.

15.    A photograph depicting the retail packaging of GOLDTOE men's Premier athletic socks is attached hereto as Exhibit B.

16.    A photograph depicting the retail packaging of GOLDTOE men's Heritage dress/casual socks is attached hereto as Exhibit C.

17.    A photograph depicting the retail packaging of GOLDTOE men's Premier dress/casual socks is attached hereto as Exhibit D.

18.    A photograph depicting the retail packaging of GOLDTOE men's (regular) dress/casual socks is attached hereto as Exhibit E.

19.    Photographs depicting the retail packaging of GOLDTOE women's Heritage dress/casual socks are attached hereto as Exhibits F and G.

20.    A photograph depicting the retail packaging of GOLDTOE women's Premier dress/casual socks is attached hereto as Exhibit H.

21.    Gildan also sells two other lines of men's and women's socks which include on their packages indications that those socks are from the producers of GOLDTOE brand socks. However, those lines of socks are branded more prominently as SIGNATURE GOLD brand and POWER-SOX brand socks, and, as such, their packaging does not incorporate the GOLDTOE Trade Dress.

22.    As can be seen in Exhibit A, the GOLDTOE men's Heritage athletic socks incorporate the GOLDTOE Trade Dress by having packaging comprised of: 1) a blue colored band with contrasting white lettering for its word mark having two components, the first of which is the term "GOLD"; 2) a rectangle of contrasting color, gold or green, in the upper-right

LEGAL02/35245683v1

3

-32-

portion of the front of the packaging; and 3) side panels which incorporate the color gold (hereinafter, the "GOLDTOE Men's Athletic Socks Trade Dress").

23.    Gildan has enjoyed tremendous success in its sales of GOLDTOE brand socks in its distinctive GOLDTOE Trade Dress.

24.    Gildan's current sales (wholesale) of GOLDTOE brand socks in the GOLDTOE Trade Dress in this country exceed $150 million annually. That represents annual sales of nearly 100 million pairs of socks in the GOLDTOE Trade Dress.

25.    Of that volume of sales, men's socks account for more than 2/3 of the sales, and, of that amount, men's athletic socks account for nearly 40% of the men's sock sales.

26.    Men's athletic sock sales alone account for about 30% of the total sales of GOLDTOE brand socks sold in this country.

27.    The annual U.S. sales of men's athletic socks in the GOLDTOE Trade Dress are about $50 million dollars (wholesale) and about 30 million pairs.

28.    Gildan's socks in the GOLDTOE Trade Dress enjoy a market share of more than 27% of the entire U.S. market for men's socks sold in department stores, ranking it No. 1 in sales among all brands in this country (ahead of such other well-known competitors as Calvin Klein, Polo, Hanes, adidas and Nike).

29.    In the men's athletic socks subcategory, Gildan's socks in the GOLDTOE Men's Athletic Socks Trade Dress rank No. 2 in sales among all brands sold in department stores, trailing only Nike in that subcategory.

30.    Gildan annually spends about $5 million advertising and promoting its GOLDTOE brand socks, all of which socks are packaged in the GOLDTOE Trade Dress. This figure is exclusive of marketing discounts, allowances, and other considerations that are agreed

4

LEGAL02/35245683v1

upon with Gildan's vendors and deducted from invoices. Of that amount, about $3 million is advertising and promotion of its men's GOLDTOE socks.

31.    Since 2011, Gildan has spent approximately $18 million advertising and promoting the GOLDTOE brand, including the GOLDTOE Trade Dress.

32.    Those expenses are incurred in such media as national print ads, digital advertising, out-of-home advertising (e.g., kiosks), radio and the GoldToe website, www.goldtoe.com.

33.    Print ads promoting GOLDTOE brand socks regularly appear in such well-known and widely distributed publications as *GQ, Money, Men's Health, Golf Digest* and *Wired*.

34.    As is customary in the industry, Gildan also underwrites significant expenses of some of its retailer customers through Gildan's cooperative advertising program. Annually, millions of consumers in this country receive newspaper inserts promoting GOLDTOE brand socks being sold in particular retail store chains, a substantial portion of the cost of which is paid by Gildan through its cooperative advertising program.

35.    Other means of advertising and promoting the GOLDTOE brand socks include direct mail pieces, hundreds of thousands of which are sent to the purchasing public annually.

36.    Gildan's GOLDTOE socks have been sold in Dillard's stores since prior to the March 2011 introduction of packaging featuring the GOLDTOE Trade Dress.

37.    Gildan has observed that Dillard's has recently decreased its purchases of GOLDTOE socks.

38.    In Gildan's view, it is apparent that this reduction in Dillard's purchases of GOLDTOE socks is part of Dillard's systematic effort to supplant sales of GOLDTOE socks with those of its own GOLD LABEL brand.

5

39.    Coincident with Dillard's reduced purchases of GOLDTOE socks, Dillard's recently began selling its house-branded GOLD LABEL men's athletic socks in new packaging that incorporates the elements of the GOLDTOE Trade Dress.

40.    Dillard's GOLD LABEL men's athletic socks are now being sold in a package that incorporates: 1) a blue colored band with contrasting white lettering for its word mark having two components, the first of which is the term "GOLD"; 2) a gold rectangle in the upper-right portion of the front of the packaging; and 3) side panels which incorporate the color gold.

41.    Dillard's has also included a serrated bottom edge of the rectangle in the upper-right portion of the front of the packaging, just as Gildan uses such a serrated edge on the bottom of its corresponding rectangle in its GOLDTOE Men's Athletic Socks Trade Dress and in the packaging of most other sub-categories of its GOLDTOE brand socks.

42.    Further, the blue color chosen by Dillard's for its men's athletic socks corresponds to the color blue used by Gildan in its packaging for its men's athletic socks, the GOLDTOE Men's Athletic Socks Trade Dress.

43.    Gildan has in no way licensed or authorized Dillard's to mimic the GOLDTOE Trade Dress, of which trade dress Dillard's was well aware due to its long-standing status as a retailer of GOLDTOE socks, including GOLDTOE men's athletic socks.

44.    In Gildan's view, in Dillard's effort to transition its customers away from GOLDTOE socks and toward Dillard's own GOLD LABEL socks, Dillard's intentionally copied the GOLDTOE Trade Dress.

45.    Not only has Dillard's decided to use the GOLD LABEL designation on its house brand socks, but also it has taken such deceptively imitative steps as designating its

6

LEGAL02/35245683v1

counterparts to the GOLDTOE "Canterbury" and "Metropolitan" socks as its "Canter" and "Metro" socks.

46.     Further, since the back of the GOLDTOE band includes a white sock with gold features in the toe area, Dillard's has added gold coloring in the area of the toes of the white sock on the back of its infringing band.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

DATED this 17 day of December, 2014

Patricia M. McHale

Patricia McHale

LEGAL02/35245683v1
Case 3:14-cv-00590-MOC-DSC   Document 16-3   Filed 12/17/14   Page 7 of 24

-36-

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA**

GILDAN USA INC.,

    Plaintiff,

v.

DILLARD'S, INC.,

    Defendant.

CIVIL ACTION NO.  3:14-CV-00590-MOC-DSC

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 17, 2014, I electronically filed the foregoing

*Declaration of Patricia McHale in Support of Motion for Preliminary Injunction* with the Clerk

of Court using the CM/ECF system, which will automatically send e-mail notification of such

filing to all attorneys of record.

<u>s/ Uly S. Gunn</u>
Uly S. Gunn

# Exhibit A

Case 3:14-cv-00590-MOC-DSC   Document 16-3   Filed 12/17/14   Page 9 of 24



Case 3:14-cv-00590-MOC-DSC   Document 16-3   Filed 12/17/14   Page 10 of 24

-39-

# Exhibit B

Case 3:14-cv-00590-MOC-DSC   Document 16-3   Filed 12/17/14   Page 11 of 24



# Exhibit C

Case 3:14-cv-00590-MOC-DSC   Document 16-3   Filed 12/17/14   Page 13 of 24



Case 3:14-cv-00590-MOC-DSC   Document 16-3   Filed 12/17/14   Page 14 of 24

**-43-**

# Exhibit D

Case 3:14-cv-00590-MOC-DSC   Document 16-3   Filed 12/17/14   Page 15 of 24



Case 3:14-cv-00599-MOC-DSC   Document 16-3   Filed 12/17/14   Page 15 of 24

-45-

# Exhibit E



Case 3:14-cv-00590-MOC-DSC   Document 16-3   Filed 12/17/14   Page 18 of 24

**-47-**

# Exhibit F



Case 3:14-cv-00590-MOC-DSC   Document 16-3   Filed 12/17/14   Page 20 of 24

**-49-**

# Exhibit G



Case 3:14-cv-00590-MOC-DSC   Document 16-3   Filed 12/17/14   Page 22 of 24

# Exhibit H

Case 3:14-cv-00590-MOC-DSC   Document 16-3   Filed 12/17/14   Page 23 of 24



## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA

GILDAN USA INC.,

      Plaintiff,

v.

DILLARD'S, INC.,

      Defendant.

CIVIL ACTION NO.  3:14-CV-00590-MOC-DSC

### DECLARATION OF LARRY C. JONES IN SUPPORT OF
### MOTION FOR PRELIMINARY INJUNCTION

I, LARRY C. JONES, hereby declare as follows:

1.      My name is Larry C. Jones.  I am of legal age and under no legal disability.  I have personal knowledge of the facts stated in this affidavit and know them to be true and correct.

2.      I am a Partner with the law firm Alston & Bird LLP in Charlotte, North Carolina. I am representing Plaintiff Gildan USA Inc. ("Gildan") in connection with the present litigation.

3.      Attached hereto as Exhibit A is a true and correct copy of a portion of Defendant Dillard's, Inc.'s ("Dillard's) investor relations website at https://investor.shareholder.com/dillards/.  According to this website and Dillard's marketing website, http://www.dillards.com, Dillard's operates a chain of department stores through much of the United States.  Also according to those websites, Dillard's retail stores sell a variety of clothing items, in addition to an extensive array of other merchandise.

4.      Dillard's 2013 annual report is accessible through the investor relations website referenced above.  That report indicates, *inter alia*, that "Men's apparel and accessories"

accounted for only 17% of Dillard's annual revenue, of which men's athletic socks would be a much smaller percentage.

5.    On September 6, 2014, I visited the Dillard's department store located at SouthPark Mall in Charlotte, North Carolina. On that day I photographed both Gildan's GOLDTOE men's athletic socks and Dillard's GOLD LABEL men's athletic socks being sold together in a single retail display bearing signage at the top that read GOLD LABEL. True and correct copies of a selection of these photographs are attached as Exhibit B.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

DATED this 9th day of December, 2014

Larry C. Jones

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA

GILDAN USA INC.,

       Plaintiff,

v.

DILLARD'S, INC.,

       Defendant.

CIVIL ACTION NO.  3:14-CV-00590-MOC-DSC

## CERTIFICATE OF SERVICE

       I hereby certify that on December __, 2014, I electronically filed the foregoing *Declaration of Larry C. Jones in Support of Motion for Preliminary Injunction* with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to all attorneys of record.

                                     /s/ Uly S. Gunn_____
                                     Uly S. Gunn

# Exhibit A

Case 3:14-cv-00590-MOC-DSC   Document 16-4   Filed 12/17/14   Page 4 of 18

- Sale & Clearance
- Shop By Brand
- My Account
- Dillard's Card
- Wish List
- Shopping Bag ( 0) $ 0.00



Search

- Women
- Juniors
- Shoes
- Handbags
- Accessories
- Lingerie
- Beauty
- Men
- Children
- Home

# Investor Overview

Dillard's, Inc. ranks among the nation's largest fashion apparel, cosmetics and home furnishings retailers with annual sales exceeding $6.5 billion. The Company focuses on delivering maximum fashion and value to its shoppers by offering compelling selections complemented by exceptional customer care. Dillard's stores offer a broad selection of merchandise and feature products from both national and exclusive brand sources. The Company operates 278 Dillard's locations and 20 clearance centers spanning 29 states plus an Internet store at www.dillards.com.



## Recent Releases

View all »

**Nov 21, 2014**
Dillard's, Inc. Announces $0.06 Cash Dividend and New $500 Million Share Repurchase Program

**Nov 13, 2014**
Dillard's, Inc. Reports Third Quarter Earnings per Share of $1.30 versus $1.13

- Dillard's Gift Cards
- Wedding & Baby Registry
- Catalogs & Ads
- Store Locator & Events
- Apply for a Dillard's Card

## Customer Service

Call 1-800-DILLARD (800-345-5273)

https://investor.shareholder.com/dillards/                                      12/9/2014

-58-



Dillard's

2013
ANNUAL
REPORT

-59-

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-K

(Mark one)

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended February 1, 2014

or

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from            to            .

Commission file number 1-6140

# DILLARD'S, INC.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **DELAWARE** | **71-0388071** |
| State or other jurisdiction of incorporation or organization | (IRS Employer Identification No.) |
| **1600 CANTRELL ROAD, LITTLE ROCK, ARKANSAS** | **72201** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code **(501) 376-5200**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Class A Common Stock | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. ☒ Yes  ☐ No

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. ☐ Yes  ☒ No

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. ☒ Yes  ☐ No

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). ☒ Yes  ☐ No

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§ 229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company"

l

PART I

ITEM 1.  BUSINESS.

Dillard's, Inc. ("Dillard's", the "Company", "we", "us", "our" or "Registrant") ranks among the nation's largest fashion apparel, cosmetics and home furnishing retailers. The Company, originally founded in 1938 by William T. Dillard, was incorporated in Delaware in 1964. As of February 1, 2014, we operated 296 Dillard's stores, including 18 clearance centers, and an Internet store offering a wide selection of merchandise including fashion apparel for women, men and children, accessories, cosmetics, home furnishings and other consumer goods. The Company also operates a general contracting construction company, CDI Contractors, LLC and CDI Contractors, Inc. ("CDI"), a portion of whose business includes constructing and remodeling stores for the Company.

The following table summarizes the percentage of net sales by segment and major product line:

|  | Percentage of Net Sales | | |
|  | Fiscal 2013 | Fiscal 2012 | Fiscal 2011 |
| Retail operations segment: | | | |
| Cosmetics . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 15% | 15% | 15% |
| Ladies' apparel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 22 | 22 | 23 |
| Ladies' accessories and lingerie . . . . . . . . . . . . . . . . . . . . . . . . . . . | 16 | 15 | 14 |
| Juniors' and children's apparel . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 8 | 8 | 8 |
| Men's apparel and accessories . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 17 | 17 | 17 |
| Shoes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 16 | 16 | 16 |
| Home and furniture . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5 | 5 | 6 |
| | 99 | 98 | 99 |
| Construction segment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 | 2 | 1 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 100% | 100% | 100% |

Additional information regarding our business, results of operations and financial condition, including information pertaining to our reporting segments, can be found in Management's Discussion and Analysis of Financial Condition and Results of Operations in Item 7 hereof and in Note 2 of "Notes to Consolidated Financial Statements" in Item 8 hereof.

We operate retail department stores in 29 states, primarily in the southwest, southeast and midwest regions of the United States. Most of our stores are located in suburban shopping malls and open-air centers. Customers may also purchase our merchandise on-line at our website, www.dillards.com, which features on-line gift registries and a variety of other services.

Our retail merchandise business is conducted under highly competitive conditions. Although we are a large regional department store, we have numerous competitors at the national and local level that compete with our individual stores, including specialty, off-price, discount and Internet retailers. Competition is characterized by many factors including location, reputation, merchandise assortment, advertising, price, quality, operating efficiency, service and credit availability. We believe that our stores are in a strong competitive position with regard to each of these factors. Other retailers may compete for customers on some or all of these factors, or on other factors, and may be perceived by some potential customers as being better aligned with their particular preferences.

Our merchandise selections include, but are not limited to, Dillard's lines of exclusive brand merchandise such as Antonio Melani, Gianni Bini, GB, Roundtree & Yorke and Daniel Cremieux. Dillard's exclusive brands/private label merchandise program provides benefits for Dillard's and our customers. Our customers receive fashionable, higher quality product often at a savings compared to national brands. Dillard's private label merchandise program allows us to ensure Dillard's high standards are achieved, while minimizing costs and differentiating our merchandise offerings from other retailers.

We have made a significant investment in our trademark and license portfolio, in terms of design function, advertising, quality control and quick response to market trends in a quality manufacturing environment. Dillard's trademark registrations are maintained for as long as Dillard's holds the exclusive right to use the trademarks on the listed products.

1

# Exhibit B



Case 3:14-cv-00590-MOC-DSC   Document 16-4   Filed 12/17/14   Page 10 of 18

**-63-**



Case 3:14-cv-00590-MOC-DSC   Document 16-4   Filed 12/17/14   Page 11 of 18







Case 3:14-cv-00590-MOC-DSC   Document 16-4   Filed 12/17/14   Page 14 of 18



Case 3:14-cv-00590-MOC-DSC   Document 16-4   Filed 12/17/14   Page 15 of 18

-68-



**-69-**





Case 3:14-cv-00590-MOC-DSC   Document 16-4   Filed 12/17/14   Page 18 of 18

**-71-**

# Exhibit C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**

GILDAN USA INC.,

     Plaintiff,

v.                                                          CIVIL ACTION NO. 3:14-CV-00590-
                                                            MOC-DSC

DILLARD'S, INC.,

     Defendant.

**DECLARATION OF SHELDON WOLFF IN SUPPORT OF**
**MOTION FOR PRELIMINARY INJUNCTION**

I, Sheldon Wolff, hereby declare as follows:

     1.    My name is Sheldon Wolff. I am of legal age and under no legal disability. I

have personal knowledge of the facts stated in this affidavit and know them to be true and

correct.

     2.    I currently hold the position of Vice President - Sales at Gildan USA Inc.

("Gildan"). I have been working with the GOLD TOE or GOLDTOE brand for over 40 years.

As part of my position, I meet occasionally with representatives of Dillards, Inc.

     3.    Dillard's Vice President Michael McNiff has made statements on several

occasions that he would like to find a way to replace Dillard's GOLDTOE socks business with

another offering for Dillard's consumers.

     4.    Dillard's at one time designated its private label style comparables to the

GOLDTOE "Canterbury" and "Metropolitan" ribbed dress socks as its "Canter-Rib" and

"Metro-Rib" socks.

**-73-**

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

DATED this 2̸ day of January, 2015

_____

Sheldon Wolff

2

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA

GILDAN USA INC.,

     Plaintiff,

v.                                                           CIVIL ACTION NO.  3:14-CV-00590-
MOC-DSC

DILLARD'S, INC.,

     Defendant.

### CERTIFICATE OF SERVICE

     I hereby certify that on January 30, 2015, I electronically filed the foregoing *Declaration of Sheldon Wolff in Support of Motion for Preliminary Injunction* with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to all attorneys of record.

                                       /s/ Uly S. Gunn
                                       Uly S. Gunn

# Exhibit D

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**

GILDAN USA INC.,

     Plaintiff,

v.

DILLARD'S, INC.,

     Defendant.

CIVIL ACTION NO. 3:14-CV-00590-MOC-DSC

**DECLARATION OF VIRAF PUDUMJEE IN SUPPORT OF**
**MOTION FOR PRELIMINARY INJUNCTION**

I, Viraf Pudumjee, hereby declare as follows:

     1.     My name is Viraf Pudumjee. I am of legal age and under no legal disability. I have personal knowledge of the facts stated in this affidavit and know them to be true and correct.

     2.     I currently hold the position of Director of Sales  National Accounts at Gildan USA Inc. ("Gildan"). I have been working with the GOLD TOE or GOLDTOE brand for over 20 years. As part of my position, I meet occasionally with representatives of Dillards, Inc.

     3.     Dillard's Vice President Michael McNiff has made statements on numerous occasions that he would like to find a way to replace Dillard's GOLDTOE socks business with another offering for Dillards consumers.

     4.     Dillard's at one time designated its private label styles comparables to the GOLDTOE "Canterbury" and "Metropolitan" ribbed dress socks as its "Canter-Rib" and "Metro-Rib" socks.

5.      Dillard's Vice President Michael McNiff stated to me on one occasion that he hoped Dillard's customers confused Dillard's "Canter-Rib" and "Metro-Rib" socks for GOLDTOE's "Canterbury" and "Metropolitan" socks.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

DATED this 29th day of January, 2015

_____
Viraf Pudumjee

2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**

GILDAN USA INC.,

     Plaintiff,

v.

DILLARD'S, INC.,

     Defendant.

CIVIL ACTION NO.  3:14-CV-00590-MOC-DSC

## CERTIFICATE OF SERVICE

     I hereby certify that on January 30, 2015, I electronically filed the foregoing *Declaration of Viraf Pudumjee in Support of Motion for Preliminary Injunction* with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to all attorneys of record.

                                     /s/ Uly S. Gunn
                                     Uly S. Gunn

# Exhibit E

## IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF NORTH CAROLINA

GILDAN USA INC.,

    Plaintiff,

v.

DILLARD'S, INC.,

    Defendant.

CIVIL ACTION NO. 3:14-CV-00590-MOC-DSC

## SUPPLEMENTAL DECLARATION OF PATRICIA MCHALE IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

I, PATRICIA MCHALE, hereby declare as follows:

1.    My name is Patricia McHale. I am of legal age and under no legal disability. I have personal knowledge of the facts stated in this affidavit and know them to be true and correct.

2.    I currently hold the position of Vice President Marketing of Gildan USA Inc. ("Gildan"). In that position, I am in charge of the marketing of the GOLDTOE brand of socks. I have been responsible for the marketing of GOLDTOE socks since 2000 when I began working for one of Gildan's predecessors-in-interest, Great American Knitting Mills, Inc., and I have been in charge of the marketing of GOLDTOE socks continuously since that time.

3.    Gildan did not discover the Infringing GOLD LABEL Packaging until September 1, 2014, when I observed the packaging at the Dillard's store at Northwoods Mall in North Charleston.

4.    Within the month, after discussions with counsel, Gildan sent a cease and desist letter to Dillard's.

LEGAL02/35245683v1

5.    Though Gildan had hoped for an amicable resolution, when the response from Dillard's outside counsel indicated clear disagreement with Gildan's position, Gildan proceeded with filing its complaint within approximately three weeks of receiving that response.

6.    After filing its complaint, Gildan was hopeful that Dillard's would reconsider its position and that a motion for preliminary injunction would not be necessary.

7.    When Dillard's filed an answer indicating its intent to vigorously defend Gildan's claims, Gildan then proceeded with preparing and filing a motion for preliminary injunction.

8.    Though the motion for preliminary injunction was filed on December 17, 2014, the date of the filing was not intended to coincide with the holiday season or cause Dillard's and its counsel to respond to the motion over the holiday.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

DATED this 28th day of January, 2015

Patricia M. McHale

Patricia McHale

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**

GILDAN USA INC.,

      Plaintiff,

v.

DILLARD'S, INC.,

      Defendant.

CIVIL ACTION NO.  3:14-CV-00590-MOC-DSC

## CERTIFICATE OF SERVICE

    I hereby certify that on January 30, 2015, I electronically filed the foregoing *Supplemental Declaration of Patricia McHale in Support of Motion for Preliminary Injunction* with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to all attorneys of record.

                        /s/ Uly S. Gunn
                        Uly S. Gunn

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:14-cv-00590-MOC-DSC

| | | |
|---|---|---|
| **GILDAN USA INC.,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| Vs. | ) | ORDER |
| | ) | |
| **DILLARD'S, INC.,** | ) | |
| | ) | |
| Defendant. | ) | |

**THIS MATTER** is before the court on plaintiff's Motion for Preliminary Injunction (#16).  While it is never safe to say that a matter has been fully briefed in an intellectual property case, it appears to the court that the briefing allowed by the Local Civil Rules is complete.  Oral arguments will, therefore, be scheduled for hearing.

In advance of such hearing, the court believes that it is advisable to inform the parties that the court has conducted a preliminary review of the extensive briefs and exhibits and has some initial thoughts based on that review.  Knowing that there is substantial cost in packaging and that substantial lead times are needed to change over product on the retail floor, the parties are advised that a preliminary balance-of-hardships test suggests that a preliminary injunction may well issue.  Section 43(a) of the Lanham Act prohibits unauthorized use of another's trade dress if such use is likely to confuse or deceive the public. Trade dress is protectable under the *Lanham Act* when it is distinctive and nonfunctional and where a plaintiff ultimately shows a likelihood of confusion. While all of the factors (and the sub-factors that inform such decision) will be considered in detail -- and the court may well be swayed in the other direction at oral arguments -

-1-

- it appears likely that plaintiff will be able to show a likelihood that it will prevail at trial based on the similarly of defendants' trade dress.  Indeed, the exhibits the court has reviewed indicate that the packaging would not just confuse the public, but would likely confuse *the court* as to which product is a genuine GOLDTOE sock and what is a Dillard's house-brand GOLD LABEL sock.   Put another way, if a customer were to walk into Dillard's to buy a pair of GOLDTOE socks, it is very likely that if the customer saw the GOLD LABEL house brand first, the customer would pick up and purchase those socks.  While Dillard's would certainly have that sale and a larger profit, it would likely lose that customer's business or at least some goodwill once it was discovered that the product was not a genuine GOLDTOE sock, as no one appreciates being duped.

Such discussion is not intended to be binding on the courts or the parties, but may be grist for discussions between the parties leading up to the hearing.  As the court further gears up for this hearing, the parties are encouraged to communicate any amicable resolution to the court well in advance of the hearing date so that resources may be directed to other matters.

**ORDER**

**IT IS, THEREFORE, ORDERED** that the Clerk of Court notice plaintiff's Motion for Preliminary Injunction (#16) for **ORAL ARGUMENTS** during the March 2015 hearings calendar.

Signed: February 13, 2015

Max O. Cogburn Jr
United States District Judge

### INDEX OF EXHIBITS TO DILLARD'S
### MEMORANDUM OF LAW IN OPPOSITION TO
### GILDAN'S MOTION FOR PRELIMINARY INJUNCTION

The following are submitted electronically to the above-referenced Opposition

Memorandum filed on February 13, 2015 (exhibits with an asterisk were submitted under seal):

Exhibit 1* – Declaration of William Michael Shields.

Exhibit 2* – Declaration of Kelly McElyea.

Exhibit 3* – Dillard's Gold Label Designs – iterations.

Exhibit 4 – Collection of Third Party Uses.

Exhibit 5 – GOLDTOE and Design Registration.

Exhibit 6 – Illustrated Comparison of Gildan Trade Dress definitions.

Exhibit 7 – Comparison of Gildan and Dillard's packaging.

Exhibit 8 – All Gold Toe Sock Screen Shots from website.

Exhibit 9 – Dillard's Gold Label packages for other products (DIL 000027 – DIL 000029).

Exhibit 10 – Gildan's Cease and Desist Letter (GT00029 – GT00036).

Exhibit 11 – Dillard's Response to Cease and Desist Letter (GT00026 – GT00028).

Exhibit 12 – Table of Gildan's Registrations.

Exhibit 13 – Gildan's Gold Toe Design Registration Nos. 308,608 and 2,056,422.

Exhibit 14 – Gold Toe and Gold Label comparison  (GT00009 and GT00015).

Exhibit 15 – Images of Gold Toe Socks (GT00021; GT00296; GT00779; GT00066).

Exhibit 16 – Gildan Press Release (GT00102 – GT00106).

Exhibit 17 – Declaration of Cecilia M. Sidebottom.

Exhibit 18 – Gildan's Responses to Dillard's Requests for Production of Documents.

Exhibit 19 – Physical Exemplars submitted to Court.

# EXHIBIT 4





Case 3:14-cv-00590-MOC-DSC   Document 36-1   Filed 02/13/15   Page 3 of 52



































































































# EXHIBIT 5

Case 3:14-cv-00590-MOC-DSC   Document 36-2   Filed 02/13/15   Page 1 of 3

1/5/2015            Trademark Electronic Search System (TESS)

United States Patent and Trademark Office

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | e Business | eBiz alerts | News | Help

## Trademarks > **Trademark Electronic Search System (TESS)**

*TESS was last updated on Mon Jan 5 03:22:39 EST 2015*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST |

| NEXT LIST | PREV DOC | PREV DOC | NEXT DOC | LAST DOC |

Logout  Please logout when you are done to release system resources allocated for you.

Start  List At: [        ] OR Jump to record: [        ]  **Record 1 out of 10**

**TSDR**  **ASSIGN Status**  **TTAB Status**  *( Use the "Back" button of the Internet Browser to return to TESS)*



| | |
|---|---|
| **Word Mark** | GOLDTOE |
| **Goods and Services** | IC 025. US 022 039. G & S: Clothing, namely, T-shirts and underwear; footwear, namely, socks. FIRST USE: 20120800. FIRST USE IN COMMERCE: 20120800 |
| **Mark Drawing Code** | (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS |
| **Design Search Code** | 09.01.02 - Embroidery; Labels, clothing; Stitching, not on clothing pockets 26.01.06 - Circles, semi; Semi-circles |
| **Serial Number** | 86057773 |
| **Filing Date** | September 6, 2013 |
| **Current Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Published for Opposition** | March 25, 2014 |
| **Registration Number** | 4546796 |
| **Registration Date** | June 10, 2014 |
| **Owner** | (REGISTRANT) GILDAN USA INC. CORPORATION DELAWARE 1980 CLEMENTS FERRY ROAD CHARLESTON SOUTH CAROLINA 29492 |
| **Assignment Recorded** | ASSIGNMENT RECORDED |
| **Attorney of Record** | Martha Gayle Barber |

Case 3:14-cv-00590-MOC-DSC  Document 36-2  Filed 02/13/15  Page 2 of 3

http://tmsearch.uspto.gov/bin/showfield?f=doc&state=4801:upq0do.2.1          1/2

1/5/2015                                    Trademark Electronic Search System (TESS)

| | |
|---|---|
| Prior Registrations | 0770389;3998826 |
| Description of Mark | Color is not claimed as a feature of the mark. The mark consists of the word "GOLDTOE" in a stylized upper-case format, with a semicircle comprised of six lines of a stitches pattern beneath the letters "T","O","E". |
| Type of Mark | TRADEMARK |
| Register | PRINCIPAL-2(F)-IN PART |
| Live/Dead Indicator | LIVE |
| Distinctiveness Limitation Statement | as to "GOLDTOE" |

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST |
|---|---|---|---|---|---|---|---|---|---|
| NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC | | | | | |

| .HOME | SITE INDEX | SEARCH | eBUSINESS | HELP | PRIVACY POLICY

# EXHIBIT 6

**Table 1: Gildan's Definitions of its claimed "GOLDTOE Trade Dress"**

| Gildan's COMPLAINT Definition "GOLDTOE Trade Dress" for its GOLDTOE men's athletic socks | Gildan's PRELIMINARY INJUNCTION Definition "GOLDTOE Trade Dress" (emphasis added)* [for its] men's and women's [athletic] socks |
|---|---|
| a blue band | a [blue] colored band |
| with contrasting gold elements | [elements not claimed] |
| white lettering for its word mark | contrasting white or gold lettering for its word mark |
| word mark having two components, the first of which is the term "GOLD" | word mark having two components, the first of which is the term "GOLD" |
| a gold, partially-serrated rectangle on the upper-right side of the front of the packaging | a [gold, partially-serrated] rectangle of contrasting color in the upper-right portion of the front of the packaging |
| [rectangle functions by] informing consumers how many pairs of socks are included in the package | [functional description, i.e., "informing consumers," is not claimed] |
| side panels which incorporate the color gold | side panels which incorporate the color gold |

* Underlining represents additions to Gildan's definition of "GOLDTOE Trade Dress" as defined in the Preliminary Injunction Memo (Doc. 16-1) relative to Gildan's definition of "GOLDTOE Trade Dress" as defined in the Complaint (Doc. 1). Likewise, bracketed strikethroughs represent deletions to Gildan's definition of "GOLDTOE Trade Dress" as defined in the Preliminary Injunction Memo (Doc. 16-1) relative to Gildan's definition of "GOLDTOE Trade Dress" as defined in the Complaint (Doc. 1).

**Table 2A: Gildan's Packaging Compared to Trade Dress Defined in Complaint**

| Gildan's COMPLAINT Definition "GOLDTOE Trade Dress" | Doc. 16-3 Exhibit A Example 1 | Doc. 16-3 Exhibit A Example 2 |
|---|---|---|
| |  |  |
| a blue band | yes | yes |
| with contrasting gold elements | yes | yes |
| white lettering for its word mark | yes | yes |
| word mark having two components, the first of which is the term "GOLD" | yes | yes |
| a gold, partially-serrated rectangle on the upper-right side of the front of the packaging | yes | **NO** |
| [rectangle functions by] informing consumers how many pairs of socks are included in the package | yes | **NO** |
| side panels which incorporate the color gold | **NO** | yes |

**Table 2B: Gildan's Packaging Compared to Trade Dress Defined in Complaint**

| Gildan's COMPLAINT Definition "GOLDTOE Trade Dress" | | Doc. 16-3 Exhibit B Example 1 | | Doc. 16-3 Exhibit B Example 2 | |
|---|---|---|---|---|---|
| a blue band | **NO** |  | **NO** |  | **NO** |
| with contrasting gold elements | yes | | yes | | yes |
| white lettering for its word mark | **NO** | | **NO** | | **NO** |
| word mark having two components, the first of which is the term "GOLD" | yes | | yes | | yes |
| a gold, partially-serrated rectangle on the upper-right side of the front of the packaging | yes | | yes | | **NO** |
| [rectangle functions by] informing consumers how many pairs of socks are included in the package | yes | | yes | | **NO** |
| side panels which incorporate the color gold | yes | | yes | | yes |

**Table 2C: Gildan's Packaging Compared to Trade Dress Defined in Complaint**

| Gildan's COMPLAINT Definition "GOLDTOE Trade Dress" | Doc. 16-3 Exhibit C Example 1 | Doc. 16-3 Exhibit C Example 2 | Doc. 16-3 Exhibit C Example 3 |
|---|---|---|---|
| a blue band | NO | NO | NO |
| with contrasting gold elements | NO | NO | NO |
| white lettering for its word mark | yes | yes | yes |
| word mark having two components, the first of which is the term "GOLD" | yes | yes | yes |
| a gold, partially-serrated rectangle on the upper-right side of the front of the packaging | NO | NO | NO |
| [rectangle functions by] informing consumers how many pairs of socks are included in the package | yes | yes | yes |
| side panels which incorporate the color gold | yes | yes | yes |

-146-

**Table 2D: Gildan's Packaging Compared to Trade Dress Defined in Complaint**

| Gildan's COMPLAINT Definition "GOLDTOE Trade Dress" | Doc. 16-3 Exhibit D Example 1 | | Doc. 16-3 Exhibit D Example 2 | | Doc. 16-3 Exhibit D Example 3 | |
|---|---|---|---|---|---|---|
| a blue band | **NO** | | **NO** | | **NO** | |
| with contrasting gold elements | yes | | yes | | yes | |
| white lettering for its word mark | **NO** | | **NO** | | **NO** | |
| word mark having two components, the first of which is the term "GOLD" | yes | | yes | | yes | |
| a gold, partially-serrated rectangle on the upper-right side of the front of the packaging | yes | | yes | | yes | |
| [rectangle functions by] informing consumers how many pairs of socks are included in the package | yes | | **NO** | | **NO** | |
| side panels which incorporate the color gold | yes | | yes | | yes | |

**Table 2E: Gildan's Packaging Compared to Trade Dress Defined in Complaint**

| Gildan's COMPLAINT Definition "GOLDTOE Trade Dress" | Doc. 16-3 Exhibit E Example 1 | | Doc. 16-3 Exhibit E Example 2 | | Doc. 16-3 Exhibit E Example 3 | |
|---|---|---|---|---|---|---|
| a blue band | **NO** |  | **NO** |  | **NO** |  |
| with contrasting gold elements | yes | | yes | | yes | |
| white lettering for its word mark | yes | | yes | | yes | |
| word mark having two components, the first of which is the term "GOLD" | yes | | yes | | yes | |
| a gold, partially-serrated rectangle on the upper-right side of the front of the packaging | **NO** | | **NO** | | **NO** | |
| [rectangle functions by] informing consumers how many pairs of socks are included in the package | **NO** | | **NO** | | **NO** | |
| side panels which incorporate the color gold | yes | | yes | | yes | |

**Table 2F: Gildan's Packaging Compared to Trade Dress Defined in Complaint**

| Gildan's COMPLAINT Definition "GOLDTOE Trade Dress" | | Doc. 16-3 Exhibit F Example 1 | | Doc. 16-3 Exhibit F Example 2 | | Doc. 16-3 Exhibit F Example 3 |
|---|---|---|---|---|---|---|
| a blue band | **NO** |  | **NO** |  | **NO** |  |
| with contrasting gold elements | yes | | yes | | yes | |
| white lettering for its word mark | yes | | yes | | yes | |
| word mark having two components, the first of which is the term "GOLD" | yes | | yes | | yes | |
| a gold, partially-serrated rectangle on the upper-right side of the front of the packaging | yes | | yes | | yes | |
| [rectangle functions by] informing consumers how many pairs of socks are included in the package | yes | | yes | | yes | |
| side panels which incorporate the color gold | yes | | yes | | yes | |

**Table 2G: Gildan's Packaging Compared to Trade Dress Defined in Complaint**

| Gildan's COMPLAINT Definition "GOLDTOE Trade Dress" | Doc. 16-3 Exhibit G Example 1 | | Doc. 16-3 Exhibit G Example 2 | | Doc. 16-3 Exhibit G Example 3 | |
|---|---|---|---|---|---|---|
| a blue band | **NO** |  | **NO** |  | **NO** |  |
| with contrasting gold elements | yes | | yes | | yes | |
| white lettering for its word mark | yes | | yes | | yes | |
| word mark having two components, the first of which is the term "GOLD" | yes | | yes | | yes | |
| a gold, partially-serrated rectangle on the upper-right side of the front of the packaging | yes | | yes | | yes | |
| [rectangle functions by] informing consumers how many pairs of socks are included in the package | yes | | yes | | yes | |
| side panels which incorporate the color gold | yes | | yes | | yes | |

**Table 2F: Gildan's Packaging Compared to Trade Dress Defined in Complaint**

| Gildan's COMPLAINT Definition "GOLDTOE Trade Dress" | Doc. 16-3 Exhibit F Example 1 | Doc. 16-3 Exhibit F Example 2 | Doc. 16-3 Exhibit F Example 3 |
|---|---|---|---|
| a blue band | **NO** | **NO** | **NO** |
| with contrasting gold elements | yes | yes | yes |
| white lettering for its word mark | **NO** | **NO** | **NO** |
| word mark having two components, the first of which is the term "GOLD" | yes | yes | yes |
| a gold, partially-serrated rectangle on the upper-right side of the front of the packaging | yes | yes | yes |
| [rectangle functions by] informing consumers how many pairs of socks are included in the package | **NO** | **NO** | **NO** |
| side panels which incorporate the color gold | yes | yes | yes |

# EXHIBIT 7

**Table 3: Elemental Comparison of Gildan Packaging and Dillard's "Accused" Packaging**



| Gildan Packaging Element | Present in Dillard's? | Present in Gildan? | Dillard's Packaging Element |
|---|---|---|---|
| Athlete in Background | NO | NO | Bottom Informational Panel |
| Water/Sky Blue Band | NO | NO | Solid Light Blue Band |
| Top Product Informational Panel | YES | YES | Top Product Informational Panel |
| GOLDTOE + Design Registered Trademark | NO | NO | GOLD LABEL/ROUNDTREE & YORKE Registered Trademark |
| Triangular Side Product Informational Panel | NO | NO | Rectangular Transverse Side Product Informational Panel |
| Gold Faux Stitch Imagery | NO | NO | Secondary Product Informational Panel |
| Made in Honduras | NO | NO | Made in USA |

# EXHIBIT 8

MEN'S SOCKS | MEN'S UNDERWEAR | MEN'S CASUALWEAR | WOMEN'S SOCKS | KIDS' SOCKS

25% OFF SITE WIDE Includes CLEARANCE | FREE SHIPPING OVER $50

## MEN'S ATHLETIC SOCKS

Buy Athletic Socks at GoldToe.com. Shop a Large Selection of Men's Athletic Socks, Men's Cotton Socks, Men's Cotton Crew Socks, Men's Black Athletic Socks & More Styles In One Place.

Pages: 1 2 Next »

Ultra Tec Qtr 3 Pr

Ultra Tec Quarter Extended 3 Pair

Cushion Tec® Crew 3 Pr
SHOP
MPARE

ADC Cushion Tec® Qtr
3 Pack
~~$16.00~~
$12.00
SHOP
COMPARE

Sign in / Register

Cocona Lo-Cut Sport 3 Pair
3 Pack
~~$18.00~~
$13.50
SHOP
COMPARE

Ultratec Short Crew 3 Pr
3 Pack
~~$16.00~~
$12.00
SHOP
COMPARE

Cushion Tec® Crew
3 Pack
~~$16.00~~
$12.00
SHOP
COMPARE

Ultra Tec Extended OTC
3 Pack
~~$18.00~~
$13.50
SHOP
COMPARE

Cushion Liner 4 Pack
4 Pack
~~$16.00~~
$12.00
SHOP
COMPARE

SoleUtion Sport Ultra Tec® Liner
3 Pack
~~$16.00~~
$12.00
SHOP
COMPARE

Ultra Tec Over the Calf
3 Pack
~~$17.00~~
$12.75
SHOP
COMPARE

Cushion Tec® Quarter
3 Pack
~~$16.00~~
$12.00
SHOP
COMPARE

Cushioned Cotton 4 Pack
4 Pack
~~$16.00~~
$12.00
SHOP
COMPARE

6 Pr Cotton Sport Liner
6 Pack
~~$20.00~~
$15.00
SHOP
COMPARE

6 Pr Cotton No Show
6 Pack
~~$20.00~~
$15.00
SHOP
COMPARE

6 Pr Cotton Crew
6 Pack
~~$20.00~~
$15.00
SHOP
COMPARE

## BEST SELLERS

1

Ultra Tec Over the Calf
3 Pack
~~$17.00~~ $12.75
SHOP

2

Ultra Tec Extended OTC
3 Pack
~~$18.00~~ $13.50
SHOP

3

6 Pr Cotton Crew
6 Pack
~~$20.00~~ $15.00
SHOP

Follow Us







1/2/2015                                    Shop Men's Athletic Socks at GoldToe.com



Pages:  1  2                                                    Next »

INFORMATION

Return Policy
Shipping
Site Map
Privacy & Security
Terms of Use

Gold Toe Legacy
Gold Toe Innovation
Gold Toe Standard of Quality

Contact Us
FAQs
Care Instructions

MORE WAYS TO SHOP

Gold Toe Stores
Retail Partners
Online

BRANDS

GOLDTOE®
PowerSox®
SoleUtion®

SPECIAL OFFERS

email@example.com      

             

MEN'S UNDERWEAR | MEN'S CASUALWEAR | WOMEN'S SOCKS | KIDS' SOCKS

25% OFF SITE WIDE Includes CLEARANCE | FREE SHIPPING OVER $50

# MEN'S ATHLETIC SOCKS

Buy Athletic Socks at GoldToe.com. Shop a Large Selection of Men's Athletic Socks, Men's Cotton Socks, Men's Cotton Crew Socks, Men's Black Athletic Socks & More Styles In One Place.

« Previous Pages: 1 2

Cushion Quarter 3 Pack
3 Pack
~~$12.00~~
$9.00
SHOP
COMPARE

6 Pr Cotton Quarter Sock
6 Pack
~~$20.00~~
$15.00
SHOP
COMPARE

AquaFX® Soleution Crew
3 Pack
~~$17.00~~
$12.75
SHOP
COMPARE

AquaFX® Soleution Tab Liner
3 Pack
~~$17.00~~
$12.75
SHOP
COMPARE

AquaFX® Soleution Quarter
3 Pack
~~$17.00~~
$12.75
SHOP
COMPARE

UltraTec Crew Extended
3 Pack
~~$18.00~~
$13.50
SHOP
COMPARE

6 Pr Cotton Crew Extended
6 Pack
~~$21.00~~
$15.75
SHOP
COMPARE

COMPARE SELECTED

« Previous Pages: 1 2

## BEST SELLERS

1

Ultra Tec Over the Calf
3 Pack
~~$17.00~~ $12.75
SHOP

2

Ultra Tec Extended OTC
3 Pack
~~$18.00~~ $13.50
SHOP

3

6 Pr Cotton Crew
6 Pack
~~$20.00~~ $15.00
SHOP

Follow Us

INFORMATION
Return Policy
Shipping
Site Map
Privacy & Security
Terms of Use
Gold Toe Legacy
Gold Toe Innovation
Gold Toe Standard of Quality
Contact Us
FAQs
Care Instructions

MORE WAYS TO SHOP
Gold Toe Stores
Retail Partners
Online

BRANDS
GOLDTOE®
PowerSox®
SoleUtion®

SPECIAL OFFERS
email@example.com SIGN UP

McAfee SECURE CLICK TO VERIFY





1/2/2015                    Shop Ultra Tec Qtr 3 Pr at Goldtoe.com Now

| MEN'S UNDERWEAR | MEN'S CASUALWEAR | WOMEN'S SOCKS | KIDS' SOCKS |

25% OFF SITE WIDE Includes CLEARANCE    FREE SHIPPING OVER $50

## ULTRA TEC QTR 3 PR

Men's Socks

| | |
|---|---|
| Style #: | 2396P |
| Price: | $16.00 |
| Your Price: | $12.00 |
| | (You save $4.00) |
| SKU: | 711-2396P |
| Pack: | 3 Pair |

Product Description
- Freshtex antimicrobial
- Hydrotec moisture control
- Soft combed cotton
- Reinforced very far &

Rating: ★★★★☆ ( 5 product reviews )

Contents:
78% Cotton, 13% Stretch Nylon, 8% Polyester, 1% Spandex
Exclusive of Ornamentation

IMPORTED

Options

| | |
|---|---|
| Shoe Size: | Choose a Shoe Size ▼ |
| Color: | Choose a Color ▼ |
| Quantity: | 1 ▼ |

**ADD TO CART**

ADD TO WISH LIST

### BEST SELLERS

1
English Rib Lisle Non-Elastic Top
1 Pack
$8.00 $6.00
★★★☆☆
SHOP

2
Basic Support Over the Calf
1 Pack
$16.00 $12.00
★★★★☆
SHOP

3
Ultra Tec Over the Calf
3 Pack
$17.00 $12.75
★★★★☆
SHOP

Follow Us
f

---

Reviews | Size Chart

## Product Reviews

WRITE A REVIEW

1. **Shrinkage and color** ★★★★☆
   Posted by Unknown on 3rd Apr 2014

   They also shrink somewhat, but maybe that can't be avoided. Pleeeeze make the gray ones again!!

2. **I Also Want Grey Socks** ★★★★☆
   Posted by K Rowe on 19th Feb 2014

   I have worn gold toe socks for years. My last purchase I bought some grey ones and I loved them. I'm sorry to hear that you have stopped making them. Please bring them back. Also, I agree with the comment that the white socks shrink to the point that they are tight on my toes. I wear a 10.5 shoe so I shouldn't have a tightness problem.

   I rated you at 4 stars because the white socks shrink and you don't sell grey socks.

3. **More than color** ★★★★★
   Posted by paul on 25th Sep 2013

   I agree with your need to bring back the gray (gray heather actually) but for a slightly less cosmetic reason. The gray have 72% cotton and 14% Hydrotec polyester vs 78% cotton and 8% hydrotec polyester that the white have. I have neuropathy of feet from Chemo and these gray are the only ones that don't shrink down on my feet and cause me pain!! They also stay softer longer and are more durable! PLEASE bring them back

4. **Copletely agree with"Wish you still made them in grey!"** ★★★★★
   Posted by Unknown on 27th Aug 2013

   Couldn't have said it better.........

5. **Wish you still made them in grey!** ★★★★★
   Posted by Larry Molsather on 12th Aug 2013

   Dear "Gold Toe:" I've purchased approximately 60 grey pairs of your athletic quarte- socks over the past 10 years, along with about 30 pairs of your full-lenght black socks. I think I've been a very loyal customer. But, I'm now disappointed that you stopped making or selling your athletic quarter-socks in grey.

   It's a matter of taste I realize; but, the white socks are "right out of the nursing-home." Go to any nursing home and look around. Every 80-year old guy and half the women are wearing white socks and sneakers. And, athletic quarter-socks in black would look really odd with a pair of sneakers. Just my opinion, I realize! But, overall, I've pretty much only worn "Gold Toe" socks for the past 30-years. Other manufacturers (including Adidis) make "quarter-socks or tube socks," but, they are typically all multi-colored and full of "Spandex," making them look like something for a person in "junior-high or high school," plus the total spandex makes them very uncomfortable for me.

   I understand you may have some good business reasons for stopping making your quarter-socks grey. But, I think you may be losing a market segment in older customers. Just my humble opinion! I've always been very happy with your products up to now and over the past 30-years! Please bring back the "grey" if you can! Thanks for listening!

   PS if you have any inventory of the former grey version, is there a way I could purchase some?

---

Case 3:14-cv-00590-MOC-DSC   Document 36-5   Filed 02/13/15   Page 5 of 34

http://www.goldtoe.com/products/Ultra-Tec-Qtr-3-Pr.html                    1/2

**-159-**

1/2/2015                              Shop Ultra Tec Qtr 3 Pr at Goldtoe.com Now

**INFORMATION**

Return Policy          Gold Toe Legacy           Contact Us
Shipping               Gold Toe Innovation       FAQs
Site Map               Gold Toe Standard of Quality   Care Instructions
Privacy & Security
Terms of Use

**MORE WAYS TO SHOP**

Gold Toe Stores
Retail Partners
Online

**BRANDS**

GOLDTOE®
PowerSox®
SoleUtion®

**SPECIAL OFFERS**

 

   

http://www.goldtoe.com/products/Ultra-Tec-Qtr-3-Pr.html                                                    2/2

**-160-**

1/2/2015                    Shop Cushion Tec® Crew 3 Pr at Goldtoe.com Now

MEN'S UNDERWEAR | MEN'S CASUALWEAR | WOMEN'S SOCKS | KIDS' SOCKS

**25% OFF** SITE WIDE
Includes CLEARANCE

**FREE SHIPPING**
OVER $50

## CUSHION TEC® CREW 3 PR

Men's Socks

| | |
|---|---|
| Style #: | 2193S |
| Price: | ~~$16.00~~ |
| Your Price: | $12.00 |
| | (You save $4.00) |
| SKU: | 711-2193S |
| Pack: | 3 Pair |

Product Description

- Features moisture-wicking high bulk acrylic
- Antimicrobial protection to keep feet fresh
- Reinforced heel and toe for longer wear
- Spandex ensures a perfect fit
- Clincher foot provides arch support

Rating:          ★★★★☆ ( 3 product reviews )

Contents:
84% Acrylic, 15% Nylon, 1% Spandex Exclusive of Ornamentation

IMPORTED

Options

| Shoe Size: | Choose a Shoe Size ▼ |
|---|---|
| Color: | Choose a Color ▼ |
| Quantity: | 1 ▼ |

**ADD TO CART**

ADD TO WISH LIST



### BEST SELLERS

1
English Rib Lisle Non-Elastic Top
1 Pack
~~$8.00~~ $6.00
★★★☆☆
SHOP

2
Basic Support Over the Calf
1 Pack
~~$16.00~~ $12.00
★★★★☆
SHOP

3
Ultra Tec Over the Calf
3 Pack
~~$17.00~~ $12.75
★★★★☆
SHOP

Follow Us

---

Reviews | Size Chart

## Product Reviews

WRITE A REVIEW

1. One size doesn't work ★★★★☆
   Posted by Frank M on 8th Mar 2014

   I wear a size 9 boot and the 10-13 ends up wadeup on the bottom of my foot after several hours. What happened to the 9-11 size at fit very well

2. Best socks ever ★★★★★
   Posted by John A on 22nd Sep 2012

   I purchased 21 pairs of the black poly spun gold toe socks over 5 years ago. I wear them every day for work and believe it or not have never worn a hole thru them. The cushioned sole has only worn at the heal, but not thru on some of the socks. Gold toe does not make them anymore. I just purchased (several weeks ago) 12 pair of these socks and couldn't be happier. The fit and comfort are excellant, and I expect I'll get years of use from these as well.

3. 2193s cushion tec white ★★★★☆
   Posted by Unknown on 21st Nov 2011

   Good sock but are a little tight for size 12-13 foot, should be offered in extended sizes. Have you looked at the size of men growing in this country?

---

**INFORMATION**

| | | |
|---|---|---|
| Return Policy | Gold Toe Legacy | Contact Us |
| Shipping | Gold Toe Innovation | FAQs |
| Site Map | Gold Toe Standard of Quality | Care Instructions |
| Privacy & Security | | |
| Terms of Use | | |

**MORE WAYS TO SHOP**
Gold Toe Stores
Retail Partners
Online

**BRANDS**
GOLDTOE®
PowerSox®
SoleUtion®

**SPECIAL OFFERS**
email@example.com
SIGN UP

MasterCard VISA DISCOVER AMERICAN EXPRESS

McAfee SECURE
CLICK TO VERIFY

http://www.goldtoe.com/products/Cushion-Tec%C2%AE-Crew-3-Pr.html                    1/1

1/2/2015                         Shop ADC Cushion Tec® Qtr at Goldtoe.com Now

| MEN'S UNDERWEAR | MEN'S CASUALWEAR | WOMEN'S SOCKS | KIDS' SOCKS |

25% OFF SITE WIDE Includes CLEARANCE     FREE SHIPPING OVER $50



## ADC CUSHION TEC® QTR
Men's Socks

| | |
|---|---|
| Style #: | 2025P |
| Price: | $16.00 |
| Your Price: | $12.00 |
| | (You save $4.00) |
| SKU: | 711-2025P |
| Pack: | 3 Pair |

Product Description
- Soft combed cotton
- Zoned cushioning
- Secure fit arch support
- Y heel for fit
- Reinforced Toe

Contents:
70% Cotton, 16% Stretch Nylon, 13% Polyester, 1% Spandex
Exclusive of Ornamentation

IMPORTED

Options

| | |
|---|---|
| Shoe Size: | Choose a Shoe Size ▼ |
| Color: | Choose a Color ▼ |
| Quantity: | 1 ▼ |

ADD TO CART

ADD TO WISH LIST

BEST SELLERS

1
English Rib Lisle Non-Elastic Top
1 Pack
$8.00 $6.00
SHOP

2
Basic Support Over the Calf
1 Pack
$16.00 $12.00
SHOP

3
Ultra Tec Over the Calf
3 Pack
$17.00 $12.75
SHOP

Reviews    Size Chart

## Product Reviews
This product hasn't received any reviews yet. Be the first to review this product!

WRITE A REVIEW

INFORMATION
Return Policy
Shipping
Site Map
Privacy & Security
Terms of Use

Gold Toe Legacy
Gold Toe Innovation
Gold Toe Standard of Quality

Contact Us
FAQs
Care Instructions

MORE WAYS TO SHOP
Gold Toe Stores
Retail Partners
Online

BRANDS
GOLDTOE®
PowerSox®
SoleUtion®

SPECIAL OFFERS
email@example.com    SIGN UP

McAfee SECURE
CLICK TO VERIFY

MEN'S UNDERWEAR | M'S CASUALWEAR | WOMEN'S SOCKS | KIDS' SOCKS

25% OFF SITE WIDE Includes CLEARANCE | FREE SHIPPING OVER $50

Follow Us

# COCONA LO-CUT SPORT 3 PAIR

Men's Socks

Style #: 3010P

Price: ~~$18.00~~

Your Price: $13.50

(You save $4.50)

SKU: 711-3010P

Pack: 3 Pair

Product Description

- Contemporary Styling and superb quality
- A new generation of the GOLDTOE ® brand
- Comfort toe seams
- Reinforced Toe for longer wear
- Cocona is derived from volcanic minerals and other safe & natural sources
- Cocona is integral to the fiber, naturally occurring and cannot wash out

Rating: ( 2 product reviews )

Contents:
65% POLYESTER,17% OLEFIN,16% NYLON,2% SPANDEX, Exclusive of Ornamentation

IMPORTED

Options

Shoe Size: Choose a Shoe Size

Color: Choose a Color

Quantity: 1

ADD TO CART

ADD TO WISH LIST

## BEST SELLERS

1

English Rib Lisle Non-Elastic Top
1 Pack
~~$8.00~~ $6.00
SHOP

2

Basic Support Over the Calf
1 Pack
~~$16.00~~ $12.00
SHOP

3

Ultra Tec Over the Calf
3 Pack
~~$17.00~~ $12.75
SHOP

Related Products | Reviews | Size Chart

## RELATED PRODUCTS

3 Pair Sport Liner
~~$10.00~~ $7.50

Wimbeldon 3 pair
~~$10.00~~ $7.50

INFORMATION

Return Policy
Shipping
Site Map
Privacy & Security
Terms of Use
Gold Toe Legacy
Gold Toe Innovation
Gold Toe Standard of Quality
Contact Us
FAQs
Care Instructions

MORE WAYS TO SHOP

Gold Toe Stores
Retail Partners
Online

BRANDS

GOLDTOE®
PowerSox®
SoleUtion®

SPECIAL OFFERS

email@example.com SIGN UP

McAfee SECURE CLICK TO VERIFY



1/2/2015                    Shop Ultratec Short Crew 3 Pr at Goldtoe.com Now



1/2/2015                    Shop 6 Pr Cotton Liner Extended at Goldtoe.com Now



1/2/2015    Shop Cushion Tec® Crew at Goldtoe.com Now



MEN'S UNDERWEAR | MEN'S CASUALWEAR | WOMEN'S SOCKS | KIDS' SOCKS

25% OFF SITE WIDE Includes CLEARANCE    FREE SHIPPING OVER $50

## CUSHION TEC® CREW

Men's Socks

| | |
|---|---|
| Style #: | 2024S |
| Price: | $16.00 |
| Your Price: | $12.00 |
| | (You save $4.00) |
| SKU: | 711-2024S |
| Pack: | 3 Pair |

Product Description
- Soft combed cotton
- Zoned cushioning
- Secure fit arch support
- Y heel for fit
- Reinforced Toe

Rating: ⭐⭐⭐⭐⭐ ( 2 product reviews )

Contents:
75% Cotton, 16% Stretch Nylon, 8% Polyester, 1% LYCRA Spandex Exclusive of Ornamentation

IMPORTED

Options
Shoe Size:    Choose a Shoe Size ▼
Color:        Choose a Color ▼
Quantity:     1 ▼

**ADD TO CART**
ADD TO WISH LIST

### BEST SELLERS

1
English Rib Lisle Non-Elastic Top
1 Pack
$8.00 $6.00
⭐⭐⭐
SHOP

2
Basic Support Over the Calf
1 Pack
$16.00 $12.00
⭐⭐⭐⭐
SHOP

3
Ultra Tec Over the Calf
3 Pack
$17.00 $12.75
⭐⭐⭐⭐
SHOP

[ Reviews ] [ Size Chart ]

## Product Reviews

WRITE A REVIEW

1. Unbeatable ⭐⭐⭐⭐⭐
Posted by Bill Maniaci on 5th Sep 2014

I am a retired soldier and I also retired from my second career as a police officer. I have literally worn out boots before these socks finally needed to be pressed into service as "old rags". I am buying three of the three-packs. They will be put to use again, as boot socks and in-the- house socks with slippers this winter. It's going to be years before they will need to be replaced. They are tough, comfortable, very well made and always hold their shape. These Gold Toe socks are, in a word, unbeatable.

2. Wears like iron, feels like a cloud ⭐⭐⭐⭐⭐
Posted by RachelChana on 7th Jul 2014

I'm a female with hard to fit feet, medical issues, and I'm hard on socks. Honestly, GoldToe could go out of business selling well made socks that last for so many years. LOL. Bought my first multi-pair pack in the men's department and have stayed with this Cushion Tec design for many years. Absolutely no seam at the toe, the sole cushioning lasts forever, socks keep their shape and softness through hot water washings and bleachings. I just can't say more. Best day to day sock I have ever worn. No blisters ever.

INFORMATION          MORE WAYS TO SHOP     BRANDS          SPECIAL OFFERS
Return Policy    Gold Toe Legacy     Contact Us       Gold Toe Stores     GOLDTOE®     email@example.com    SIGN UP
Shipping         Gold Toe Innovation FAQs             Retail Partners     PowerSox®
Site Map         Gold Toe Standard of Quality  Care Instructions   Online   SoleUtion®
Privacy & Security
Terms of Use

MasterCard   VISA   DISCOVER   AMERICAN EXPRESS

McAfee SECURE
CLICK TO VERIFY

1/2/2015                                    Shop Ultra Tec Extended OTC at Goldtoe.com Now

| | MEN'S UNDERWEAR | MEN'S CASUALWEAR | WOMEN'S SOCKS | KIDS' SOCKS | **25% OFF** SITE WIDE Includes CLEARANCE | **FREE SHIPPING** OVER $50 |

## ULTRA TEC EXTENDED OTC

Men's Socks

| | |
|---|---|
| Style #: | 287HE |
| Price: | ~~$18.00~~ |
| Your Price: | $13.50 |
| | (You save $4.50) |
| SKU: | 711-287HE |
| Pack: | 3 Pair |

Product Description
- Soft and Breathable
- Keeps feet cool and dry
- Cushioned foot to absorb shock
- Reinforced Toe for better fit comfort and wear

Rating:      ★★★★★ ( 6 product reviews )

Contents:
80% Cotton, 15% Nylon, 4% Polyester, 1% Spandex, Exclusive of Ornamentation

IMPORTED

Options
Shoe Size:    [Choose a Shoe Size ▼]
Color:        [Choose a Color ▼]
Quantity:     [1 ▼]

[ ADD TO CART ]
[ ADD TO WISH LIST ]



### BEST SELLERS

1

**English Rib Lisle Non-Elastic Top**
1 Pack
~~$8.00~~ $6.00
★★★☆☆    SHOP

2

**Basic Support Over the Calf**
1 Pack
~~$16.00~~ $12.00
★★★★☆    SHOP

3

**Ultra Tec Over the Calf**
3 Pack
~~$17.00~~ $12.75
★★★★☆    SHOP

Follow Us

---

Related Products | Reviews | Size Chart

## RELATED PRODUCTS



**INFORMATION**          **MORE WAYS TO SHOP**    **BRANDS**         **SPECIAL OFFERS**
Return Policy    Gold Toe Legacy           Gold Toe Stores       GOLDTOE®       email@example.com    [SIGN UP]
Shipping         Gold Toe Innovation       Retail Partners       PowerSox®
Site Map         Gold Toe Standard of Quality   Online           SoleUtion®
Privacy & Security
Terms of Use

                                                    

1/2/2015                               Shop Cushion Liner 4 Pack at Goldtoe.com Now

| MEN'S UNDERWEAR | MEN'S CASUALWEAR | WOMEN'S SOCKS | KIDS' SOCKS

**25% OFF** SITE WIDE Includes CLEARANCE    **FREE SHIPPING** OVER $50

## CUSHION LINER 4 PACK

Men's Socks

| | |
|---|---|
| Style #: | 2764P |
| Price: | ~~$16.00~~ |
| Your Price: | $12.00 |
| | (You save $4.00) |
| SKU: | 711-2764P |
| Pack: | 4 Pair |

Product Description

- Soft and Breathable
- Keeps feet cool and dry
- Cushioned foot to absorb shock
- Reinforced Toe for better fit comfort and wear

Contents:
82% Cotton, 16% polyester, 1% Nylon, 1% Spandex, Exclusive of Ornamentation

IMPORTED

Options

| | |
|---|---|
| Shoe Size: | Choose a Shoe Size ▼ |
| Color: | Choose a Color ▼ |
| Quantity: | 1 ▼ |

**ADD TO CART**

ADD TO WISH LIST



| Related Products | Reviews | Size Chart |

## RELATED PRODUCTS

Coolmax® Cushion Low Cut Liner, 3 Pack
~~$13.00~~ $9.75
★★★★☆

### BEST SELLERS

Follow Us

1

English Rib Lisle Non-Elastic Top
1 Pack
~~$8.00~~ $6.00
★★★☆☆          SHOP

2

Basic Support Over the Calf
1 Pack
~~$16.00~~ $12.00
★★★★☆          SHOP

3

Ultra Tec Over the Calf
3 Pack
~~$17.00~~ $12.75
★★★★☆          SHOP

**INFORMATION**
Return Policy
Shipping
Site Map
Privacy & Security
Terms of Use

Gold Toe Legacy
Gold Toe Innovation
Gold Toe Standard of Quality

Contact Us
FAQs
Care Instructions

**MORE WAYS TO SHOP**
Gold Toe Stores
Retail Partners
Online

**BRANDS**
GOLDTOE®
PowerSox®
SoleUtion®

**SPECIAL OFFERS**
email@example.com    SIGN UP

[MasterCard] [VISA] [DISCOVER] [AMERICAN EXPRESS]

[McAfee SECURE — CLICK TO VERIFY]

1/2/2015                    Shop SoleUtion Sport Ultra Tec® Liner at Goldtoe.com Now



http://www.goldtoe.com/products/SoleUtion-Sport-Ultra-Tec%C2%AE-Liner.html                    1/1

**-169-**



-170-

1/2/2015

Shop Ultra Tec Over the Calf at Goldtoe.com Now





http://www.goldtoe.com/products/Ultra-Tec-Over-the-Calf.html

2/2

**-171-**

1/2/2015                    Shop Cushion Tec® Qtr at Goldtoe.com Now



1/2/2015                    Shop Cushioned Cotton 4 Pack at Goldtoe.com Now

MEN'S UNDERWEAR | MEN'S CASUALWEAR | WOMEN'S SOCKS | KIDS' SOCKS    25% OFF SITE WIDE Includes CLEARANCE    FREE SHIPPING OVER $50

## CUSHIONED COTTON 4 PACK
Men's Socks

| | |
|---|---|
| Style #: | 2767S |
| Price: | $16.00 |
| Your Price: | $12.00 |
| | (You save $4.00) |
| SKU: | 711-2767S |
| Pack: | 4 Pair |

Product Description
- Soft and Breathable
- Keeps feet cool and dry
- Cushioned foot to absorb shock
- Reinforced Toe for better fit comfort and wear

Rating:        ★☆☆☆☆ ( 1 product review )

Contents:
79% Cotton, 15% Polyester, 4% Nylon, 2% Spandex, Exclusive of Ornamentation

IMPORTED

Options
Shoe Size:    Choose a Shoe Size ▾
Color:        Choose a Color ▾
Quantity:     1 ▾

ADD TO CART
ADD TO WISH LIST



### BEST SELLERS

1
English Rib Lisle Non-Elastic Top
1 Pack
$8.00 $6.00
★★★☆☆    SHOP

2
Basic Support Over the Calf
1 Pack
$16.00 $12.00
★★★★☆    SHOP

3
Ultra Tec Over the Calf
3 Pack
$17.00 $12.75
★★★★☆    SHOP

Reviews  Size Chart

## Product Reviews                                        WRITE A REVIEW

1. Product size range is incorrect. ★☆☆☆☆
   Posted by Unknown on 23rd Mar 2013

   I wear a shoe size ranging from 11 1/2 to 12, but after several washings, I have to struggle to put them on. They are way too tight.

INFORMATION          MORE WAYS TO SHOP      BRANDS          SPECIAL OFFERS
Return Policy    Gold Toe Legacy        Contact Us    Gold Toe Stores    GOLDTOE®    email@example.com    SIGN UP
Shipping         Gold Toe Innovation    FAQs          Retail Partners    PowerSox®
Site Map         Gold Toe Standard of Quality   Care Instructions   Online   SoleUtion®
Privacy & Security
Terms of Use

McAfee SECURE

1/2/2015                         Shop 6 Pr Cotton Sport Liner at Goldtoe.com Now



1/2/2015                    Shop 6 Pr Cotton No Show at Goldtoe.com Now



25% OFF SITE WIDE Includes CLEARANCE    FREE SHIPPING OVER $50

MEN'S UNDERWEAR | 'S CASUALWEAR | WOMEN'S SOCKS | KIDS' SOCKS

## 6 PR COTTON NO SHOW
Men's Socks

| | |
|---|---|
| Style #: | 656F |
| Price: | $20.00 |
| Your Price: | $15.00 |
| | (You save $5.00) |
| SKU: | 711-656F |
| Pack: | 6 Pair |

Product Description
- A soft, breathable sock that absorbs sweat
- Keeps feet cool and dry
- Cushioned bottoms and gold panel at toe

Contents:
75% Cotton, 19% Polyester, 5% Nylon, 1% Spandex, Exclusive of Ornamentation

IMPORTED

Options

| | |
|---|---|
| Shoe Size: | Choose a Shoe Size ▾ |
| Color: | Choose a Color ▾ |
| Quantity: | 1 ▾ |

ADD TO CART
ADD TO WISH LIST

Reviews | Size Chart

### Product Reviews
This product hasn't received any reviews yet. Be the first to review this product!

WRITE A REVIEW

### BEST SELLERS

1
English Rib Lisle Non-Elastic Top
1 Pack
$8.00 $6.00
★★★☆☆
SHOP

2
Basic Support Over the Calf
1 Pack
$16.00 $12.00
★★★★☆
SHOP

3
Ultra Tec Over the Calf
3 Pack
$17.00 $12.75
★★★★☆
SHOP

Follow Us

INFORMATION
Return Policy
Shipping
Site Map
Privacy & Security
Terms of Use

Gold Toe Legacy
Gold Toe Innovation
Gold Toe Standard of Quality

Contact Us
FAQs
Care Instructions

MORE WAYS TO SHOP
Gold Toe Stores
Retail Partners
Online

BRANDS
GOLDTOE®
PowerSox®
SoleUtion®

SPECIAL OFFERS
email@example.com    SIGN UP

McAfee SECURE
CLICK TO VERIFY

http://www.goldtoe.com/products/6-Pr--Cotton-No-Show.html                                      1/1

-175-

1/2/2015    Shop 6 Pr Cotton Crew at Goldtoe.com Now





1/2/2015                    Shop 6 Pr Cotton Crew at Goldtoe.com Now

Why did you stop making 100% cotton white crew socks?Short style

10. where are the Acrylic ???? ★★★★★
Posted by Bruce Warren on 10th Mar 2014

they use to have Acrylic are they not making them anymore????

Showing reviews 1-10 of 36 | Next

**INFORMATION**
Return Policy
Shipping
Site Map
Privacy & Security
Terms of Use

Gold Toe Legacy
Gold Toe Innovation
Gold Toe Standard of Quality

Contact Us
FAQs
Care Instructions

**MORE WAYS TO SHOP**
Gold Toe Stores
Retail Partners
Online

**BRANDS**
GOLDTOE®
PowerSox®
SoleUtion®

**SPECIAL OFFERS**
email@example.com  SIGN UP



MEN'S UNDERWEAR | MEN'S CASUALWEAR | WOMEN'S SOCKS | KIDS' SOCKS

**25% OFF** SITE WIDE Includes CLEARANCE    **FREE SHIPPING** OVER $50

## 6 PR COTTON LINER EXTENDED

Men's Socks

| | |
|---|---|
| Style #: | 656FE |
| Price: | $21.00 |
| Your Price: | $15.75 |
| | (You save $5.25) |
| SKU: | 711-656FE |
| Pack: | 6 Pair |

Product Description
- A soft, breathable sock that absorbs sweat
- Keeps feet cool and dry
- Cushioned bottoms and gold panel at toe

Rating:  ★★★★★ ( 1 product review )

Contents:
79% Cotton, 20% Nylon, 1% Spandex Exclusive of Ornamentation

IMPORTED

Options

| | |
|---|---|
| Shoe Size: | Choose a Shoe Size ▼ |
| Color: | Choose a Color ▼ |
| Quantity: | 1 ▼ |

**ADD TO CART**
ADD TO WISH LIST

### BEST SELLERS

1
English Rib Lisle Non-Elastic Top
1 Pack
$8.00 $6.00
★★★☆☆    SHOP

2
Basic Support Over the Calf
1 Pack
$16.00 $12.00
★★★★☆    SHOP

3
Ultra Tec Over the Calf
3 Pack
$17.00 $12.75
★★★★☆    SHOP

Reviews  Size Chart

## Product Reviews

**WRITE A REVIEW**

1. Best low-rise I've found ★★★★★
Posted by Jarret on 19th Jul 2013

So, I have waited a few months since I have ordered these socks and I must say I'm very impressed. They have shown no form of wear and are still extremely comfortable. These socks handle a lot with me as I wear them to the gym, work, and just while I'm around the house. Unlike many other socks I have worn (Nike, Under Armour), these are affordable and fit a size larger than advertised (my shoes size is 17) and more importantly they have not ripped at the heel or toe.

**INFORMATION**
Return Policy
Shipping
Site Map
Privacy & Security
Terms of Use

Gold Toe Legacy
Gold Toe Innovation
Gold Toe Standard of Quality

Contact Us
FAQs
Care Instructions

**MORE WAYS TO SHOP**
Gold Toe Stores
Retail Partners
Online

**BRANDS**
GOLDTOE®
PowerSox®
SoleUtion®

**SPECIAL OFFERS**
email@example.com    SIGN UP

1/2/2015                                    Pheasants - GoldToe.com



1/2/2015                                    Shop SolUtion Sport Cushion Tec ® Liner at Goldtoe.com Now



1/2/2015                                  Shop Ultratec Qtr 3 Pr at Goldtoe.com Now



http://www.goldtoe.com/products/Ultratec-Qtr-3-Pr.html                                          1/1

-181-

1/2/2015                    Shop Cushion Quarter 3 Pack at Goldtoe.com Now

| MEN'S UNDERWEAR | MEN'S CASUALWEAR | WOMEN'S SOCKS | KIDS' SOCKS

**25% OFF** SITE WIDE
Includes CLEARANCE

**FREE SHIPPING**
OVER $50

## CUSHION QUARTER 3 PACK

Men's Socks

| | |
|---|---|
| Style #: | 2771P |
| Price: | ~~$12.00~~ |
| Your Price: | $9.00 |
| | (You save $3.00) |
| SKU: | 711-2771P |
| Pack: | 3 Pair |

Product
Description
- Soft and breathable
- Keeps feet cool and dry
- Cushioned foot to absorb shock
- Reinforced toe for better fit, comfort and wear

Contents:
80% Cotton, 16% Polyester, 3 % Nylon, 1% Spandex, Exclusive
of Ornamentation

IMPORTED

Options

| | |
|---|---|
| Shoe Size: | Choose a Shoe Size ▼ |
| Color: | Choose a Color ▼ |
| Quantity: | 1 ▼ |

**ADD TO CART**

ADD TO WISH LIST



Related Products | Reviews | Size Chart

## RELATED PRODUCTS

Cushion Tec® Quarter
~~$15.00~~ $12.00
★★★☆☆

### BEST SELLERS

1
English Rib Lisle Non-
Elastic Top
1 Pack
~~$8.00~~ $6.00
★★★☆☆   SHOP

2
Basic Support Over the
1 Pack      Calf
~~$16.00~~ $12.00
★★★★☆   SHOP

3
Ultra Tec Over the Calf
3 Pack
~~$17.00~~ $12.75
★★★★☆   SHOP

Follow Us

INFORMATION
Return Policy
Shipping
Site Map
Privacy & Security
Terms of Use

Gold Toe Legacy
Gold Toe Innovation
Gold Toe Standard of Quality

Contact Us
FAQs
Care Instructions

MORE WAYS TO SHOP
Gold Toe Stores
Retail Partners
Online

BRANDS
GOLDTOE®
PowerSox®
SoleUtion®

SPECIAL OFFERS
email@example.com      SIGN UP

McAfee
SECURE
CLICK TO VERIFY

http://www.goldtoe.com/products/Cushion-Quarter-3--Pack.html                    1/1

**-182-**

1/2/2015                    Shop 6 Pr Cotton Quarter Sock at Goldtoe.com Now



MEN'S UNDERWEAR | MEN'S CASUALWEAR | WOMEN'S SOCKS | KIDS' SOCKS

25% OFF SITE WIDE Includes CLEARANCE        FREE SHIPPING OVER $50

## 6 PR COTTON QUARTER SOCK

Men's Socks

| | |
|---|---|
| Style #: | 656P |
| Price: | $20.00 |
| Your Price: | $15.00 |
| | (You save $5.00) |
| SKU: | 711-656P |
| Pack: | 6 Pair |

Product Description
A soft, breathable sock that absorbs sweat Keeps feet cool and dry Cushioned bottoms and gold panel at toe

Rating:         ★★★★☆  ( 4 product reviews )

Contents:
76% Cotton, 17% Polyester, 5% Nylon, 2% Spandex, Exclusive of Ornamentation

IMPORTED

Options

| | |
|---|---|
| Shoe Size: | Choose a Shoe Size ▼ |
| Color: | Choose a Color ▼ |
| Quantity: | 1 ▼ |

ADD TO CART

ADD TO WISH LIST

Reviews | Size Chart

## Product Reviews

WRITE A REVIEW

1. Mr. Pitt would love these socks! ★★★★☆
   Posted by Ricardo on 7th Dec 2014

   I have been searching for a nice pair of black socks. I am rarely satisfied. The socks I have had are either too thin, too tight, don't stay up, or I have to pay a lot for designer socks.

   These socks are the best. They get on easy, feel great, and stay in place. I went back to the store and bought 6 more in packs of 8. At 51 years old I will probably never have to buy another pair of black socks.

   Thanks Gold Toe!

2. They shrink a lot ★★☆☆☆
   Posted by Carlos on 12th Nov 2014

   After the first wash they shrink a lot, probably because of the spandex, I had different quarter goldtoe socks but with different contents and didn't shrink so they fit comfortably.

3. great ★★★★★
   Posted by Unknown on 20th Oct 2012

   great

4. Perfect ★★★★★
   Posted by Unknown on 9th May 2012

   These socks are perfect for athletic and everyday wear. Great for the gym!

### BEST SELLERS

1

English Rib Lisle Non-Elastic Top
1 Pack
$8.00 $6.00
★★★☆☆          SHOP

2

Basic Support Over the Calf
1 Pack
$16.00 $12.00
★★★★☆          SHOP

3

Ultra Tec Over the Calf
3 Pack
$17.00 $12.75
★★★★☆          SHOP

**INFORMATION**
Return Policy
Shipping
Site Map
Privacy & Security
Terms of Use

Gold Toe Legacy
Gold Toe Innovation
Gold Toe Standard of Quality

Contact Us
FAQs
Care Instructions

**MORE WAYS TO SHOP**
Gold Toe Stores
Retail Partners
Online

**BRANDS**
GOLDTOE®
PowerSox®
SoleUtion®

**SPECIAL OFFERS**
email@example.com     SIGN UP

http://www.goldtoe.com/products/6-Pr--Cotton-Quarter-Sock.html                                    1/1

-183-

1/2/2015                                AquaFX® Soleution Crew - GoldToe.com



1/2/2015                                    AquaFX® Soleution Tab Liner - GoldToe.com

| MEN'S UNDERWEAR | MEN'S CASUALWEAR | WOMEN'S SOCKS | KIDS' SOCKS

**25% OFF** SITE WIDE Includes CLEARANCE    **FREE SHIPPING** OVER $50

## AQUAFX® SOLEUTION TAB LINER

Men's Socks

| | |
|---|---|
| Style #: | 2374P |
| Price: | $17.00 |
| Your Price: | $12.75 |
| | (You save $4.25) |
| SKU: | 711-2374P |
| Pack: | 3 Pair |

Product
Description
- Premium Zone Cushioning
- AquaFX® Moisture Control wicks away moisture to keep feet
  dry and comfortable all day

Rating:    ★★★☆☆ ( 3 product reviews )

Contents:
41% Rayon made from Bamboo, 41% Cotton, 16% Nylon,
Exclusive of Ornamentation

IMPORTED

Options

| | |
|---|---|
| Shoe Size: | Choose a Shoe Size ▼ |
| Color: | Choose a Color ▼ |
| Quantity: | 1 ▼ |

**ADD TO CART**
ADD TO WISH LIST



**BEST SELLERS**

1
**English Rib Lisle Non-Elastic Top**
1 Pack
$8.00 $6.00
★★★☆☆    SHOP

2
**Basic Support Over the Calf**
1 Pack
$16.00 $12.00
★★★★☆    SHOP

3
**Ultra Tec Over the Calf**
3 Pack
$17.00 $12.75
★★★★☆    SHOP

Follow Us

Related Products | Reviews | Size Chart

## RELATED PRODUCTS

**SoleUtion Sport Ultra Tec® Liner**
$16.00 $12.00

**AquaFX® Soleution Crew**
$17.00 $12.75
★★★★☆

**AquaFX® Soleution Quarter**
$17.00 $12.75
★★☆☆☆

**INFORMATION**
Return Policy
Shipping
Site Map
Privacy & Security
Terms of Use

Gold Toe Legacy
Gold Toe Innovation
Gold Toe Standard of Quality

Contact Us
FAQs
Care Instructions

**MORE WAYS TO SHOP**
Gold Toe Stores
Retail Partners
Online

**BRANDS**
GOLDTOE®
PowerSox®
SoleUtion®

**SPECIAL OFFERS**
email@example.com    SIGN UP

MasterCard  VISA  DISCOVER  AMERICAN EXPRESS

McAfee SECURE
CLICK TO VERIFY

http://www.goldtoe.com/products/AquaFX%C2%AE-Soleution-Tab-Liner.html                                    1/1

**-185-**

1/2/2015                                    AquaFX® Soleution Quarter - GoldToe.com



## AQUAFX® SOLEUTION QUARTER

Men's Socks

Style #:          2339P
Price:            $17.00
Your Price:       $12.75
                  (You save $4.25)
SKU:              711-2339P
Pack:             3 Pair

Product
Description

- Premium Zone Cushioning
- AquaFX® Moisture Control wicks away moisture to keep feet dry and comfortable all day

Rating:           ★★☆☆☆ ( 3 product reviews )

Contents:
39% Rayon made from Bamboo, 39% Cotton, 19% Nylon, 3% Spandex, Exclusive of Ornamentation

IMPORTED

Options

Shoe Size:        [Choose a Shoe Size ▼]
Color:            [Choose a Color ▼]
Quantity:         [1 ▼]

[ADD TO CART]
[ADD TO WISH LIST]

**BEST SELLERS**

1
English Rib Lisle Non-Elastic Top
1 Pack
$8.00 $6.00
★★★☆☆            SHOP

2
Basic Support Over the Calf
1 Pack
$16.00 $12.00
★★★★☆            SHOP

3
Ultra Tec Over the Calf
3 Pack
$17.00 $12.75
★★★★☆            SHOP

Related Products | Reviews | Size Chart

## RELATED PRODUCTS

AquaFX® Quarter 3 pair
$14.00 $10.50

SoleUtion Sport Ultra Tec®
Liner
$16.00 $12.00

AquaFX® Soleution Crew
$17.00 $12.75
★★★★☆

AquaFX® Soleution Tab
Liner
$17.00 $12.75
★★★☆☆

**INFORMATION**        **MORE WAYS TO SHOP**    **BRANDS**        **SPECIAL OFFERS**

Return Policy      Gold Toe Legacy        Gold Toe Stores    GOLDTOE®      email@example.com   [SIGN UP]
Shipping           Gold Toe Innovation    Retail Partners    PowerSox®
Site Map           Gold Toe Standard of Quality  Online       SoleUtion®
Privacy & Security Contact Us
Terms of Use       FAQs
                   Care Instructions

[MasterCard] [VISA] [DISCOVER] [AMERICAN EXPRESS]          [McAfee SECURE]
                                                          CLICK TO VERIFY

1/2/2015                    UltraTec Crew Extended - GoldToe.com



MEN'S UNDERWEAR | MEN'S CASUALWEAR | WOMEN'S SOCKS | KIDS' SOCKS

**25% OFF** SITE WIDE
Includes CLEARANCE

**FREE SHIPPING** OVER $50

## ULTRATEC CREW EXTENDED

Men's Socks

| | |
|---|---|
| Style #: | 2187E |
| Price: | ~~$18.00~~ |
| Your Price: | $13.50 (You save $4.50) |
| SKU: | 711-2187E |
| Pack: | 3 Pair |

Product Description
- Delcron® Hydrotec for Moisture Control
- Spandex ensures Perfect fit
- and Reinforced Toe

Contents:
79% Cotton, 15% Nylon, 5% Hydrotec® Polyester, 1% Spandex, Exclusive of Ornamentation

IMPORTED

Options

| | |
|---|---|
| Shoe Size: | Choose a Shoe Size ▾ |
| Color: | Choose a Color ▾ |
| Quantity: | 1 ▾ |

**ADD TO CART**

ADD TO WISH LIST

Related Products | Reviews | Size Chart

## RELATED PRODUCTS

UltraTec Crew
~~$17.00~~ $12.75

Ultratec Short Crew 3 Pr
~~$16.00~~ $12.00

Ultratec Qtr 3 Pr
~~$16.00~~ $12.00

### BEST SELLERS

1

English Rib Lisle Non-Elastic Top
1 Pack
~~$8.00~~ $6.00
SHOP

2

Basic Support Over the Calf
1 Pack
~~$16.00~~ $12.00
SHOP

3

Ultra Tec Over the Calf
3 Pack
~~$17.00~~ $12.75
SHOP

Follow Us

---

INFORMATION
Return Policy
Shipping
Site Map
Privacy & Security
Terms of Use

Gold Toe Legacy
Gold Toe Innovation
Gold Toe Standard of Quality

Contact Us
FAQs
Care Instructions

MORE WAYS TO SHOP
Gold Toe Stores
Retail Partners
Online

BRANDS
GOLDTOE®
PowerSox®
SoleUtion®

SPECIAL OFFERS
email@example.com    SIGN UP

MasterCard   VISA   DISCOVER   AMERICAN EXPRESS

McAfee SECURE
CLICK TO VERIFY

1/2/2015                          Shop 6 Pr Cotton Crew Extended at Goldtoe.com Now



|   | MEN'S UNDERWEAR | MEN'S CASUALWEAR | WOMEN'S SOCKS | KIDS' SOCKS | **25% OFF** SITE WIDE Includes CLEARANCE | **FREE SHIPPING** OVER $50 |

# 6 PR COTTON CREW EXTENDED

Men's Socks

| | |
|---|---|
| Style #: | 656SE |
| Price: | ~~$21.00~~ |
| Your Price: | $15.75 |
| | (You save $5.25) |
| SKU: | 711-656SE |
| Pack: | 6 Pair |

Product Description
- A soft, breathable sock that absorbs sweat
- Keeps feet cool and dry
- Cushioned bottoms and gold panel at toe

Rating:       ★★★☆☆ ( 4 product reviews )
Contents:
81% Cotton, 18% Nylon, 1% Spandex Exclusive of Ornamentation

IMPORTED

**Options**

| | |
|---|---|
| Shoe Size: | Choose a Shoe Size ▼ |
| Color: | Choose a Color ▼ |
| Quantity: | 1 ▼ |

ADD TO CART
ADD TO WISH LIST

**BEST SELLERS**

1
English Rib Lisle Non-Elastic Top
1 Pack
~~$8.00~~ $6.00
★★★☆☆    SHOP

2
Basic Support Over the Calf
1 Pack
~~$16.00~~ $12.00
★★★★☆    SHOP

3
Ultra Tec Over the Calf
3 Pack
~~$17.00~~ $12.75
★★★★☆    SHOP

Follow Us

---

[ Reviews ] [ Size Chart ]

## Product Reviews

WRITE A REVIEW

1. Gold Toe Large Sizes Downsized ★★★☆☆
   Posted by Unknown on 19th Dec 2014

   Found these socks at JCP. Bought them for several years and LOVED the cotton comfort, They fit a larger size foot and calf. Last year, same size, same price, but found the sock is now much, much smaller. [As in no longer wearable.] Hoped for a manufacturing error, but it seems the adjustment is systematic. Just a warning. Pull a pair out of the package if possible and compare to the size you need. (Or check the return policy wherever you buy.)

2. Durable and comfortable ★★★★☆
   Posted by James Goodman on 14th Nov 2014

   I love these socks. They provide good support for aging blood vessels. I bought six pairs of these socks four years ago. I wear them virtually every day, though enough of them have worn holes so I'm running low. now about to buy more. The styles and numbers have changed, but the nearest one -- Cotton Crew Extended -- costs a bit less than I paid in 2010. I hope they last as long!

   In reference to another review: The ones I bought four years ago were stretchy, so this isn't a recent change.

3. THE EXTENDED SIZE HAS BEEN MODIFIED ★★☆☆☆
   Posted by BIJ on 25th Jul 2014

   THE SOCKS HAVE BEEN SHORTENED AND MADE MORE STRETCHY. FOR ME I PREFER THE OLD NON STRETCHY LONGER UPPERS. I ALSO HAVE A PROBLEM WITH THE HEEL WEARING OUT QUICKLY.

4. gold toe extended size crew socks ★★★☆☆
   Posted by Unknown on 8th Jun 2014

   i have used these socks for years & their still the same. the heel wears out first. if the heel didn't wear out i could get another year out of them. also, the last couple years they look like baby socks. sock size 13 - 15, i have to streach them & they shrink up tight against my toes. don't like, thats why i buy extended size.

---

**INFORMATION**
Return Policy
Shipping
Site Map
Privacy & Security
Terms of Use

Gold Toe Legacy
Gold Toe Innovation
Gold Toe Standard of Quality

Contact Us
FAQs
Care Instructions

**MORE WAYS TO SHOP**
Gold Toe Stores
Retail Partners
Online

**BRANDS**
GOLDTOE®
PowerSox®
SoleUtion®

**SPECIAL OFFERS**
email@example.com   SIGN UP

MasterCard  VISA  Discover  American Express        McAfee SECURE

-188-

# EXHIBIT 9



Case 3:14-cv-00590-MOC-DSC Document 116-6 Filed 02/13/15 Page 2 of 4

CONFIDENTIAL

DIL 000027



DILLARD'S GOLD LABEL PANT PACKAGING

GOLD LABEL PANT POCKET FLASHER

GOLD LABEL PANT JOKER TICKET

GOLD LABEL PANT HANGTAG

**Gold Label**
ROUNDTREE & YORKE®
100% LUXURY SUPIMA COTTON
INNO-FLEX WAISTBAND
FOR ULTIMATE COMFORT
WRINKLE FREE/NON-IRON
RESISTS SHRINKAGE, FADING & PILLING
SUPERIOR COLOR RETENTION
MACHINE WASHABLE & DRYABLE

CLASSIC FIT    XXW x XXL
**Gold Label**
INNO-FLEX WAISTBAND
FOR ULTIMATE COMFORT
XXxXX
CLASSIC FIT    FLAT FRONT

**Gold Label**
INNO-FLEX WAISTBAND
FOR ULTIMATE COMFORT
100% Luxury Supima cotton
Wrinkle free, non-iron
Resists shrinkage, fading & pilling
Superior color retention
Machine washable & dryable

DIL 000028

Case 3:14-cv-00590-MOC-DSC  Document 46-6   Filed 02/13/15   Page 4 of 4

CONFIDENTIAL

DIL 000029

-192-

# EXHIBIT 10



Direct line: (514) 744-8567
Direct fax: (514) 734-8379
mreit@gildan.com

BY UPS

September 23, 2014

Dean Worley, Esq.
General Counsel
Dillard's, Inc.
1600 Cantrell Road
Little Rock, AR  72201

**Re: Infringement of Gildan's GOLDTOE Trade Dress**

Dear Mr. Worley:

I write to you today on behalf of Gildan Activewear, Inc. and its affiliates (collectively, "Gildan"). As you are likely aware, Gildan is a leading manufacturer and marketer of branded apparel, including its GILDAN, GOLDTOE and ANVIL clothing.

For several years, Gildan's GOLDTOE men's athletic socks have been sold in distinctive packaging featuring a blue band with contrasting gold elements and white lettering for its word mark having two components, the first of which is the term "GOLD." On the upper-right side of the front of the packaging is a gold partially serrated rectangle which informs consumers how many pairs of socks are included in the package, and gold color is also used in the band's side panels.

Gildan and its predecessors in interest have used this distinctive packaging design in conjunction with GOLDTOE men's athletic socks since at least as early as March 2011, and the packaging has been seen by millions of consumers in many of the nation's leading clothing retailers and elsewhere. Due to its continuous use of the distinctive packaging, Gildan owns common law trade dress rights in the design of its GOLDTOE men's athletic socks packaging, which consumers have come to associate solely with Gildan and its GOLDTOE products.

Gildan learned recently that Dillard's has begun selling socks under its GOLD LABEL house brand in packaging that is highly similar to, and obviously imitative of, the packaging used with the GOLDTOE men's athletic socks packaging. Specifically, and as shown in the attached images, Dillard's GOLD LABEL packaging incorporates each of the features described above and associated with the GOLDTOE men's athletic socks

SIÈGE SOCIAL - CORPORATE OFFICE

GT00029

**-194-**



packaging. This copying of the GOLDTOE packaging by Dillard's is likely to cause consumers to believe, mistakenly, that Dillard's GOLD LABEL socks originate from, or are otherwise associated or affiliated with, Gildan or its GOLDTOE socks in violation of several laws including, without limitation, Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Such confusion is even more likely given that (as is also shown in the attached images) Dillard's stores are mixing GOLDTOE men's athletic socks with GOLD LABEL socks in retail displays that bear a GOLD LABEL sign above those displays. Upon information and belief, Dillard's copying of the GOLDTOE trade dress for its GOLD LABEL packaging is part of an intentional effort to move its customers away from the GOLDTOE brand and towards Dillard's GOLD LABEL house brand. In any event, Dillard's blatant mimicry constitutes willful infringement of Gildan's proprietary trade dress.

Accordingly, we demand that Dillard's immediately: 1) remove from its stores and destroy the packaging of all merchandise having the infringing GOLD LABEL packaging; 2) cease all other use of the infringing GOLD LABEL packaging; 3) disclose to Gildan the unit volume of GOLD LABEL socks sold in the infringing packaging, along with the gross profits earned from these sales; 4) disclose to Gildan the supplier from which Dillard's acquires the infringing GOLD LABEL packaging; and 5) cease its display of GOLDTOE socks in retail displays with GOLD LABEL signs above those displays and any display of GOLD LABEL socks in retail displays with GOLDTOE signs above those displays.

This matter is of significant concern to Gildan, but it is hopeful that an amicable resolution can be reached. Towards that end, I look forward to hearing from you by October 6, 2014 with your written assurances that Dillard's has complied with the demands above. Should you have any questions or wish to discuss this matter further, please do not hesitate to contact me.

Yours very truly,

Maria Reit
Director, Legal Affairs – Intellectual Property and Global Marketing

Encl.

MR/nl

cc: Lindsay Matthews
Vice-President, General Counsel and Corporate Secretary

Case 3:14-cv-00590-MOC-DSC   Document 36-7   Filed 02/13/15   Page 3 of 9
GT00030





GT00032

-197-



GT00033

-198-







GT00036

-201-

# EXHIBIT 11



WILLIAM F. WESTERMAN    SHUJI YOSHIZAKI*    OF COUNSEL             BERNADETTE MCGANN*
KEN-ICHI HATTORI        DARRIN A. AUITO*    NICOLAS E. SECKEL      TANG (OLIVER) TANG, PhD*
SCOTT M. DANIELS        KENNETH H. SALEN*   STEPHEN B. PARKER      SUNG-HOON KIM*
STEPHEN G. ADRIAN       WILLIAM M. SCHERTLER*   LE-NHUNG McLELAND   CINDY H. CHEN* **
JOHN P. KONG            RYAN B. CHIRNOMAS   DENNIS M. HUBBS*
SADAO KINASHI           ANDREW G. MELICK    LINDA J. SHAPIRO
THOMAS E. BROWN         SIMOR L. MOSKOWITZ                        BENRISHI/PATENT AGENT*
LEE C. WRIGHT           ALLEN S. MELSER     KUMIKO IDE             TSUYOSHI NAKAMURA
MICHAEL J. CARIDI       GEORGE W. LEWIS     ROBERT Y. RAHEJA       YOSHIYA NAKAMURA**

*Not admitted in DC, practice limited to matters and proceedings    ** Limited Recognition at the U.S. Patent Office
before federal courts and agencies

www.WHDA.com

September 30, 2014

Maria Reit
Director, Legal Affairs – Intellectual Property and Global Marketing
600, boulevard de Maisonneuve Ouest
33ième étage
Montréal (Québec
Canada                          **FED. R. EVID. 408**

Re: <u>Infringement of Gildan's GOLDTOE Trade Dress</u>

Dear Ms. Reit:

This will refer to your September 23, 2014 letter addressed to Dean Worley, General Counsel of Dillard's, Inc. ("Dillard's"), which has been referred to our office for consideration and appropriate reply.

We note that Gildan claims to own "…common law trade dress rights in the design of its GOLDTOE men's athletic socks packaging [which you claim to be a distinctive design], which consumers have come to associate solely with Gildan and its GOLDTOE products". At the outset, we question that the asserted "distinctive packaging design" is in fact distinctive. In our considered opinion, the so-called "blue band with contrasting gold elements and white lettering for its word mark" is purely ornamental, and certainly not inherently distinctive. In this regard, we note that Gildan did not think enough of the asserted trade dress to seek federal trademark protection despite the fact that it apparently owns numerous federal trademark registrations for other marks, including design marks.

Based upon this initial assessment, in order for Gildan to establish a protectable interest in its asserted trade dress, it would be necessary for Gildan to establish that the purely ornamental "packaging design" has acquired distinctiveness. While you have asserted that "… since at least as early as March, 2011, … the packaging has been seen by millions of consumers in many of the nation's leading clothing retailers and elsewhere", even if true, that in and of itself does not establish that consumers focus on the packaging design and that the asserted trade dress has, in fact, acquired distinctiveness. And, certainly, there is nothing submitted with and/or claimed in your letter that establishes that Gildan treats the asserted trade dress as a trademark and promotes it as such to the purchasing public.

WASHINGTON OFFICE: 1250 CONNECTICUT AVE., N.W., SUITE 700, WASHINGTON, D.C. 20036  |  TEL. 202.822.1100  |  FAX. 202.822.1111  |  WHDAmail@WHDA.com
TOKYO OFFICE: Case 8:14-cv-00590-MGG-DSG Document 36-8 Filed 02/13/15 Page 2 of 4  FAX. 03-5909-1171
GT00026

-203-

Maria Reit
September 30, 2014
Page 2

As I see that you are writing from Canada, I would note that, as a general rule under U.S. law, for matter that is not inherently distinctive because of its nature (e.g., nondistinctive product design, overall color of a product, and mere ornamentation), evidence of extended use alone is not sufficient to show acquired distinctiveness. In such a case, actual evidence that the mark is perceived by the consuming public as a mark for the relevant goods would be required to establish distinctiveness. No such proof has been proferred here.

A review of Gildan's Goldtoe web page, www.goldtoe.com, is consistent with our skepticism, as there appears to be no effort whatsoever by Gildan to focus the consumer's attention on the asserted trade dress. In fact, the noted web page appears to show the contrary in its offer of the below differently packaged blue-banded athletic socks:

  



On behalf of Dillard's, we take this opportunity to assure you that it endeavors to respect the intellectual property rights of others, when it is first satisfied that protectable rights exist. In this instance, we call upon you to provide evidence of Gildan's promotion of its asserted trade dress as a trademark or otherwise to establish its acquired distinctiveness as an indication of source or origin rather than merely an ornamental

Maria Reit
September 30, 2014
Page 3

package design. Once such evidence is received, we will promptly revisit your claim and
provide our further response.

Lastly, and without in any way admitting or conceding your position and/or
liability, or acknowledging a likelihood of confusion, please be advised that Dillard's will
consider taking steps to separate the in-store displays of the respective Dillard's and
Gildan socks.

In view of the foregoing, we await your reply.

Very truly yours,

Westerman, Hattori, Daniels & Adrian, LLP

Simor L. Moskowitz

cc:  Dean Worley, Esq.
     Steven Duke, Esq.

GT00028

-205-

# EXHIBIT 12

Gildan's USPTO Trademark Registrations and Applications to Register Trademarks

| | Serial No. | Registration No. | Word Mark | Filing Date |
|---|---|---|---|---|
| 1 | 86315560 | | RAIN REPEL | June 20, 2014 |
| 2 | 86298601 | | ALL PRO | June 3, 2014 |
| 3 | 86022145 | | GILDAN PERFORMANCE | July 29, 2013 |
| 4 | 86300568 | | POWER PLAY | June 4, 2014 |
| 5 | 86298718 | | POWERSOX | June 3, 2014 |
| 6 | 86298709 | | G | June 3, 2014 |
| 7 | 86298624 | | SOLEUTION | June 3, 2014 |
| 8 | 86298611 | | G | June 3, 2014 |
| 9 | 86006301 | | AQUA DEFENSE | July 10, 2013 |
| 10 | 86231601 | | GOLDLINE | March 25, 2014 |
| 11 | 86387711 | | SILKS ILLUSION | September 8, 2014 |
| 12 | 86119258 | | SOFTOES | November 14, 2013 |
| 13 | 86314173 | | GOLD TOE PREMIER | June 19, 2014 |
| 14 | 86331569 | | SILVER TOE | July 8, 2014 |
| 15 | 86449805 | | GILDAN SUPPLY & CO. | November 10, 2014 |
| 16 | 86298732 | | GT A GOLD TOE BRAND | June 3, 2014 |
| 17 | 86438716 | | TEMPFX | October 29, 2014 |
| 18 | 86125574 | | THERMO SHIELD | November 21, 2013 |
| 19 | 86343210 | | THERAPY PLUS | July 21, 2014 |
| 20 | 86095580 | | TEMPFX | October 18, 2013 |
| 21 | 86298637 | | GOLD TOE | June 3, 2014 |
| 22 | 86322832 | | PRO A GOLD TOE BRAND | June 27, 2014 |
| 23 | 86318716 | | GOLD TOE PREMIER | June 24, 2014 |
| 24 | 86315566 | | DRY GUARD | June 20, 2014 |
| 25 | 86057987 | | AQUAFX | September 6, 2013 |
| 26 | 86057969 | | FRESHCARE | September 6, 2013 |
| 27 | 86005275 | | | July 9, 2013 |
| 28 | 86140435 | 4579586 | ANVIL | December 11, 2013 |
| 29 | 86318733 | | MOBILITY STRETCH | June 24, 2014 |
| 30 | 86057773 | 4546796 | GOLDTOE | September 6, 2013 |
| 31 | 85957832 | | GILDAN PLATINUM | June 12, 2013 |
| 32 | 85736876 | | SIGNATURE SHADES BY KUSHYFOOT | September 24, 2012 |
| 33 | 85616891 | | COTTONFX | May 4, 2012 |
| 34 | 85616885 | | COTTONFX | May 4, 2012 |
| 35 | 85760070 | | EVERY THREAD COUNTS | October 22, 2012 |
| 36 | 85981178 | | SIGNATURE GOLD BY GOLDTOE | April 17, 2013 |
| 37 | 85796357 | 4632959 | INTELLI-SOLES | December 6, 2012 |

| 38 | 85268221 | 4632662 | GILDAN | March 16, 2011 |
| 39 | 85907198 | | SIGNATURE GOLD BY GOLDTOE | April 17, 2013 |
| 40 | 85769878 | | SOCKANISTA | November 2, 2012 |
| 41 | 85732644 | | THE BEST SOCKS ON TWO FEET | September 19, 2012 |
| 42 | 85536769 | | DURA MATES | February 8, 2012 |
| 43 | 85288028 | | POWER MOVES | April 6, 2011 |
| 44 | 85751128 | | EZ MATES | October 11, 2012 |
| 45 | 85576758 | | THE COLOR OF PERFECTION | March 22, 2012 |
| 46 | 85382427 | 4593223 | AQUA FX ZONE | July 27, 2011 |
| 47 | 85522371 | 4175734 | | January 23, 2012 |
| 48 | 85330655 | 4166009 | | May 26, 2011 |
| 49 | 85215871 | 4400534 | POWERVALUE | January 12, 2011 |
| 50 | 85176783 | 3938157 | POWERSOX | November 15, 2010 |
| 51 | 85153612 | 3957847 | GOLDTOE | October 15, 2010 |
| 52 | 85153578 | 3947965 | POWERSOX | October 15, 2010 |
| 53 | 85137645 | 4518036 | GILDAN PREMIUM COTTON | September 24, 2010 |
| 54 | 85135301 | 4165224 | SHIRT SCAN | September 22, 2010 |
| 55 | 85135290 | 4161806 | SHIRT SCAN | September 22, 2010 |
| 56 | 85135267 | 4068377 | SHIRT SCAN | September 22, 2010 |
| 57 | 85113657 | 4158404 | TRACK MY T | August 23, 2010 |
| 58 | 85113646 | 4158403 | TRACK MY T WWW.TRACKMYT.COM | August 23, 2010 |
| 59 | 85111699 | 4350516 | ONE SOX YOUR SPORT | August 19, 2010 |
| 60 | 85105852 | 3992503 | GILDAN SOFTSTYLE | August 12, 2010 |
| 61 | 85078553 | 4396515 | DRYBLEND | July 6, 2010 |
| 62 | 85071715 | 4004976 | GENUINE STEWARDSHIP | June 25, 2010 |
| 63 | 78938054 | 3309926 | SOLEUTION | July 26, 2006 |
| 64 | 78937990 | 3442946 | GOLDTOE SOLEUTION | July 26, 2006 |
| 65 | 78918153 | 3317989 | IRONSOX | June 27, 2006 |
| 66 | 78896595 | 3718665 | GILDAN | May 31, 2006 |
| 67 | 78831280 | 3210933 | PERFECT FIT | March 7, 2006 |
| 68 | 78711772 | 3218935 | FRESHCARE | September 13, 2005 |
| 69 | 78707924 | 3231451 | GOLD TOE PREMIER | September 7, 2005 |
| 70 | 78554285 | 3131112 | SILVER TOE GEAR | January 26, 2005 |
| 71 | 78508163 | 3279342 | GT A GOLD TOE BRAND | October 29, 2004 |
| 72 | 78222463 | 2849746 | SOXMATES | March 6, 2003 |
| 73 | 78206201 | 2846805 | CUSHION TEC | January 23, 2003 |
| 74 | 78466145 | 3119227 | | August 12, 2004 |
| 75 | 78448227 | 3104992 | | July 9, 2004 |
| 76 | 78370459 | 3281060 | | February 19, 2004 |
| 77 | 78336231 | 2979644 | EVER WEAR | December 4, 2003 |

| 78 | 78323954 | 2959499 | | November 6, 2003 |
| 79 | 78202584 | 2817241 | SETTING THE STANDARD | January 13, 2003 |
| 80 | 78190247 | 3026380 | GILDAN FINDER.COM | December 2, 2002 |
| 81 | 78179095 | 3060831 | SOLE 2 SOUL | October 28, 2002 |
| 82 | 78071212 | 2673300 | EZ MATCH | June 27, 2001 |
| 83 | 77955770 | 3863723 | ANVIL | March 10, 2010 |
| 84 | 77955750 | 3933644 | ANVIL | March 10, 2010 |
| 85 | 77926121 | 4033167 | TRACK MY T | February 2, 2010 |
| 86 | 77887431 | 3967161 | STANDARD OF QUALITY | December 7, 2009 |
| 87 | 77873519 | 3813984 | POWER SOX A GOLD TOE BRAND X | November 16, 2009 |
| 88 | 77871250 | 4491342 | SMART BASICS | November 12, 2009 |
| 89 | 77862744 | 3998887 | G | November 2, 2009 |
| 90 | 77856211 | 4365001 | AURO | October 23, 2009 |
| 91 | 77847496 | 3998828 | GOLDTOE | October 13, 2009 |
| 92 | 77847485 | 3998826 | GOLD TOE | October 13, 2009 |
| 93 | 77843266 | 3905403 | GREAT PERFORMANCE STARTS FEET FIRST | October 7, 2009 |
| 94 | 77808834 | 4432726 | PART OF YOUR LIFE | August 20, 2009 |
| 95 | 77801601 | 3953108 | POWER-LITES | August 11, 2009 |
| 96 | 77773476 | 4035443 | SPILLGUARD | July 2, 2009 |
| 97 | 77750201 | 4295914 | ALL PRO | June 2, 2009 |
| 98 | 77621356 | 3811663 | ECO-FX | November 25, 2008 |
| 99 | 77621348 | 3929005 | ECO-FX | November 25, 2008 |
| 100 | 77415071 | 3877319 | ANVILRECYCLED | March 6, 2008 |
| 101 | 77397969 | 3828775 | ANVILSUSTAINABLE | February 15, 2008 |
| 102 | 77310578 | 3741524 | GOLDTOE MORETZ | October 23, 2007 |
| 103 | 77252176 | 3990322 | ANVILORGANIC | August 10, 2007 |
| 104 | 77149810 | 3775103 | AUROGANICS | April 5, 2007 |
| 105 | 77029782 | 3250356 | SILVERTOE | October 26, 2006 |
| 106 | 77023665 | 3250352 | GOLDTOE | March 27, 2007 |
| 107 | 76559816 | 2893048 | ANVIL | October 30, 2003 |
| 108 | 76687135 | | ANATOMICAL PERFORMANCE FIT | February 27, 2008 |
| 109 | 76463729 | 2781599 | G | November 1, 2002 |
| 110 | 76463728 | 2781598 | G | November 1, 2002 |
| 111 | 76687136 | 3725892 | APF | February 27, 2008 |
| 112 | 76590936 | 3043541 | MAX SPUN | May 7, 2004 |
| 113 | 76590545 | 3006302 | AQUAFX | May 5, 2004 |
| 114 | 76463727 | 2801963 | | November 1, 2002 |
| 115 | 76462707 | 2831431 | | October 29, 2002 |
| 116 | 76461806 | 3104313 | TREADWELL | October 28, 2002 |
| 117 | 76435362 | 2799496 | | July 29, 2002 |

| 118 | 76339324 | 2954083 |  |  | November 19, 2001 |
|-----|----------|---------|--|--|-------------------|
| 119 | 76276434 | 2694015 | AURO |  | June 25, 2001 |
| 120 | 76179968 | 2751736 | GOLD TOE |  | December 13, 2000 |
| 121 | 76135132 | 2586443 | GOLD TOE GEAR |  | September 25, 2000 |
| 122 | 76041120 | 2707500 | GOLD STANDARD |  | May 3, 2000 |
| 123 | 75704093 | 2870757 | ULTRA BLEND |  | May 13, 1999 |
| 124 | 75727363 | 2525702 | FALL PROOF |  | June 11, 1999 |
| 125 | 75650363 | 2319377 | PRO-THICKS |  | February 26, 1999 |
| 126 | 75630275 | 2770527 |  |  | January 29, 1999 |
| 127 | 75622752 | 2331852 | FRESH SOLES |  | January 19, 1999 |
| 128 | 75312207 | 2381715 | ULTRA COTTON |  | June 20, 1997 |
| 129 | 75307746 | 2215412 | POWERF.I.T. |  | June 12, 1997 |
| 130 | 75307745 | 2215411 | POWERF.I.T. |  | June 12, 1997 |
| 131 | 75242778 | 2160214 | GOLD CLUB |  | February 18, 1997 |
| 132 | 75197421 | 2163413 | STANDARD OF QUALITY |  | November 13, 1996 |
| 133 | 75185623 | 2075900 | VAPOR-TECH |  | October 22, 1996 |
| 134 | 75103283 | 2139828 | PERFECT FIT |  | May 13, 1996 |
| 135 | 75050736 | 2240936 | ALL WALKS OF LIFE |  | January 29, 1996 |
| 136 | 74270361 | 1829880 | GILDAN |  | April 28, 1992 |
| 137 | 74323039 | 1802161 | ALL PRO |  | October 16, 1992 |
| 138 | 74680710 | 2056422 |  |  | May 26, 1995 |
| 139 | 74668550 | 1994946 | LEGEND BY GOLD TOE |  | May 1, 1995 |
| 140 | 74559762 | 1997463 | POWER SOX |  | August 11, 1994 |
| 141 | 74525534 | 2114401 | FOR ALL WALKS OF LIFE |  | May 17, 1994 |
| 142 | 74325824 | 1987386 | FOOT UNDIES |  | October 26, 1992 |
| 143 | 74323035 | 1924671 | GOLD TOE CLASSIC |  | October 16, 1992 |
| 144 | 74239513 | 1780355 | GOLD TOE |  | January 22, 1992 |
| 145 | 74239325 | 1837930 | GOLD TOE |  | January 22, 1992 |
| 146 | 74219519 | 1849356 | SOCK VIEWS |  | November 7, 1991 |
| 147 | 74171849 | 1751939 | COZY TREADS |  | May 31, 1991 |
| 148 | 74033025 | 1633270 | MORETZ |  | February 27, 1990 |
| 149 | 74032998 | 1624975 | MORETZ |  | February 27, 1990 |
| 150 | 73764138 | 1592084 | COLOR MATCH |  | November 9, 1988 |
| 151 | 73239207 | 1197967 | POWER PLAY |  | November 15, 1979 |
| 152 | 72190854 | 0783710 | ANVIL |  | April 13, 1964 |
| 153 | 72155148 | 0770388 |  |  | October 15, 1962 |
| 154 | 71340286 | 0308608 |  |  | August 1, 1933 |
| 155 | 72155149 | 0770389 | GOLD TOE |  | October 15, 1962 |
| 156 | 72122805 | 0761381 | ADAM'S RIB |  | June 26, 1961 |
| 157 | 72360621 | 0903069 | ANVIL |  | May 25, 1970 |

| 158 | 72229650 | 0819545 |              | October 8, 1965    |
|-----|----------|---------|--------------|--------------------|
| 159 | 72132671 | 0740958 | SILVER TOE   | November 24, 1961  |
| 160 | 72097305 | 0711571 | FLUFFIES     | May 17, 1960       |
| 161 | 71360254 | 0347461 | CUSHION-BILT | January 14, 1935   |

# EXHIBIT 13

Int. Cl.: 25

Prior U.S. Cl.: 39

**United States Patent and Trademark Office**

Reg. No. 308,608

Registered Dec. 12, 1933

10 Year Renewal

Renewal Term Begins Dec. 12, 1993

## TRADEMARK
## PRINCIPAL REGISTER



GAKM RESOURCES CORPORATION (DELAWARE CORPORATION)
1105 NORTH MARKET STREET, SUITE 1300

WILMINGTON, DE 19899, BY ASSIGNMENT, MERGER, ASSIGNMENT, ASSIGNMENT AND ASSIGNMENT FROM GREAT AMERICAN KNITTING MILLS, INC. (DELAWARE CORPORATION) BECHTELSVILLE, PA

THE REPRESENTATION OF A STOCKING IN THE DRAWING FORMS NO PART OF APPLICANT'S TRADEMARK.

THE DRAWING IS LINED FOR GOLD.

FOR: HOSIERY, IN CLASS 39 (INT. CL. 25).

FIRST USE 1–20–1932; IN COMMERCE 1–20–1932.

SER. NO. 71–340,286, FILED 8–1–1933.

*In testimony whereof I have hereunto set my hand and caused the seal of The Patent and Trademark Office to be affixed on Jan. 4, 1994.*

COMMISSIONER OF PATENTS AND TRADEMARKS

Int. Cl.: 25

Prior U.S. Cls.: 22 and 39

## United States Patent and Trademark Office

Reg. No. 2,056,422

Registered Apr. 22, 1997

## TRADEMARK
### SUPPLEMENTAL REGISTER



GAKM RESOURCES CORPORATION (DELA-WARE CORPORATION)
575 FIFTH AVENUE
NEW YORK, NY 10017

FOR: HOSIERY, IN CLASS 25 (U.S. CLS. 22 AND 39).

FIRST USE 6-0-1994; IN COMMERCE 6-0-1994.

OWNER OF U.S. REG. NOS. 308,608 AND 770,389.

THE MATTER SHOWN BY THE DOTTED LINES IS NOT A PART OF THE MARK AND SERVES ONLY TO SHOW THE POSITION OF THE MARK. THE DRAWING IS LINED FOR THE COLOR GOLD.

THE MARK CONSISTS OF A GOLD LINE ON THE CLOSING SEAM ACROSS THE TOP OF THE TOE OF A STOCKING.

SER. NO. 74–680,710, FILED P.R. 5–26–1995; AM. S.R. 6–3–1994.

CATHERINE KAISER KREBS, EXAMINING ATTORNEY

# EXHIBIT 14



GT00009

Case 3:14-cv-00590-MOC-DSC   Document 36-11   Filed 02/13/15   Page 2 of 3



Case 3:14-cv-00590-MOC-DSC   Document 36-11   Filed 02/13/15   Page 3 of 3

# EXHIBIT 15







Case 3:14-cv-00590-MOC-DSC    Document 36-12    Filed 02/13/15    Page 4 of 5

GT00779



# EXHIBIT 16



The best socks on two feet.
GOLDTOE

**For Immediate Release**

**Contact: Kelly Durcan
212-253-4444
kdurcan@devitoverdi.com**

# GOLDTOE® STEPS INTO 80TH ANNIVERSARY

## Iconic Brand Kicks Off 80 Years With Consumer Contests And New Line Extensions

CHARLESTON, SC (December 01, 2014) – For the past 80 years, presidents and painters, actors and athletes, teachers and technicians, and millions of others have started their day by slipping on a pair of Gold Toe® socks.

Born out of the Great Depression when a durable sock was most in demand, the iconic Gold Toe® sock celebrates its 80th anniversary this year as one of the country's most famous – and recognizable – hosiery brands. The venerable sock will celebrate its milestone this month with a number of promotions and contests surrounding its 80 years selling socks. It is also partnering with clothing charities on a donation program and introducing line extensions.

"Few American brands have stood the test of time as Gold Toe®. We've rolled with the whims of cultural and lifestyle changes, and adapted to the ever-evolving dictates of fashion – from three-piece suits and bell-bottoms to leisure suits and casual Fridays," said Trish McHale, vice president of marketing for Gold Toe®. "It's been a remarkable history, but we've made it clear that we don't live in the past. Our styles, colors and innovation will continue to make us 'The best socks on two feet™' for the next 80 years."

The Gold Toe® brand will be stepping into the footwear business by debuting its first branded line of slippers for men and women this month. The brand has already moved from making just socks to other dressing essentials for men, women and kids.

"Gold Toe® will forever be known as a great American sock, but that doesn't preclude us from leveraging this proven reputation for style, comfort and durability to expand our portfolio to other apparel items befitting the brand," said Ms. McHale. "We're inspired to continue moving this great brand forward."

And the "G®" collection of apparel and accessories is indicative of the Gold Toe® brand's concerted effort to remain contemporary and fashion forward to a younger consumer. The "G®" collection offers fashion socks, underwear, T-shirts, active fleece, slippers, and other comfortable and trend-right goods.

Three German immigrants founded the Great American Knitting Mills in Pennsylvania in 1919. When a cousin of one founder's wife later joined the company, he used his engineering background to develop the "linenized toe." Irish linen proved to be significantly stronger than cotton, and more resistant to fraying and holes. In 1934, a department store executive mentioned to company executives that consumers were unable to distinguish the sock with the linenized toe from others. In response, Great American Knitting Mills began wrapping a gold thread of acetate around the linen to differentiate its sock from the competition. The Gold Toe® sock was born.

As the Gold Toe® brand grew in prestige and popularity, the socks became so desirable that the company decided that only one retailer per city would be permitted to sell the coveted line. Since its inception, Gold Toe® has always been a leading sock brand at department stores by offering an extremely diversified number of styles, up to 600 currently. A number of its famed styles that were introduced generations ago continue to be asked for by name, including the Fluffies®, Metropolitan, Canterbury and Bermuda.

To promote its anniversary, Gold Toe® is celebrating "80 Days of Gold Toe" via its social media platforms (Facebook, Twitter), where it will award weekly product giveaways and a grand prize of a $1,500 wardrobe makeover at its conclusion. The "80 Days of Gold Toe" will highlight the brand over the years via vintage styles and old ads, as well as spotlight the exciting new styles and fashion tips for today's Gold Toe® brand wearer.

The trademarked gold thread that is knit into the toe is a recognized symbol identifying the Gold Toe® brand as the "Standard of Quality®" and durability in hosiery. Initially a favorite of those looking for a long-lasting sock during the Great Depression, the Gold Toe® brand has continued to thrive over the past 80 years by continuously offering a quality product that is durable, comfortable and affordable – a formula that never goes out of style.

## About Gold Toe

Today, the Gold Toe® brand is the number one brand of socks (men's, women's and kids') in department stores and national chains for dress, casual and athletic combined. Gold Toe® Men's underwear and casualwear collections can also be found in the same channels of distribution. In addition, there are more than 50 Gold Toe® retail stores currently in the country, with more stores opening this year. Gold Toe® is a brand owned by Gildan USA Inc., a leading supplier of quality branded basic family apparel, including T-shirts, fleece, sport shirts, socks and underwear, which sells its products under a diversified portfolio of brands, including the Gildan® and Anvil® brand family, as well as the recently acquired Secret®, Silk™ and Therapy Plus™ brands. Gildan also has license agreements for the Under Armour®, Mossy Oak® and New Balance® brands.





The best socks on two feet.
GOLDTOE

## SOCK STYLE

Until recently, men's socks were limited to black, navy or white. Today, a stroll down the hosiery aisle reveals bold designs and countless colors. The once basic sock is now the ideal accessory for imparting flair, color or personality to a wardrobe.

"The sock has replaced the tie as the canvas for sartorial self-expression," said Trish McHale, head of marketing for Gold Toe Socks. "Socks are fashion statements and more men are putting an exclamation point to that fact."

Since 1934, Gold Toe has adapted to fashion's fickle nature. Today, its "G" collection is the brand's answer to the needs of a younger and more fashion-forward consumer.

"This year, we're seeing more modern and abstract geometrics – and a lot more color," said Matthew Mull, sock designer. "But the desire to be different can lead to creative trend-setting style – and to fashion mis-steps."

Here are a few tips to blend bold and brash socks into your wardrobe:

• Socks should be a reflection of your personality, not a wild exaggeration

• Step into style slowly if you're unsure. Start with updated classic patterns like rich plaids, herringbones and geometrics.

• The style or weight of your socks should complement your shoes. Heavier socks are more casual; thinner socks are more upscale and dressy.

• There are no rules for matching socks, but the most stylish men match them to their pants.

• The key is to be savvy and dress for the occasion. Stick with the brand you trust.

"The traditional dress sock will always be essential, but brighter and more creative styles certainly have made socks the perfect accessory that they have become," said Mull.

The Gold Toe brand has continued to thrive these past 80 years by combining durability and comfort with fashion. To learn more abut sock style, visit www.facebook.com/goldtoe.



# EXHIBIT 17

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**

_____ )
                                     )
GILDAN USA INC.,                     )
                                     )
                    Plaintiff,       )
                                     )
        v.                           )        Case No. 3:14-cv-00590
                                     )
DILLARD'S, INC.,                     )
                                     )
                    Defendant.       )
_____ )

### DECLARATION OF CECILIA M. SIDEBOTTOM

I, Cecilia M. Sidebottom, declare:

1.      I am a paralegal in the Intellectual Property Practice Group of the law firm of Shumaker, Loop & Kendrick, LLP, attorneys for Dillard's, Inc. ("Dillard's") in this action.  I am over the age of 18 and have personal knowledge of the matters set out in this Declaration, except where otherwise indicated, and if called to testify I could and would competently testify to them.

2.      Exhibit 1 is a true copy of the Declaration of Michael Shields.

3.      Exhibit 2 is a true copy of the Declaration of Kelly McElyea.

4.      Exhibit 3 is an exhibit prepared to illustrate various iterations of packaging labels used by Gildan on its hosiery products.

5.      Exhibit 4 is a collection of third party hosiery products, including packaging illustrations obtained by me by shopping internet buying sites such as Amazon and eBay, as well as purchases made in stores.

6.      Exhibit 5 is a true copy of U.S. Trademark Registration No. 4,546,796 for GOLDTOE and Design.

7.      Exhibit 6 is a Comparison of Gildan trade dress definitions.

1

8.    Exhibit 7 illustrates Gildan and Dillard's packaging.

9.    Exhibit 8 is a screenshot from a Gildan website illustrating the manner in which GOLDTOE socks are advertised on Gildan's website.

10.    Exhibit 9 is a collection of Dillard's GOLD LABEL packages and labels for Dillard's products other than hosiery.

11.    Exhibit 10 is a true copy of a Cease and Desist Letter forwarded by Gildan to Dillard's bearing Gildan production Nos. GT00029 – GT00036.

12.    Exhibit 11 is a true copy of a letter from Dillard's counsel to Gildan's counsel in response to the letter of Exhibit 10, bearing Gildan production Nos. GT00026 – GT00028.

13.    Exhibit 12 is a table of Gildan's GOLDTOE trademark registrations collected from the website of the United States Patent and Trademark Office.

14.    Exhibit 13 contains true copies of Gildan's GOLDTOE Design Registration Nos. 308,608 and 2,056,422.

15.    Exhibit 14 contains true copies of documents bearing Gildan production Nos. GT00009 and GT00015 showing Gold Toe and Gold Label comparisons.

16.    Exhibit 15 is a true copy of images showing GOLDTOE socks having a gold toe, including Gildan advertising.

17.    Exhibit 16 is a true copy of a Gildan Press Release bearing Gildan production Nos. GT00102 – GT00106.

18.    Exhibit 17 is this Declaration of Cecilia M. Sidebottom.

19.    Exhibit 18 is a true copy of Gildan's responses to Dillard's requests for production of documents.

20.    I declare under penalty of perjury that the foregoing is true and correct.

2

Executed this 13th day of February, 2015.

Cecilia M. Sidebottom

3

# EXHIBIT 18

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA

GILDAN USA INC.,

     Plaintiff,

v.

DILLARD'S, INC.,

     Defendant.

CIVIL ACTION NO.  3:14-cv-00590

## PLAINTIFF'S RESPONSES TO DEFENDANT'S FIRST
## SET OF REQUESTS FOR PRODUCTION

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Plaintiff Gildan USA Inc. ("Plaintiff" or "Gildan") hereby responds to Defendant's first set of requests for production ("Request" and/or "Requests") as follows:

### PRELIMINARY STATEMENT

1.     Gildan's responses to the Requests are based upon its present knowledge, information and belief.  Gildan has not completed its investigation and discovery of the facts related to this lawsuit.  Further discovery, independent investigation, legal research and analysis may supply additional facts and/or add meaning to known facts.  Without acknowledging any obligation to do so, except as required by law, Gildan reserves the right to amend, supplement, correct, or clarify its responses to the Requests when and if new or additional information becomes available.

2.     Gildan reserves the right to object to the use and/or admissibility of any of its responses or documents produced in response to the Requests at the trial of this action, at any other proceeding, or in any other action or proceeding.

LEGAL02/35317416v1

3.      Nothing contained in these responses should be construed as an admission relative to the existence or non-existence of any fact, and no response is to be considered an admission respecting the relevance or admissibility of any information contained therein.

4.      The following responses are submitted without prejudice to Gildan's right to produce evidence of any subsequently discovered fact or facts which Gildan may later recall or discover.  The responses contained herein are made in a good faith effort to supply as much factual information as is presently known, but in no way prejudice Gildan's ability to engage in further discovery, research or analysis.

5.      Gildan incorporates by reference this Preliminary Statement and the following General Objections in each and every response set forth below.

-                    **GENERAL OBJECTIONS**

A.      Gildan objects to the Requests propounded by Defendant ("Dillard's") to the extent they seek information which is neither relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence with respect to the issues in this action.

B.      Gildan objects to the Requests as burdensome and as designed, in whole or in part, to harass it rather than to serve any legitimate discovery purpose.

C.      Gildan objects to the Requests as overbroad and not limited to a reasonable time period.

D.      Gildan objects to the Requests to the extent they seek information of a commercially sensitive nature.  Revealing such information would substantially and irreparably injure Gildan by revealing information which derives independent economic

value from not being generally known or which has been acquired primarily through confidential research and development efforts by or on behalf of Gildan.

      E.     Gildan objects to the Requests to the extent they seek privileged information protected by the attorney-client privilege or the attorney work-product doctrine. Such privileged information includes, but is not limited to, the following:

          1.     Information which constitutes, reflects, refers to or relates to confidential communications between officers, directors or employees of Gildan and counsel; and

          2.     Information which constitutes, reflects, refers to or relates to the impressions, conclusions, opinions or mental process of counsel, their agents or employees.

      F.     Gildan objects to the Requests to the extent they seek information relating to employees or customers of Gildan, the disclosure of which would invade their right to privacy.

      G.     Gildan objects to the Requests to the extent they seek information which is equally or more accessible to Dillard's and which is maintained primarily by persons or entities other than Gildan.

      H.     Gildan objects to any requirement that it identify or provide a list of any documents withheld from discovery pursuant to either the attorney-client communications privilege and/or the attorney work product immunity doctrine and which documents were created on or after October 22, 2014, the date on which this lawsuit was filed. Such a requirement would be unduly burdensome and would interfere with this lawsuit by deterring the creation of such documents.

<div align="center">3</div>

I.    In responding to the Requests, Gildan is mindful of, and Gildan applies, the particular meanings which Dillard's dictated in its *Definitions*.  Accordingly:

(i)    the term "Gildan," as defined by Dillard's, means only the nominative plaintiff, Gildan USA Inc., and the term "Plaintiff," as defined by Dillard's, "means [not only] Gildan USA Inc. ("Gildan") [but also] any parents, subsidiaries, divisions, affiliates...[etc.] of Gildan USA Inc." (*Definitions*, ¶ B).

(ii)    The term "Gildan Footwear," as defined by Dillard's, means certain articles of manufacture, namely, "socks, knitted slippers and other hosiery items sold or offered for sale by Gildan [i.e., by Gildan USA Inc. vis-a-vis its affiliates and predecessors] since January 1, 2008" (*Definitions*, ¶ I).

(iii)    The term "Accused Product," as defined by Dillard's, means "any footwear [vis-a-vis any packaging material] which Gildan contends in this litigation infringes any trade dress right asserted by Gildan" (*Definitions*, ¶ J).

J.    Gildan objects to these requests to the extent (if any) that they pertain, or were intended to pertain, to the activities, products or product packaging of Doris Inc., a Canadian hosiery marketer acquired in 2014 by Gildan Activewear Inc., on the grounds that information and documents relating to that company's operations are neither relevant to any issue to be decided in this lawsuit nor reasonably calculated to lead to the discovery of admissible evidence relevant to any issue to be decided in this lawsuit.

4

Accordingly, any otherwise responsive documents relating to that entity will not be produced.

## RESPONSES TO REQUESTS FOR PRODUCTION

**REQUEST NO. 1**:

All correspondence to or from Gildan and relating to any claim of ownership in, or intellectual property or infringement relating to the Gildan Footwear.

**RESPONSE TO REQUEST NO. 1**:

Gildan objects to this Request on the grounds that, inasmuch as it seeks the production of correspondence relating to ownership in, or intellectual property or infringement relating to, socks, knitted slippers and other hosiery goods (vis-a-vis the *packaging* for such hosiery goods), this Request seeks documents and information neither relevant to any issue to be decided in this lawsuit nor reasonably calculated to lead to the discovery of admissible evidence relevant to any issue to be decided in this lawsuit. Accordingly, an application of the *Definitions* explicitly specified by Dillard's to the terms used in this Request leads to the conclusion that this Request exceeds the bounds of discovery permitted under Rule 26(b)(1), F.R.Civ.P.

Nevertheless, subject to and without waiver of the foregoing objections and its general objections, Gildan, in a good faith effort to advance meaningful discovery, further responds that Gildan USA Inc., as presently informed, believes that, other than its correspondence with Dillard's, it has no correspondence to or from itself relating to any claim of ownership in, or intellectual property or infringement relating to, the allegedly infringed packaging from which its claims in this lawsuit arise.

LEGAL02/35317416v1

5

-238-

**REQUEST NO. 2:**

All advertising and promotional copy, press releases, and the like including text, graphics or a combination of the two and relating or referring to the Gildan Footwear.

**RESPONSE TO REQUEST NO. 2:**

Gildan objects to this Request on the grounds that this Request, to the extent it requires the production of "all" such advertisements and other requested materials relating or referring to the socks and other hosiery products of Gildan USA Inc. since January 1, 2008, is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections and its general objections, Gildan will produce representative samples of the advertising and promotional copy, press releases, and the like, including text, graphics or a combination of the two, published on or after January 1, 2008, to the extent such materials:  (i) are in its possession, custody or control and are located upon a reasonable investigation; and (ii) relate or refer to the socks and other hosiery goods sold or offered for sale by Gildan USA Inc.

**REQUEST NO. 3:**

All packaging in which the Gildan Footwear has ever been packaged for display and sale since January 1, 2008.

**RESPONSE TO REQUEST NO. 3:**

Subject to and without waiving the foregoing objections and its general objections, Gildan will produce specimens or images of all packaging in which socks and other hosiery goods of Gildan USA Inc. have been packaged for display and sale since January 1, 2008, to the extent such materials are in its possession, custody or control and are located upon a reasonable investigation.

6

**REQUEST NO. 4:**

All written, graphical or printed descriptions of the Gildan Footwear since January 1, 2008.

**RESPONSE TO REQUEST NO. 4:**

Gildan objects to this Request on the grounds that, inasmuch as it seeks the production of written, graphical or printed descriptions of its socks, knitted slippers and other hosiery goods (vis-a-vis the *packaging* for such hosiery goods), this Request seeks documents and information neither relevant to any issue to be decided in this lawsuit nor reasonably calculated to lead to the discovery of admissible evidence relevant to any issue to be decided in this lawsuit. Accordingly, an application of the *Definitions* explicitly specified by Dillard's to the terms used in this Request leads to the conclusion that this Request exceeds the bounds of discovery permitted under Rule 26(b)(1), F.R.Civ.P.

**REQUEST NO. 5:**

All patent, trademark, copyright or other intellectual property applications describing, disclosing or claiming any aspect of the Gildan Footwear.

**RESPONSE TO REQUEST NO. 5:**

Gildan objects to this Request on the grounds that, inasmuch as it seeks the production of patent, trademark, copyright or other intellectual property applications describing any aspect of its socks, knitted slippers and other hosiery goods (vis-a-vis the *packaging* for such hosiery goods), this Request seeks documents and information neither relevant to any issue to be decided in this lawsuit nor reasonably calculated to lead to the discovery of admissible evidence relevant to any issue to be decided in this lawsuit. Accordingly, an application of the *Definitions* explicitly specified by Dillard's to the

7

LEGAL02/35317416v1

-240-

terms used in this Request leads to the conclusion that this Request exceeds the bounds of discovery permitted under Rule 26(b)(1), F.R.Civ.P.

**REQUEST NO. 6:**

All descriptions, drawings, explanations and diagrams of the Gildan Footwear from Gildan or anyone on its behalf to the manufacturer of the Gildan Footwear.

**RESPONSE TO REQUEST NO. 6:**

Gildan objects to this Request on the grounds that, inasmuch as it seeks the production of descriptions, drawings, explanations and diagrams of its socks, knitted slippers and other hosiery goods (vis-a-vis the *packaging* for such hosiery goods), this Request seeks documents and information neither relevant to any issue to be decided in this lawsuit nor reasonably calculated to lead to the discovery of admissible evidence relevant to any issue to be decided in this lawsuit. Accordingly, an application of the *Definitions* explicitly specified by Dillard's to the terms used in this Request leads to the conclusion that this Request exceeds the bounds of discovery permitted under Rule 26(b)(1), F.R.Civ.P.

**REQUEST NO. 7:**

All tangible embodiments of any sales presentation, exhibit or display regarding the Gildan Footwear, including any PowerPoint or similar video or graphical presentations.

**RESPONSE TO REQUEST NO. 7:**

Gildan objects to this Request, to the extent it requires the production of "all" sales presentations, exhibits or displays regarding the socks and other hosiery products of Gildan USA Inc. since January 1, 2008, on the grounds that this Request is overly broad and unduly burdensome.

8

LEGAL02/35317416v1

-241-

Subject to and without waiving the foregoing objections and its general objections, Gildan will produce those sales presentations, exhibits and displays regarding the socks and hosiery products of Gildan USA Inc. used since January 1, 2008, to the extent such materials:  (i) are in its possession, custody or control and are located upon a reasonable investigation; and (ii) depict, relate or refer to the packaging for its socks and other hosiery goods.

**REQUEST NO. 8:**

All documents referring or relating to any function performed by the Gildan Footwear or any component part thereof.

**RESPONSE TO REQUEST NO. 8:**

Gildan objects to this Request on the grounds that, inasmuch as it seeks the production of all documents relating or referring to any function performed by its socks, knitted slippers and other hosiery goods (vis-a-vis the *packaging* for such hosiery goods), this Request seeks documents and information neither relevant to any issue to be decided in this lawsuit nor reasonably calculated to lead to the discovery of admissible evidence relevant to any issue to be decided in this lawsuit.  Accordingly, an application of the *Definitions* explicitly specified by Dillard's to the terms used in this Request leads to the conclusion that this Request exceeds the bounds of discovery permitted under Rule 26(b)(1), F.R.Civ.P.

**REQUEST NO. 9:**

All documents and things relating to any rollout, point-of-sale consumer blitz, signage, packaging, in-store events, point-of-purchase or other marketing materials relating to the Gildan Footwear.

9

LEGAL02/35317416v1

**RESPONSE TO REQUEST NO. 9:**

Gildan objects to this Request, to the extent it requires the production of "all" such marketing materials relating or referring to the socks and other hosiery products of Gildan USA Inc. since January 1, 2008, on the grounds that this Request is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections and its general objections, Gildan will produce representative samples of such "roll-out, point-of-sale consumer blitz, signage, packaging, in-store events, point-of-purchase [and] other marketing materials" used by it on or after January 1, 2008, to the extent such materials: (i) are in its possession, custody or control and are located upon a reasonable investigation; and (ii) relate or refer to the socks and other hosiery goods sold or offered for sale by Gildan USA Inc.

**REQUEST NO. 10:**

All documents and things referring or relating to the structure, construction, function, design specifications, conception, development, modification, alteration or revision to the construction or design of any Gildan Footwear.

**RESPONSE TO REQUEST NO. 10:**

Gildan objects to this Request on the grounds that, inasmuch as it seeks the production of documents and things referring or relating to the structure, construction, function, design specifications, conception, development, modification, alteration or revision to the construction or design of any of its socks, knitted slippers and other hosiery goods (vis-a-vis the *packaging* for such hosiery goods), this Request seeks documents and information neither relevant to any issue to be decided in this lawsuit nor reasonably calculated to lead to the discovery of admissible evidence relevant to any

10

LEGAL02/35317416v1

issue to be decided in this lawsuit. Accordingly, an application of the *Definitions* explicitly specified by Dillard's to the terms used in this Request leads to the conclusion that this Request exceeds the bounds of discovery permitted under Rule 26(b)(1), F.R.Civ.P.

**REQUEST NO. 11:**

All documents relating to a consumer need for features of the Gildan Footwear.

**RESPONSE TO REQUEST NO. 11:**

Gildan objects to this Request on the grounds that, inasmuch as it seeks the production of all documents relating to a consumer need for features of its socks, knitted slippers and other hosiery goods (vis-a-vis the *packaging* for such hosiery goods), this Request seeks documents and information neither relevant to any issue to be decided in this lawsuit nor reasonably calculated to lead to the discovery of admissible evidence relevant to any issue to be decided in this lawsuit. Accordingly, an application of the *Definitions* explicitly specified by Dillard's to the terms used in this Request leads to the conclusion that this Request exceeds the bounds of discovery permitted under Rule 26(b)(1), F.R.Civ.P.

**REQUEST NO. 12:**

All documents relating to Gildan's in-house research relating to the Gildan Footwear, including any results of surveys, interviews or focus groups relating to the Gildan Footwear, or any samples, prototypes, or earlier footwear products from which the Gildan Footwear may have been derived.

**RESPONSE TO REQUEST NO. 12:**

Gildan objects to this Request on the grounds that, inasmuch as it seeks the production of all documents relating to its in-house research relating to its socks and other hosiery goods (vis-a-vis the *packaging* for such hosiery goods), this Request seeks

11

documents and information neither relevant to any issue to be decided in this lawsuit nor reasonably calculated to lead to the discovery of admissible evidence relevant to any issue to be decided in this lawsuit. Accordingly, an application of the *Definitions* explicitly specified by Dillard's to the terms used in this Request leads to the conclusion that this Request exceeds the bounds of discovery permitted under Rule 26(b)(1), F.R.Civ.P.

**REQUEST NO. 13:**

All documents, including correspondence, relating or referring to Dillard's and also referring in any manner to the Gildan Footwear.

**RESPONSE TO REQUEST NO. 13:**

Gildan objects to this Request on the grounds that, inasmuch as it seeks the production of such documents as its correspondence with Dillard's and all purchase orders, invoices and shipping documents pertaining to socks purchased by Dillard's from Gildan USA Inc. at any time since January 1, 2008, this Request is overly broad and unduly burdensome, and Dillard's should have those materials in its possession, custody, and control.

Subject to and without waiving the foregoing objections and its general objections, Gildan will produce such correspondence on or after January 1, 2008, to or from third-parties and relating or referring to Dillard's and also referring to the socks and other hosiery goods of Gildan USA Inc., to the extent such materials are in its possession, custody or control and are located upon a reasonable investigation. However, Gildan, as presently informed, believes that it has no such documents in its possession, custody or control.

LEGAL02/35317416v1

Otherwise, Gildan objects to this request on the grounds that it is overly broad, unduly burdensome, and seeks documents neither relevant to any issue to be decided in this lawsuit nor reasonably calculated to lead to the discovery of admissible evidence relevant to any issue to be decided in this lawsuit.

**REQUEST NO. 14:**

All documents referring or relating to any agreement between Gildan and any other person relating to the licensing, purchase or sale of any intellectual property rights in any footwear product, including but not limited to Gildan Footwear.

**RESPONSE TO REQUEST NO. 14:**

Gildan objects to this Request on the grounds that, inasmuch as it seeks the production of all documents referring or relating to any agreement that relates to the licensing, purchase or sale of any intellectual property rights in any footwear product (vis-a-vis the *packaging* for such footwear products), this Request seeks documents and information neither relevant to any issue to be decided in this lawsuit nor reasonably calculated to lead to the discovery of admissible evidence relevant to any issue to be decided in this lawsuit. Accordingly, an application of the *Definitions* explicitly specified by Dillard's to the terms used in this Request leads to the conclusion that this Request exceeds the bounds of discovery permitted under Rule 26(b)(1), F.R.Civ.P.

**REQUEST NO. 15:**

All documents referring or relating to any settlement of any dispute between Gildan and any other person relating to any intellectual property rights in any footwear products, including but not limited to Gildan Footwear, without regard to whether the claimed intellectual property rights were alleged to be owned by Gildan or such person.

**RESPONSE TO REQUEST NO. 15:**

Gildan objects to this Request on the grounds that, inasmuch as it seeks the production of all documents referring or relating to any settlement of any dispute that

LEGAL02/35317416v1

relates to any intellectual property rights in any footwear product (vis-a-vis the *packaging* for such footwear products), this Request seeks documents and information neither relevant to any issue to be decided in this lawsuit nor reasonably calculated to lead to the discovery of admissible evidence relevant to any issue to be decided in this lawsuit. Accordingly, an application of the *Definitions* explicitly specified by Dillard's to the terms used in this Request leads to the conclusion that this Request exceeds the bounds of discovery permitted under Rule 26(b)(1), F.R.Civ.P.

**REQUEST NO. 16:**

All documents referring or relating to any litigation or any threatened litigation between Gildan and any other person relating to any intellectual property rights in any footwear product, including but not limited to Gildan Footwear, without regard to whether the claim intellectual property rights were alleged to be owned by Gildan or such person, including correspondence between Gildan and such person, or between Gildan's attorneys and such person or attorneys for such person.

**RESPONSE TO REQUEST NO. 16:**

Gildan objects to this Request on the grounds that, inasmuch as it seeks the production of all documents and things referring or relating to any litigation or any threatened litigation that relates to any intellectual property rights in any footwear product (vis-a-vis the *packaging* for such footwear products), this Request seeks documents and information neither relevant to any issue to be decided in this lawsuit nor reasonably calculated to lead to the discovery of admissible evidence relevant to any issue to be decided in this lawsuit. Accordingly, an application of the *Definitions* explicitly specified by Dillard's to the terms used in this Request leads to the conclusion that this Request exceeds the bounds of discovery permitted under Rule 26(b)(1), F.R.Civ.P.

14

**REQUEST NO. 17:**

All reports and opinions, including but not limited to expert reports relating to alleged similarity between any Gildan Footwear product and any footwear product of any other person.

**RESPONSE TO REQUEST NO. 17:**

Gildan objects to this Request on the grounds that, inasmuch as it seeks the production of expert reports and all other reports and opinions that relate to any alleged similarity between any of Gildan's socks and other hosiery goods, on the one hand, and, on the other hand, any other person's footwear product (vis-a-vis *packaging* used by such other persons for their hosiery goods), this Request seeks documents and information neither relevant to any issue to be decided in this lawsuit nor reasonably calculated to lead to the discovery of admissible evidence relevant to any issue to be decided in this lawsuit. Accordingly, an application of the *Definitions* explicitly specified by Dillard's to the terms used in this Request leads to the conclusion that this Request exceeds the bounds of discovery permitted under Rule 26(b)(1), F.R.Civ.P.

**REQUEST NO. 18:**

All reports and opinions, including but not limited to expert reports relating to any profits, damages or other claimed recovery in any action between Gildan and any other person and relating to either a Gildan Footwear product or any footwear product of any such person.

**RESPONSE TO REQUEST NO. 18:**

Subject to and without waiving the foregoing objections and its general objections, Gildan will produce copies of all reports and opinions issued since January 1, 2008, which reports and opinions relate to any profits, damages or other claimed recovery in any action in which it was a party, to the extent such reports and opinions: (i) relate to one of its footwear products or the footwear product of another party to the action; and

LEGAL02/35317416v1

15

-248-

(ii) are in its possession, custody or control and are located upon a reasonable investigation.  However, Gildan, as presently informed, believes that there are no such materials in its possession, custody or control.

**REQUEST NO. 19**:

All documents comprising written, graphical or image archives of footwear designs wherein the footwear designs include any design feature relating to any functional or ornamental feature of the Gildan Footwear.

**RESPONSE TO REQUEST NO. 19**:

Gildan objects to this Request on the grounds that, inasmuch as it seeks the production of certain written, graphical and image archives of certain footwear designs (vis-a-vis the *packaging* for footwear incorporating those footwear designs), this Request seeks documents and information neither relevant to any issue to be decided in this lawsuit nor reasonably calculated to lead to the discovery of admissible evidence relevant to any issue to be decided in this lawsuit.  Accordingly, an application of the *Definitions* explicitly specified by Dillard's to the terms used in this Request leads to the conclusion that this Request exceeds the bounds of discovery permitted under Rule 26(b)(1), F.R.Civ.P.

**REQUEST NO. 20**:

A sample of each variation of Gildan Footwear, including design and fabric pattern variations, variations sold under a single model number, made, sold or imported by Gildan since January 1, 2008, including packaging, manuals, warranties and any other documents.

**RESPONSE TO REQUEST NO. 20**:

Gildan objects to this Request on the grounds that, to the extent that it seeks the production of samples of footwear products, and the manuals, warranties, and other documents pertaining to those footwear products, this Request seeks documents and

16

information neither relevant to any issue to be decided in this lawsuit nor reasonably calculated to lead to the discovery of admissible evidence relevant to any issue to be decided in this lawsuit.  Accordingly, an application of the *Definitions* explicitly specified by Dillard's to the terms used in this Request leads to the conclusion that this Request exceeds the bounds of discovery permitted under Rule 26(b)(1), F.R.Civ.P.

To the extent that this Request seeks the production of samples of packaging for such footwear products, Gildan objects to this request on the ground that it is duplicative of Request No. 3.  Accordingly, Gildan incorporates by reference its response to Request No. 3.

**REQUEST NO. 21:**

All documents and things relating to any and all factual allegations contained in Gildan's Complaint, including but not limited to:

> (a)    Gildan's development, ownership, sales and promotion of Gildan Footwear;
>
> (b)    Gildan's communications with Dillard's, including communications regarding the Gildan Footwear and the Accused Dillard's Products;
>
> (c)    Evidence of any secondary meaning acquired by the Gildan Footwear;
>
> (d)    Evidence of any irreparable harm sustained by Gildan and alleged to have arisen out of the sale by Dillard's of the Accused Dillard's Products;
>
> (e)    Evidence of market value of any design, feature, brand or other aspect of the Gildan Footwear; and
>
> (f)    Evidence of any damage, including amount and extent, suffered by Gildan as a result of any action or inaction on the part of Defendant.

**RESPONSE TO REQUEST NO. 21:**

Gildan objects to this Request to the extent it seeks, via its preamble, the production of "[a]ll documents and things relating to any and all factual allegations

17

LEGAL02/35317416v1

contained in Gildan's Complaint," on the grounds that the request fails to satisfy the requirement of Rule 34(b)(1) that it specify each item or category of requested documents "with reasonable particularity."

Gildan objects to subpart (a) of this Request on the grounds that, inasmuch as it seeks the production of documents relating to the factual allegations in Gildan's Complaint pertaining to its development and ownership of footwear products, there are no such allegations. Accordingly, this Request seeks documents and information neither relevant to any issue to be decided in this lawsuit nor reasonably calculated to lead to the discovery of admissible evidence relevant to any issue to be decided in this lawsuit.

Gildan also objects to subpart (a) of this Request to the extent that it seeks "all" documents and things relating to any and all factual allegations contained in Gildan's Complaint pertaining to its sales and promotion of any and all footwear products, on the grounds that: (i) the Request is overly broad, unduly burdensome; and (ii) to the extent that it pertains only to the sales and promotion of footwear products in the allegedly infringed packaging, not only overly broad and unduly burdensome, but also duplicative of previous requests.

Gildan objects to subpart (b) of this Request on the grounds that, inasmuch as it seeks the production of all of Gildan's communications with Dillard's, this Request is overly broad and unduly burdensome.

For the same reason, Gildan also objects to subpart (b) of this Request to the extent that it seeks all communications with Dillard's regarding the footwear products of Gildan USA Inc. (i.e., "the Gildan Footwear"). Still further, Gildan objects to subpart (b) of this Request to the extent that it seeks all communications with Dillard's regarding

18

Gildan's footwear products and the "Alleged Dillard's Products" on the grounds that: (i) such documents are already in the possession of Dillard's; and (ii) the Request is duplicative of previous requests.

Gildan objects to subpart (c) of this Request, which seeks all documents and things relating to, or comprising, "[e]vidence of any secondary meaning acquired by the ["socks, knitted slippers and other hosiery" products of Gildan USA Inc.]" (vis-a-vis the *packaging* for such hosiery goods) on the grounds that, because Gildan does not claim any secondary meaning in the hosiery goods themselves (vis-a-vis *packaging* for such goods), this Request seeks documents and information neither relevant to any issue to be decided in this lawsuit nor reasonably calculated to lead to the discovery of admissible evidence relevant to any issue to be decided in this lawsuit. Accordingly, an application of the *Definitions* explicitly specified by Dillard's to the terms used in this Request leads to the conclusion that this Request exceeds the bounds of discovery permitted under Rule 26(b)(1), F.R.Civ.P.

Gildan objects to subpart (d) of this Request, which seeks all documents and things comprising evidence of "any irreparable harm sustained by Gildan and alleged to have arisen out of the sale by Dillard's of the Accused Dillard's Products," because such request is vague and ambiguous and, as presently understood, overly broad and unduly burdensome. In any event, as the courts have held repeatedly, such irreparable harm arises from such facts as: the trade dress owner's loss of control over the manner in which its image, and the public's perception of its products, are presented to the public.

Gildan objects to subpart (e) of this Request on the grounds that, inasmuch as it seeks the production of evidence of the market value of the design, feature, brand or other

LEGAL02/35317416v1

aspect of its footwear products themselves (*i.e.*, the "Gildan Footwear") (vis-a-vis the *packaging* for such hosiery goods), this Request seeks documents and information neither relevant to any issue to be decided in this lawsuit nor reasonably calculated to lead to the discovery of admissible evidence relevant to any issue to be decided in this lawsuit. Accordingly, an application of the *Definitions* explicitly specified by Dillard's to the terms used in this Request leads to the conclusion that this Request exceeds the bounds of discovery permitted under Rule 26(b)(1), F.R.Civ.P.

Gildan objects to subpart (f) of this Request on the grounds that it is, *inter alia*, premature, as the amount of any actual damages due Gildan under its claims (including, without limitation, its lost profits or, as a substitute therefor, Dillard's ill-gotten profits) cannot yet be determined.

Respectfully submitted,

Larry C. Jones
larry.jones@alston.com
Carla H. Clements
carla.clements@alston.com
ALSTON & BIRD LLP
Bank of America Plaza
101 South Tryon Street, Suite 4000
Charlotte, NC 28280-4000
Tel: (704) 444-1000
Fax: (704) 444-1111

Of Counsel:

Uly S. Gunn
sam.gunn@alston.com
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street NE
Atlanta, GA 30309-3424

20

Tel:  (404) 881-7000
Fax:  (404) 881-7777

*Counsel for Plaintiff Gildan USA Inc.*

LEGAL02/35317416v1

21

**-254-**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 20th day of January 2015, a true and correct copy of the foregoing document was served by U.S. first class mail, postage prepaid, addressed to the following attorneys for Defendant:

> W. Thad Adams, III
> Samuel A. Long, Jr.
> Shumaker, Loop & Kendrick, LLP
> First Citizens Bank Plaza
> 128 South Tryon Street
> Charlotte, NC  28202

LEGAL02/35317416v1

# EXHIBIT 19

# (PHYSICAL EXEMPLARS SUBMITTED TO COURT)

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

_____
                                  )
GILDAN USA INC.,                  )
                                  )
            Plaintiff,            )    DOCKET NO. 3:14-CV-590
                                  )
            vs.                   )
                                  )
DILLARD'S, INC.,                  )
                                  )
            Defendant.            )
_____ )


TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
BEFORE THE HONORABLE MAX O. COGBURN, JR.
UNITED STATES DISTRICT COURT JUDGE
WEDNESDAY, MARCH 11, 2015 AT 9:30 A.M.


JILLIAN M. TURNER, RMR, CRR, CLR
Official Court Reporter
United States District Court
Charlotte, North Carolina

2

```
 1    APPEARANCES:

 2    On Behalf of the Plaintiff:

 3            LARRY CURRELL JONES, ESQ.
              Alston & Bird LLP
 4            101. S. Tryon Street, Suite 4000
              Charlotte, North Carolina  28280
 5

 6            ULY SAMUEL GUNN III, ESQ.
              Alston & Bird, LLP
 7            1201 West Peachtree Street Northwest
              Atlanta, Georgia  30309
 8

 9    On Behalf of the Defendant:

10            W. THAD ADAMS III, ESQ.
              S. ALEXANDER LONG, ESQ.
11            Shumaker, Loop & Kendrick, LLP
              128 South Tryon Street, Suite 1800
12            Charlotte, North Carolina  28202

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1    (Wednesday, March 11, 2015 at 9:30 a.m.)

2                  **P R O C E E D I N G S**

3         THE COURT:  Good morning.

4         THE COURTROOM AUDIENCE:  Good morning, Your Honor.

5         THE COURT:  Well, it looks like we're here about

6    some socks.  Let's hear from everyone about this.  I think

7    somebody filed a preliminary injunction.  Fire away.

8         MR. JONES:  Your Honor, may I first introduce the

9    representatives of the plaintiff, please?

10        THE COURT:  Yes, sir.

11        MR. JONES:  Maria Reit, Patricia McHale and

12   Andrew Colvin.

13        MR. COLVIN:  Good morning, Your Honor.

14        THE COURT:  Good morning.

15        MR. JONES:  I'm Larry Jones, and this is my

16   associate Sam Gunn.

17        THE COURT:  Glad to have you here.

18        MR. JONES:  Do you mind if I stand?  Because I'm

19   going to be moving back and forth.

20        THE COURT:  You can do whatever you want to.  I

21   was -- throughout my career, I was a trial attorney who

22   participated in the courtroom, and it's hard enough to do

23   things in the courtroom and then to try to adjust your style

24   to whatever the judge thinks the style ought to be.  So any

25   style that works for you, works for me.

4

1          MR. JONES:  Okay.  Thank you, Your Honor.

2          THE COURT:  Yes, sir.

3          MR. JONES:  Before we get into an analysis of the

4     legal issues that are involved in this motion for preliminary

5     injunction, I'd like to take a few minutes, first of all, to

6     tell the story from which those legal issues have arisen, a

7     story that in the last few weeks has been told for the most

8     part from the mouths of Dillard's own employees during their

9     recent depositions.

10          The story begins just a few years ago.  GOLDTOE, it

11    was then GOLDTOE Moretz, you may recall, based in Newton,

12    North Carolina.  It was then, as now, a premier brand for

13    socks.  Perhaps the best known brand for socks in this

14    country.  Its GOLDTOE brand men's socks were market leaders,

15    and GOLDTOE men's socks were looked for and bought by

16    consumers in leading department stores all across this

17    country, including Dillard's since 1988, and in other men's

18    furnishings, retailers.  And particularly the high-end

19    retailers.

20          Mr. Shields, who is present today, testified that

21    the GOLDTOE brand in Dillard's, quote, "has done very well

22    over the years," end quote.  And, in fact, has been the

23    leading brand of socks sold in Dillard's in the years that he

24    has been there.

25          Now, Dillard's employees tell us that this story

5

1   began and starts unfolding when GOLDTOE did something that

2   set in motion the process that has led us here today.

3            What did GOLDTOE do?  GOLDTOE started selling its

4   socks in stores such as JC Penney and Kohl's, stores,

5   retailers that Dillard's perceived to be of a lower tier in

6   the retail food chain, so to speak.  This, as we're told, was

7   something of a big deal to some of the folks at Dillard's,

8   including some of their management.  Particularly in the

9   men's furnishings area.  They flatout didn't like that.

10  We've been told that in the face of this, this change in

11  marketing of GOLDTOE socks into lower tiered chains.  We've

12  been told that in the face of this, Dillard's decided that it

13  would buy less GOLDTOE product going forward, and Dillard's

14  began various efforts to get its customers to buy its own

15  house brand of men's socks instead of GOLDTOE brand socks.

16           In fact, we know from at least one internal e-mail

17  that GOLDTOE employees -- this is PX-20 -- GOLDTOE employees

18  were reminded that, quote, "We continue to downplay this

19  brand as they are carried in JC Penney and Kohl's."  That's

20  what they were doing.  That's what they were doing.  That's

21  why they were doing it.  That's not the only e-mail.

22           Another one, PX-21, and referring to the way in

23  which the GOLDTOE and the Dillard's house brand socks would

24  be displayed in the stores, talked about continuing to

25  minimize physically the appearance, the quantities, or

6

1  whatever of the GOLDTOE socks vis-a-vis the house label
2  socks.
3          In fact, Mr. Shields testified in his deposition
4  that Dillard's is still trying to minimize GOLDTOE sales.
5  Relatedly, Mr. Shields also testified that Dillard's redesign
6  of its men's sports socks packaging, which brings us to the
7  courtroom today, was part of its efforts to increase the
8  sales of its own house brand socks while decreasing the sales
9  of GOLDTOE socks.
10         As we have indicated in our moving papers,
11 Dillard's did some other things, too, to try to gain sales
12 for its own house brand.  Particularly at the expense of
13 GOLDTOE.  For instance, it mimicked some of the style names
14 that identified GOLDTOE's individual styles.  It used the
15 style name "Canter" to mimic GOLDTOE's Canterbury.  It used
16 the style name "Metro" to mimic GOLDTOE's style name
17 Metropolitan.
18         Meanwhile, while this was evolving, what GOLDTOE
19 was using -- excuse me.  What Dillard's was using as a label
20 for its men's athletic socks, also known as men's sports
21 socks, was this label here, which I think is part of
22 Plaintiff's Exhibit Number 15.  They've been using this for a
23 few years for its house brand.  It was basically a black
24 band.  The designation GOLD LABEL was not on the band.  The
25 background color of the band were not blue.  There was no

1   rectangular box on the upper right front or anywhere else on
2   the panel of the socks or the packaging, and there were no
3   gold panels on the side.  So that's what they came into the
4   project with.
5          Now, during this time GOLDTOE decided to refresh
6   its packaging, at least its packaging for its men's and
7   women's socks, leaving children's socks.  And what GOLDTOE
8   did was they enlisted an outside design firm in 2010 and
9   continuing into 2011, and that firm with GOLDTOE together
10  collaborated, and they came up with a series of bands to be
11  used across all of the men's and women's GOLDTOE socks.
12         Now, for the athletic socks, the counterpart to the
13  product of Dillard's at issue, they used primarily PX-4 with
14  this blue band.  There was an exception for some athletic
15  socks that are sold to Macy's primarily.  I think Bon-Ton may
16  be another customer.  But you will see -- and we'll talk
17  about the individual constituent elements of the trade
18  dress -- but you will see -- I'll leave these up here -- when
19  we talk about the elements of the trade dress, you will see
20  there are a certain set of core element that is depicted in
21  each and every one of those eight different iterations of the
22  new line of packaging that was developed and released in
23  about 2011.
24         In turn, two years later or a year and a half
25  later, Dillard's decided to refresh its packaging.  Remember,

8

1    it was using this black band here (indicating), at least for

2    the men's athletic socks.  And that's all we know about, and

3    that's all we are addressing in this hearing and with this

4    motion.

5            So they decided to -- excuse me -- refresh that

6    band, and what they did was they have an internal design

7    team.  Kelly McElyea is a graphic artist.  We deposed him.

8    His job is to design labels and packaging for Dillard's house

9    brand apparel, men's furnishings, and perhaps other products.

10           Anyway, he was given the task.  And there was a

11   meeting one day.  I think it was in February 2013.  He was

12   given the task of coming up with a new design to replace what

13   you see there.  And according to his testimony, there was

14   this meeting; and when he left the meeting, he took back to

15   his workstation a package of GOLDTOE socks, men's athletic

16   socks.  I asked him why.  His answer, quote, "Management

17   liked certain aspects of it and wanted us to consider looking

18   at it."

19           So Mr. Kelly -- excuse me.  Mr. McElyea does his

20   job and he sits down, and based upon his own ideas

21   apparently, or at least somewhat, he comes up with a first

22   iteration of new designs.  And these (indicating) represent

23   what he came up with in his first iteration.  And then that

24   got rejected.  So he then came up with a second iteration.

25           So that (indicating) is the second iteration.  And

1    you'll see that what Mr. McElyea came up with, after some

2    feedback even from management, was not a blue band.  It

3    didn't have a blue band.  Had no rectangular box in the upper

4    right corner front panel and still didn't look like the

5    GOLDTOE packaging.

6          But Dillard's management kept rejecting what

7    Mr. McElyea kept proposing.  And finally, eventually

8    Mr. McElyea testifies, quote, "They instructed me" -- they

9    instructed me -- "to use this blue."  And lo and behold we

10   have the first iteration of designs following management's

11   instruction to use not a dark blue, not a light blue, use

12   this blue.  Verbatim what he said.  And move the elements

13   around.

14          So complying with those instructions, this

15   (indicating) is what he came up with.  And you will see that

16   following those instructions, he now has a blue band.  He's

17   now put the house brand GOLD LABEL in the center here in

18   white lettering.  He now adds lo and behold a rectangular box

19   on the front, and it even has a serrated bottom edge.  And

20   you can't see I'm sure from the bench but --

21          THE COURT:  I've got them here.

22          MR. JONES:  Okay.

23          THE COURT:  I've got this pair right here.

24          MR. JONES:  There is used on some occasions by

25   GOLDTOE a serrated bottom edge.

1          Now, considering this combination, Mr. Shields

2     testified that he could not recall -- and he's been with

3     Dillard's for a while -- he could not recall Dillard's ever

4     previously using a rectangular box with a serrated lower edge

5     on any, any packaging material.

6          I'd note also, Your Honor, that after receiving

7     this more definitive mandate from management, now we have

8     what will be gold side panels incorporated into the design.

9     And you'll also notice, Your Honor, on some of the iterations

10    that he came up with he even includes -- and it's a little

11    difficult to see -- this dark shadowy image of a runner on

12    the left-hand side of the front with the packaging.

13         Now, we have not deposed a certain employee.  His

14    name is Mr. Huffman.  He's referred to in some of the

15    internal e-mails as "the boss."  We suspect that the mandate

16    was coming from Mr. Huffman.  He's no longer an employee.

17    We'll have to get to him after the state of the trial.  But I

18    asked Mr. McElyea, "Did Mr. Huffman in his meetings with him

19    show or refer you to the GOLDTOE packaging?"  Mr. McElyea

20    testified, "He may have mentioned it."

21         Well, anyway, so now they have pretty much decided

22    what they're going to do, and with a few tweaks you have the

23    next iteration derived from the mandate of management.  This

24    (indicating) is the iteration that was approved by

25    Michael McNiff, and that's what they so-called went to the

1  press with.

2         Now, they wound up basically taking all of those

3  elements that I talked about here on this immediately prior

4  iterations, except the image of a runner.  To their credit,

5  they do not incorporate the image of the runner that appears

6  on some of the GOLDTOE socks packaging.

7         The result of this series of iterations was, as

8  Mr. McElyea testified, the new Dillard's packaging has,

9  quote, "that look," end quote, that the GOLDTOE packaging

10 has.  That's from the McElyea deposition, page 88, line 17;

11 89, line 1.  It has that look.  It no longer has the look of

12 the former packaging.  It does not even have anything that

13 remotely reassembles what Dillard's uses for its men's dress

14 socks vis-a-vis its athletic socks.  This is what they were

15 using (indicating), and I think maybe are still using for

16 their dress socks.

17        So when they wanted to change the look of their

18 packaging for their athletic socks, they didn't go with what

19 they had.  They didn't go with something else they were using

20 for other socks.  They went with this (indicating), and you

21 can see in comparison with the GOLDTOE.

22        Now, as a result of this, and not surprisingly,

23 Mr. McElyea admitted that there were instances internally at

24 Dillard's in which Dillard's own employees commented on the

25 fact that Dillard's packaging had, quote, "some of the same

1    features," end quote, as GOLDTOE's packaging.  That's McElyea

2    deposition page 89, line 2; page 90, line 1.

3              Now, Mr. Shields, in response to these

4    similarities, he testifies, page 36 I think of his depo,

5    "When we signed off on the" -- let me -- "When Dillard's

6    decided to redesign its ROUNDTREE and YORKE's sports sock

7    label to match the other sock packaging, isn't it true that

8    Dillard's failed miserably to match its other sock

9    packaging?"  He testified, "That was a goal.  We want to

10   match our other socks' packaging."  He says, "I wouldn't say

11   we failed.  There's a lot of features in our sports socks

12   that match the features in the dress socks."

13             He says, Your Honor, there are a lot of features in

14   common between the dress socks packaging that Dillard's uses

15   and the athletic socks packaging.  And I said, "As shown in

16   Exhibit 18?"  Mr. McElyea -- excuse me.  Mr. Shields, "Yes."

17             "Question:  That's your story.  You're sticking to

18   it?

19             "Answer:  Yes.  I see some similarities."

20             So that's their story.  As a consequence, we don't

21   agree.  We think there are a lot of similarities between

22   their new packaging and our packaging, a lot more

23   similarities than between their new packaging and their old

24   packaging or their new packaging and anybody else's

25   packaging.

13

1          In any event, the process is completed.  Dillard's

2    launches its socks 2014, spring I think it was.  A Gildan

3    employee happens to see the new packaging in a Dillard's

4    store.  There's some correspondence between the parties.  The

5    lawsuit is launched, and now that brings us to the legal

6    issues.

7          In laymen's terms, Your Honor, there are three

8    questions, issues to be answered here.  The first one, does

9    Gildan have trade dress rights in the packaging for its men's

10   and women's socks, including its men's athletic socks?  Or at

11   least at this stage of the lawsuit, is there a sufficient

12   likelihood that such rights exist?  That's question

13   number one.

14         Question number two, is Dillard's men's athletic

15   socks packaging likely to cause consumers to believe that

16   there is some form of commercial relationship between the

17   Dillard's socks and either the GOLDTOE socks or their

18   producer?  Or at least at this stage of the lawsuit, is there

19   a sufficient likelihood that such a belief occurs?

20         And then the third question concerns whether the

21   other requisites for a preliminary injunction are satisfied

22   by the record before the Court?

23         The first question, do we have any rights?  The law

24   is quite clear a trade dress claimant is free to define the

25   particular combination of elements for which it claims trade

dress protection.

It is not necessary under the law to incorporate in your articulation of your trade dress every feature of the product or packaging.  When you have a trade dress claim in a line of packaging, as we have here, the individual packages in the line need not be identical so long as there is some consistent overall look to the appearance of that line of packaging or that line of products, depending upon the case.

Now, there is a commonality, a common core of elements across the several iterations, and we've articulated them as our trade dress.  A color band with contrasting white or gold lettering for the word mark; and the word mark has two components, the first of which is "GOLD," a rectangular box in the upper right-hand corner and the gold side panels. That we articulate we claim as our trade dress.

Now, do we have rights?  The trade dress combination is protectable if it is distinctive and non-functional.  It is distinctive, Your Honor, in our case because it is not a common combination of elements and it is sufficiently different from third parties' packaging to set it apart visually.

The issue is whether the trade dress as a whole is distinctive.  The issue is not whether each individual constituent element is distinctive.  It's not defeated by the appearance of a colored band or the appearance of white

1  lettering for the brand or the appearance of a rectangular

2  box or the appearance of "GOLD" on the panels or elsewhere on

3  the packaging because this combination comprises the trade

4  dress, no single element.  So that's the body of graphic

5  features for which the claim of trade dress, and we contend,

6  Your Honor, that it is distinctive and there has been no

7  evidence that seriously rebuts that.

8         The second thing you have to prove to demonstrate

9  that you have a trade dress is that you have to show that it

10  is non-functional.  There are two types of functionality

11  under trademark law.  There's *de facto* functionality.

12  There's *de jour* functionality.

13         What you must show as a trade dress claimant is

14  that your claim trade dress is not *de jour* functional.  Our

15  claim trade dress, our bands, are *de facto* functional.  They

16  serve a purpose.  They hold a package of socks together in a

17  way that allows consumers to see the socks, touch the socks,

18  whatever.  But they have a purpose; they serve a purpose.

19  But that's not the question.  The question is, is there *de*

20  *jour* functionality in that claimed combination of features?

21         Now, 20 years ago the law was not so clear, but the

22  Supreme Court stepped in a couple times.  We all know now

23  what the test is for *de jour* functionality.  *De jour*

24  functionality exists if either the claim trade dress is,

25  quote, "essential to the use or purpose of the packaging or

16

1    it advantageously affects the costs or quality."

2            Now, as I said, it's not *de jour* functional because

3    you don't have to have any, much less the entire combination,

4    of graphic elements to serve the purpose.  It is not

5    essential to the use or purpose of the packaging.  It is not

6    functional by means of being advantageous to the cost or

7    quality, because the law wants to protect competitors from

8    being put to a competitive disadvantage by you claiming a

9    trade dress.  Competitors are not put at a competitive

10    disadvantage.  There is no benefit cost wise that we have or

11    quality wise that we have as a result of our choice of this

12    particular group of trade dress elements.  So it's not

13    functional in the *de jour* functionality sense.

14            Now, backing up a half a step.  I said we have to

15    show in order to show that we have rights distinctive trade

16    dress, non-functionality.  I talked about distinctiveness.

17    When I was talking about distinctiveness in terms of how it

18    differs from what else you see in the marketplace, that is

19    sometimes called "inherent distinctiveness."  A trade dress

20    is also protectable if it has a separate type of

21    distinctiveness.  That's acquired distinctiveness, often

22    referred to as "secondary meaning."  In my opinion, that's a

23    misuse.  You shouldn't use secondary meaning with trade

24    dress.  It's a carryover from trademark law.

25            What we're really talking about is functionality.

1    No, we're good there.  Is it distinctive?  Yes, we're good

2    because it is inherently distinctive.  But also, even if you

3    weren't convinced that it is inherently distinctive, it has

4    acquired distinctiveness.  Now, what does that mean?  That

5    means that insofar as the commercial marketplace is

6    concerned, it has acquired this notoriety, being well known,

7    whatever.

8           As Ms. McHale testifies, and it's unrebutted, the

9    trade dress of GOLDTOE has been seen in thousands of stores

10   by millions of consumers as they walk through men's

11   departments.  Such stores as Belk, Dillard's, Macy's, men's

12   clothing retail stores, down the scale to T.J. Maxx, Costco.

13   Who hasn't seen it?

14          In fact, there have been about 100 million pairs of

15   GOLDTOE socks sold annually recently producing over

16   $150 million in revenue to GOLDTOE.  About two-thirds of

17   that -- statistics I found kind of surprising.  About

18   two-thirds of that are men's socks and almost 40 percent of

19   that are men's athletic socks.  There's a lot of men's

20   athletic socks being sold in this country, and GOLDTOE sells

21   them under either this principal men's athletic sock band in

22   blue or to Macy's and Bon-Ton I think it is and the other --

23          THE COURT:  Why is the difference in that?  Why are

24   they selling the other ones?

25          MR. JONES:  Macy's wanted a little different look.

18

1  They wanted -- they want to be in the line, but they wanted

2  an appearance of "we're better."

3         THE COURT:  Yeah, I mean, I don't want to hurt -- I

4  realize it's not the legal issue in the case.  I don't want

5  to hurt anybody's feelings, but the way -- this (indicating)

6  is what sells your sock.  People look for the gold toe.  You

7  put -- you could put this in white, in plain white and when

8  they walk in -- when I walk in and buy socks, that's what I

9  look for.  I learned for the first time that these

10  (indicating) are made in Indonesia and these (indicating) are

11  made in America, but that's what I've always looked for.  I

12  wear GOLDTOE socks myself.  And packaging, I don't even look

13  at the packaging when I walk in the store.

14         MR. JONES:  Well, Your Honor --

15         THE COURT:  Well, maybe somebody does.  But as long

16  as you got that gold toe, you're going to be probably kicking

17  most people unless you're reducing the quality while making

18  it in Indonesia.

19         MR. JONES:  Your Honor, you are right.  That --

20         THE COURT:  Reduce the quality in the thread count,

21  they'll figure it out, like they did Krispy Kreme selling in

22  the gas station.

23         MR. JONES:  You're absolutely right, that gold toe.

24  That physical gold toe is a --

25         THE COURT:  To me, it is the brand.  Now, trade

19

```
 1   dress is another issue.  I want to look at that.  I don't
 2   want to hurt whoever designed it.  But when I walk in, I'm
 3   looking for one thing, that thing (indicating) sticking out.
 4   I don't care what the packaging is.  I know what GOLDTOE is.
 5            MR. JONES:  I understand, and that's you.  But the
 6   fact that that's a very prominent and well-known brand on
 7   that package, whether you think it's the physical gold toe or
 8   the GOLDTOE word mark, that does not excuse the copying of by
 9   a competitor of the packaging.  And if that package has
10   distinctiveness in the marketplace, it deserves protection.
11            Even if you are shopping in Belk or wherever, even
12   if you are inclined to go looking for this gold toe, if
13   you're familiar with this line of socks and you encounter
14   this line of socks and you're looking for your wife's socks
15   or something and you see this line of socks, whether it's got
16   the gold toe on there or not, there's going to be some
17   familiarity there, and that trade dress makes an impression.
18   It may not be the prominent impression in your mind or other
19   people's minds, but, as I said, you can't copy somebody's
20   trade dress because they have a strong trademark.
21            Just because McDonald's is a strong trademark --
22            THE COURT:  No, I understand that.  I said that's a
23   separate thing.
24            MR. JONES:  Okay.  Okay.
25            THE COURT:  I just didn't want to hurt somebody's
```

1  feelings that came up with this trade dress that's what was

2  selling this sock.  The main seller for this sock is that

3  toe.

4           MR. JONES:  And Ms. McHale of marketing knows that,

5  Your Honor.  As you said, that's not particularly germane to

6  the legal issue.

7           THE COURT:  It's not to the legal issue.

8           MR. JONES:  Okay.  They sell a ton of these.  In

9  fact, the GOLDTOE men's athletic socks sell about $50 million

10 wholesale each year.  That represents about 30 million pairs.

11          Now, so we're talking about -- remember now,

12 distinctiveness.  You've got inherent distinctiveness or

13 acquired distinctive, and I've just given you some of the

14 factors that support our contention there's acquired

15 distinctiveness.

16          There's another thing that comes into play here.

17 Under the law of the Fourth Circuit, acquired distinctiveness

18 is presumed if the defendant intentionally copied the trade

19 dress.  There is this legal presumption.  It can be rebutted,

20 but it hasn't been rebutted here.

21          The Fourth Circuit in the *Cramer* case said 30 years

22 ago almost, quote, "We hold that evidence of intentional

23 direct copying establishes a *prima facie* case of secondary

24 meaning, acquired distinctiveness sufficient to shift the

25 burden of persuasiveness to the defendant on that issue."

21

1    That's the *Cramer* case, 783 F2d 488.

2              THE COURT:  On the color issue, are you claiming

3    these colors that are blue, these blues are the same?  I

4    mean, I know --

5              MR. JONES:  I'm sure there's a pantone difference.

6              THE COURT:  -- I know Coca-Cola red is protected

7    but not every red.  Is that -- just on the blue color, is

8    that do you contend those are exactly the same?

9              MR. JONES:  Your Honor, we have not claimed trade

10   dress protection in any of those three constituent elements

11   independently.

12             THE COURT:  I understand.  I understand.

13             MR. JONES:  Okay.

14             THE COURT:  And then the labeling is you got the

15   block that clearly says this is GOLDTOE and anybody can read

16   that it that can read English.  This is in script GOLD LABEL.

17   So -- and there's some differences on there.  I understand

18   what you're saying.

19             MR. JONES:  Your Honor --

20             THE COURT:  There is that -- that gold box is a

21   little -- does look a little the same, but the side panels

22   are somewhat different.

23             MR. JONES:  Your Honor, if they were identical,

24   we'd be here on a motion for summary judgment instead of a

25   motion for preliminary injunction.  I wish I could draft the

1  facts, you know, to get us there, but we have the facts that
2  we have.
3          THE COURT:  I understand.
4          MR. JONES:  So looking at the issue of secondary
5  meaning, is there a presumption of acquired distinctiveness
6  as a result of direct copying?
7          Well, recall the facts as I recounted them to you.
8  Dillard's had a motivation to copy.  They wanted to minimize
9  GOLDTOE sales.  They wanted to increase the sales of their
10 own house brand.  Dillard's had an opportunity and a means to
11 copy.  The redesign project, the redesign package was a part
12 of the efforts to accomplish those goals, and Dillard's
13 management was not even satisfied until they did copy them.
14         So I think that there is plenty of evidence here to
15 support the presumption of acquired distinctiveness, even if
16 you didn't find acquired distinctiveness to exist because of
17 the commercial pervasiveness, and even if you didn't find the
18 inherent distinctiveness as a result of -- excuse me.  Yeah,
19 the inherent distinctiveness as a result of the fact that the
20 GOLDTOE packaging differs significantly from everything else
21 in the marketplace.
22         Now, the second question.  Once you answer the
23 question do we have trade dress rights, the second question
24 is, is the Dillard's men's socks packaging likely to cause
25 consumers to believe that there is a commercial relationship

1  of some sort?

2          Your Honor, there's another Fourth Circuit

3  presumption that comes into play here as a result of the

4  intentional copying, and that is that the intentional copying

5  of a trade dress creates a presumption that some form of

6  relative confusion is likely to result, and that may be the

7  end of the likelihood of confusion study.  But if you want to

8  go into the elements, if you don't want to rely on the

9  presumption, you look at the seven factors from the *Pizzeria*

10 *Uno* case.  And if you look at those, the first is the

11 strength of trade dress.  Strength of trade dress is either

12 inherent or commercial strength.  Either way, we believe

13 we've covered that factor.

14         You look at relative similarity of the packaging

15 materials, the similarity of the products.  The products are

16 the same type of products.  We think there's strong

17 similarity in the packaging.  You look at the similarity of

18 the retail channels.  They both flow through the same type of

19 retail channel.  In fact, at least at the present time in

20 Dillard's stores.  You look at types of advertising and the

21 way that the products are promoted, retail circulars, that

22 sort of thing.  You look at the defendant's intent; and when

23 it is apparent that there was an intent to emulate, it is

24 strong in favor of the plaintiff.  There is no acc- -- this

25 was no accident, let me put it that way.  There was an intent

1    to emulate here.  And Mr. McElyea could not satisfy
2    management until he got close enough to make -- to
3    incorporate the features that would make people think of the
4    GOLDTOE packaging and think that there was some similarity.
5            Now, and store -- actual confusion when it exists
6    is also a factor.  We have this circumstance that was
7    photographed in a Dillard's store here in Charlotte.  And,
8    Your Honor, you'll see that this Dillard's store used floor
9    fixtures, not the wall fixtures.  And you'll see that they've
10   got a floor fixture labeled GOLD LABEL, but you'll see
11   GOLDTOE mixed in too.  Now, Your Honor, I submit that if
12   Dillard's employees were confused and mixed them up, then the
13   public is even more likely to be confused.
14           The third question -- we've covered now do we have
15   rights, is there infringement.  Have we met the other
16   prerequisite for a preliminary injunction?  There are four of
17   those:  The likelihood of irreparable harm to the plaintiff
18   if there's no injunction; the likelihood of harm to the
19   defendant if it does issue; the likelihood of success on the
20   merits, which we've covered already; and the public
21   interests.  I'll deal with that very quickly.
22           The public interests almost always favors the
23   issuance of a preliminary injunction in a legitimate
24   trademark or trade risen infringement case.  The public
25   should be free from confusion, deceit or mistake.  No doubt

1    about it.

2           The likelihood of irreparable harm to a plaintiff
3    is generally applied once a trade dress or trademark
4    plaintiff has shown a likelihood of success on the merits.
5    The Fourth Circuit hasn't said that that applies, but the
6    Fourth Circuit has noted that the district courts in this
7    circuit do apply.  They just haven't said it, and we give it
8    our stamp of approval.  They at least said it in the *Scotts*
9    case.  And I don't think they have had an occasion to address
10   that since then.

11          So we know the district courts in this circuit do
12   apply that presumption.  They even apply it following *eBay*.
13   We go through in our brief the reason why *eBay* doesn't
14   diminish the strength of our contention in this issue.

15          The gist of it, Your Honor, is this:  There is no
16   trademark.  There is no trade dress.  But for the fact that
17   whatever that trademark or combination of elements is, it
18   connotes in the marketplace a single source.  And once you
19   have somebody else using something confusingly similar, you
20   have destroyed the essence of a trademark or trade dress.  If
21   it connotes two sources, it no longer has its inherent
22   character of being a single source identifier.

23          Last factor, likelihood of -- excuse me, the
24   irreparable -- the harm that the defendant would incur if
25   there is an injunction.  We're not out to put Dillard's out

26

1   of business.  We're not out to foreclosure them from selling
2   socks.  We're not out to foreclosure them from selling socks
3   in private labeled packaging.  Instead, in fact, they're not
4   even -- Your Honor, they're not even going to be foreclosed
5   from selling men's athletic socks in private labeled
6   packaging that they already have.  There is no reason why --
7   other than stubbornness perhaps, there is no reason why if
8   you enjoin them today they cannot tomorrow start using the
9   old packaging bands, and they can do so until the end of the
10  lawsuit or until they design and implement a new design.  So
11  there is minimal, if any, harm that would result to Dillard's
12  if there is a preliminary injunction issued.
13          I submit that we have satisfied all four requisites
14  for a preliminary injunction motion.  Thank you, Your Honor.
15          THE COURT:  Yes, sir.  Thank you.
16          MR. ADAMS:  Good morning, Your Honor.
17          THE COURT:  Good morning.
18          MR. ADAMS:  With the Court's permission, I'm going
19  to remain seated if that's okay.
20          THE COURT:  That's fine.  Whatever you're
21  comfortable with.
22          MR. ADAMS:  We have a PowerPoint presentation.
23          THE COURT:  Whatever you're comfortable with works
24  with me.  That's what I said.  It's hard enough to do this
25  stuff where you guys are.  It's a lot easier to do it up

1    here.  A lot more boring up here.

2              MR. ADAMS:  I'll change places with you if I get to

3    decide.

4              Can you see the monitor, Your Honor?

5              THE COURT:  It should come up there for me.

6              MR. ADAMS:  Just very quickly, Your Honor.  I'm not

7    going to spend a lot of time on this because I don't think

8    it's worth a lot of time.

9              THE COURT:  Oh, it's worth some time.

10             MR. ADAMS:  Dillard's makes -- Gildan is trying to

11   suggest that in a fit of pique or whatever, Dillard's decided

12   to shove Gildan's aside and take over their brand for its own

13   use.  In fact, what happened is that, and Your Honor alluded

14   to it in the what you see up there was the socks from

15   Indonesia.

16             Dillard's began having reduced sales of Gildan

17   socks, GOLDTOE socks long before this issue ever came up.

18   They were having quality control issues.  They were having

19   short shipment issues, and they also made a decision, of

20   course, to go with down-market brands.  And Gildan has the

21   obvious right to do that, but Dillard's obviously doesn't

22   have to like it.  But you can expect that if there are

23   GOLDTOE socks that are now instead of being available just at

24   Macy's and Belk's and Dillard's and a few relatively high-end

25   department stores, you can also buy them at Wal-Mart, Kohl's,

1    Target and so forth, fewer socks are going to be sold at

2    Dillard's no matter what kind of packaging they're in and

3    that's exactly what they're --

4              THE COURT:  That's a business decision.

5              MR. ADAMS:  Exactly.  They made a business

6    decision.

7              What do you see here in an e-mail?  Quality control

8    issues.  Gildan:  "We won't have a definitive answer until

9    next week at the earliest.  Sorry."  Then, again, "Any

10   decision yet?"  Dillard's says, "Attached is a picture of one

11   of the new socks.  The thread has come unraveled."

12             Here we have Dillard's is saying, "Please call me.

13   Call me please."  Gildan:  "After review of current

14   inventory, we will need to remake produce to the desired

15   specifications.  Unfortunately this will take time.  We

16   cannot get you new product for six weeks."

17             I love this one.  Here they were shipping product.

18   Dillard's says, "We continue to have shipping issues with

19   this GOLDTOE athletic style."

20             And here you can see that Dillard's shipping seems

21   to be getting worse.  "I'm out of stock in some stores on

22   some styles.  Not a good time to be out of stock.  Are you

23   going to cover my lost sales?  Service has been terrible.

24   Need to start looking for a new sock supplier."

25             Dillard's:  "We are still getting short shipped."

29

1   If you look over at the e-mail, you'll see that from what
2   Dillard's ordered, they were typically getting anywhere from
3   15 to perhaps 30 percent of the actual products.
4           THE COURT:  Okay.  So I see now that your position
5   is that you did it for quality reasons.  The question,
6   though, for the Court is, you know, why this package?  I
7   mean, why not just, you know -- why not have black and white
8   packaging and say "American made, American strong"?
9           MR. ADAMS:  That's why we're going to move along.
10  I just wanted to dispel the notion that because --
11          THE COURT:  I mean, it seems like nobody wants to
12  ever put "American made" on something anymore, but that's --
13  that would seem, to me, to be a big selling point.  Unless
14  the price point is so ridiculously different because of -- I
15  don't think you have the problem anymore of high-price people
16  making socks in America anymore.  They're all out of work.
17          MR. ADAMS:  Not surprisingly, Your Honor, we look
18  at the issue somewhat differently than Gildan does.  Gildan
19  has not clearly shown that it has a likelihood of success
20  proving a protective or trade dress, which they agree is a
21  threshold requirement.
22          THE COURT:  Well, I've gone over the stuff that is
23  different with them.  I mean, you did switch something to a
24  blue.  You do have a gold box that's -- their gold box on the
25  socks that I have here says -- it's a little larger than

30

1   yours -- says "Cushioned, cotton liner, six pair."  You go,
2   "Six pairs."  And then you have very small "Made in the USA,"
3   which I think probably ought to be switched around on that if
4   you want to have a better marketing idea here.  I have to
5   look at these things.  Like I told him, what I've always done
6   is walked through and looked for these.  This (indicating) is
7   what I look for, this gold toe.  I don't care about the
8   packaging.
9           MR. ADAMS:  Your Honor, I appreciate that.
10          THE COURT:  I realize there may be lots of people
11  walking in and read every label.  Until this case, I did not
12  read these labels.
13          MR. ADAMS:  Your Honor, I think we've adequately
14  addressed the concern you have about the elements on the
15  label.  But I want you to look again at the sentence I just
16  read.  There's a threshold issue here as to whether or not
17  there's protective trade dress, and the Fourth Circuit has
18  had quite a bit to say about that.  Nothing you've heard from
19  Mr. Jones, but we're going to cover that.
20          THE COURT:  Let me hear about that.
21          MR. ADAMS:  I ask you to be patient, please.
22          THE COURT:  I will.  I'm just having heard all of
23  that and looked at these things, I have some formulation of
24  thoughts about it.  So, you know --
25          MR. ADAMS:  I think --

1          THE COURT:  But force the ones that are favorable

2    to you and disabuse me of the ones that are not.

3          MR. ADAMS:  I'll do my best.

4          The question on whether Gildan has directive trade

5    dress evolves into several questions.  First of all, Gildan's

6    trade dress must be exclusive to it.  It has to have a

7    consistent overall look, and there's some actual points of

8    agreement between Gildan and Dillard's.

9          Let's remember what Mr. Jones said.  Their trade

10   dress is not registered.  They've acknowledged that in their

11   briefs.  He said it here today.  They don't claim that they

12   have any trademark registration on their trade dress.

13   They're claiming their overall appearance --

14         THE COURT:  I even ruled where you don't have one.

15   I mean, you don't have to have a trademark.  The famous

16   barbecue restaurant case that I handled, *Rib Holdings v. Fat*

17   *Buddies*.  That was the seminal case on restaurant trade

18   dress.

19         MR. ADAMS:  Your Honor, there's a specific reason

20   why I mention the fact that their trade dress is not

21   registered.  We all know it's not, but that has significance.

22         Gildan claims that "copying" entitles it to a

23   presumption of secondary meaning.  It also claims that

24   "copying," which it claims it's shown, entitles it to a

25   presumption of likelihood of confusion, and it's wrong on

1    both scores.  Here's why:  *Ale House Management,* 2000 Fourth

2    Circuit case.  This is from the quote.  This is a quote from

3    the Fourth Circuit:  "Before considering the significance of

4    plaintiff's assertions of intentional copying, we must

5    address whether plaintiff had an exclusive proprietary

6    interest in the trade dress of its facilities."  I think we

7    all agree on that.

8             "Our cases make clear" -- this is the same case.

9    This is from *Shakespeare,* but it's the same quote as in *Ale*

10   *House.*  This is after the *Cramer* case.  "Our cases make

11   clear, however, that that presumption of secondary meaning

12   arises only where the intentional copying is motivated by an

13   intent to exploit the good will created by an already

14   registered trademark."

15            So all the information that Mr. Jones has given you

16   about copying presumptions is totally irrelevant to this

17   case.  The Fourth Circuit said the same thing in the *Ale*

18   *House* case, and I'm going to reference it again in just a few

19   minutes because it's just that important.

20            They have virtually no evidence of actual acquired

21   distinctiveness.  Why?  Because none of Ms. McHale's

22   declaration attribute any particular amount of those products

23   to any one of those particular labels.  And, in fact, we'll

24   show you where a lot of advertising and promotion that Gildan

25   does they don't use the label and so it couldn't have any --

1    it couldn't have any significance.

2         So, again, back to the *Ale House* case.  "Some

3    proprietary interest is necessary before trademark protection

4    applies.  Indeed, even if a party does 'copy' a design and

5    'sells' an almost identical product, "this it may have every

6    right to do under federal laws.'"  That's the issue Your

7    Honor is going to have to cope with.  The initial threshold

8    question of whether or not they have shown acquired

9    distinctiveness in the absence of a registered trademark.

10        Now, the *Ale House* case is a particularly

11   interesting case.  It involved -- you may be familiar with

12   the Carolina Ale House, which is a couple of blocks down the

13   street.  This was a lawsuit between two competing

14   restaurants, and one of the restaurants claimed that the

15   arrangement of the chairs and benches and bar and the TV

16   monitors and so forth was too close, and the lawsuit was in

17   the Eastern District.  Judge Fox granted summary judgment for

18   the defendant on the trade dress issue and it was affirmed by

19   the Fourth Circuit.  We'll talk about that a little bit more.

20        Now I'm going to address the threshold issue

21   that the Court is going to have to grapple with.

22        Here, again, we're looking at the *Ale House* case.

23   "Accordingly, before considering the significance of

24   plaintiff's assertions of intentional copying, we must

25   address whether plaintiff had an exclusive proprietary

1    interest in the trade dress."  In this case, the unregistered

2    trade dress.

3            So what is trade dress?  The Supreme Court says it

4    "involves a total image of a product and may include features

5    such as size, shape, color and color combinations."

6            Gildan cannot delete from its trade dress the

7    elements which eliminate likelihood of confusion.  Gildan

8    would have you believe that it can pick and choose and hollow

9    down its label until only the elements are left that look the

10   most like our label, and we'll see some cases where we find

11   that you just can't do that, including some references that

12   Gildan cited the Court to.

13           A few court cases outside the Fourth Circuit which

14   stand for the proposition that you can narrow it down, your

15   trade dress, as much as you'd like to.  They don't trump the

16   Fourth Circuit cases to the contrary, and they certainly

17   don't trump the Supreme Court's decision in Two Tacos [sic].

18           The Supreme Court said in Two Tacos [sic] even if

19   the package is -- "Only the 'total image' of the products are

20   at issue."  The trademarks of the respective products

21   dominate the respective packaging but are ignored in Gildan's

22   motion.

23           This is where I think Your Honor, with all due

24   respect, is totally wrong when you say that the significance

25   of the gold toe itself on the sock is not relevant to the

trade dress issue because that trumps that and the GOLDTOE
trademark on the label itself trumps every other issue in
this case.

It's inconceivable that anybody can walk in a store
and look past this famous GOLDTOE trademark they're talking
about and the actual gold toe on the sock itself and somehow
be confused because of a tiny box up in the upper right-hand
corner of the label, even if it were on all of their
products. And as we'll see in if just a few moments, it
clearly is not.

THE COURT: Obviously, you like something about the
label. There are a few things on there that are similar. So
there were some things that apparently you thought would help
on the label.

MR. ADAMS: Well, let's take a look at --

THE COURT: I still think the American -- "American
made" is the biggest thing when you put it on something.

MR. ADAMS: Well, Mr. Shields is sitting here, and
I'm sure he's taking careful note of that, Your Honor.

This is a case that was cited in McCormick's -- I
mean, not McCormick's. *McCarthy*'s. It was a cite in
Gildan's brief regarding its ability to subtract elements
from its label until it gets down to where it wants its trade
dress to be.

One of the cases that is cited by *McCarthy* in that

1    section is the *AM General Corp. v. DaimlerChrysler Corp.* case

2    decided back in 2013.  And the court said so far so good for

3    Gildan.  It is proper for DaimlerChrysler to exclude the head

4    lamp openings from its definition of its alleged trade dress

5    in the Jeep grille design.  If you look down, you can see at

6    issue in this case was the Jeep over on the right they had

7    this vertical -- these vertical slots, which have been around

8    for a long time.  And when Hummer came out, it came out with

9    these vertical slots as well.  And so there was a lawsuit.

10   Chrysler claimed that, well, this is our trade dress, this

11   grille, but you can include the headlights.

12        The court said, yeah, well, you -- you can describe

13   your trade dress not including the headlights if you want to;

14   however, the head lamp openings cannot be ignored in making

15   the comparison to determine a likelihood of confusion.  And

16   on that grounds, they found no infringement.

17   Notwithstanding, the court found that the grille openings

18   itself were highly similar.  The presence of these

19   headlights, the round ones and the square ones, eliminated

20   the likelihood of confusion.

21        I submit, Your Honor, that a similar situation is

22   present here because Gildan is saying forget about the fact

23   that you have what it calls an iconic trademark, the gold toe

24   itself on the physical sock, which you are required to see

25   when you purchase the product.  Forget all of that and focus

1    on this tiny little box or this shadowy athlete it's got or

2    the red band which ordinarily --

3                THE COURT:  He says you don't have the shadowy

4    athlete anymore.

5                MR. ADAMS:  They're saying, though, look at these

6    elements.  I know we don't have the athlete on it.  They're

7    saying let's take this and that away.

8                So what did the court say in the *AM* case?

9    "Recognizing the dissimilarity of the H2 and the Wrangler or

10   Liberty when viewing anything other than the grille, the H2

11   grille is much more likely to trigger consumer association

12   with the Humvee (as it is designed to do) than to threaten

13   the strength of the grille configuration as a DaimlerChrysler

14   mark."

15               There, again, I think that's something Your Honor

16   is going to have to cope with.  If you feel like Gildan is

17   going to have to prevail, you'll have to explain to the

18   Fourth Circuit why these cases don't apply and why, despite

19   Your Honor's own comment, the public should be obliged to

20   ignore altogether the presence of the word mark on the label

21   and this gold toe which they're being forced to see on the

22   sock.

23               THE COURT:  I spent my current life explaining to

24   the Fourth Circuit on all these rules.

25               MR. ADAMS:  What does Gildan say regarding their

38

1   own trade dress?  Well, in their complaint they restrict it

2   to the men's athletic socks.  So we really haven't seen the

3   dress socks and so forth before.  And I suppose Your Honor

4   will have to make up his own mind about whether or not

5   there's really a common theme with all those different

6   colors, the straight bands, the curved bands, the white, the

7   black, the green, the brown, the blue.  But to me, that's an

8   open question.  I think under the law it clearly is.

9           In the complaint, Gildan complaint, defined its

10  trade dress as a blue band.  That's what it says.  It's a,

11  quote, A blue band with contrasting gold elements and white

12  lettering for its word mark having two components, the first

13  of which is the term 'GOLD'; a gold partially-serrated

14  rectangle, dah, dah, dah; and side panels, plural, which

15  incorporate the color gold.  And they not only describe it,

16  but they reference it in the complaint as Exhibit 1, and I

17  think you're holding Exhibit 1 to their complaint, the

18  photograph of it in your hand.  Here's Exhibit 1.  And they

19  claim this represents the total image of the alleged trade

20  dress identified by Gildan in its complaint.  Total image.

21  Quoted directly from *Two Pesos*.

22          THE COURT:  Are the thread counts the same in

23  these?

24          MR. ADAMS:  I have no idea.

25          So what is the strength of a trade dress?  "The

39

1   strength of a trade dress or trademark is measured in terms
2   of its distinctiveness, or more precisely, by its tendency to
3   identify the goods sold as emanating from a particular
4   source."  Well, look at the language I've bolded.  It has to
5   be considered in its commercial context.  And that's why it's
6   important for the Court to think in terms of, for example,
7   how it bought its GOLDTOE socks instead of what you see up
8   here on the boards.
9        "The strength or distinctiveness of a mark
10  determines both the ease with which it may be established and
11  the degree of protection it will be accorded."
12       So what is the commercial context?  It's the gold
13  toes on the socks that's virtually on every pair.  It's the
14  registered GOLDTOE word mark.
15       And by the way, under the law you can't dissect
16  your own trademark.  You can't say, well, we have a
17  registered mark for GOLDTOE, but for this purpose just ignore
18  the toe part and let's just think about the GOLD.  That's
19  cited in our brief.
20       It includes the GOLDTOE design trademark.  It
21  includes their commercial context.  It includes a shadowy
22  athlete.  It includes the red triangle on the left-hand side
23  of the package.  It includes the blue background, and it does
24  include the gold rectangle directly above and aligned with
25  the semicircular portion of the design trademark.

40

1      There's actually a reason for that serration. If

2  you look down below the word "toe," Your Honor, you see what

3  is actually a toe of a sock. And what that reflects is that

4  the sock is actually been -- the toe of the sock has actually

5  been separated from the sock itself so the word "GOLDTOE" can

6  be inserted.

7      THE COURT: And what does the serration on yours

8  do? What does that recommend?

9      MR. ADAMS: It's completely arbitrary. It has no

10  function or meaning, whatever.

11      THE COURT: Okay.

12      MR. ADAMS: So Gildan is required to "clearly show"

13  that the trade dress alleged in its complaint is distinctive.

14  And "distinctive" means that the purchasing public recognizes

15  a trade dress as a source identifier.

16      Here's the quote from *Wal-Mart*. "We hold that, in

17  an action of infringement of unregistered trade dress, a

18  product's design is distinctive, and therefore protectable,

19  only upon a showing of secondary meaning." Again, no

20  presumption. You have to show it. As far as I know, the

21  *Wal-Mart* case from the Supreme Court about 15 years ago is

22  still good law. I'm confident that it is.

23      So Gildan has presided -- provided no, has zero

24  evidence of acquired distinctiveness of its trade dress. It

25  provided financial marketing data for its socks, but it

1    didn't provide any financial marketing data for the claimed

2    sock packaging.  And there is none because Gildan does not

3    show its packaging in its promotional materials and

4    advertising.

5          Let's go to GOLDTOE's website.  This is connected

6    to the web, and you can see on their own website dozens of

7    GOLDTOE socks for sale, but absolutely no reference or image

8    of the label they claim is the famous trade dress.  And the

9    trade dress must be consistent.

10          So we asked them.  In the discovery we asked them

11    to produce all packaging in which the Gildan footwear has

12    ever been packaged for display and sale since January 1,

13    2008.  And this is their response:  Gildan will produce

14    specimens or images of all packaging in which socks or other

15    hosiery goods, dah, dah, dah, have been packaged for display

16    since January 1, 2008.

17          Here's what they produced.  This is all of them

18    (indicating).  This is their entire production in response to

19    our request and their statement they would produce all of

20    their packaging.  And not surprisingly, on these particular

21    images you do see a certain amount of consistency, which

22    required us to do a little of our own third-party discovery.

23    And here you see other brands, and I'm going to get this one

24    out at this point and this one too.

25          These (indicating) were ones that Gildan failed to

1   produce, and these are just athletic socks.  They didn't

2   produce any of these other things that we've just seen for

3   the first time today.

4           Well, let's take a look at these.  These are the

5   athletic socks.  Totally different image in the upper

6   left-hand corner, different color, does have a box but

7   different -- still has the gold toe, though.

8           The one next to it, a black and blue label with no

9   drop-down box.

10          The one next to that, a black label.  And instead

11  of the shadowy athlete, it has a pair of it looks like gold

12  socks.  I think that one does have a small drop-down box on

13  it.

14          The one next to that, a much narrower band,

15  different color, no athlete at all, no side panels.

16          The one next to that, a white label with gold

17  writing for GOLDTOE.

18          One down in the lower right-hand corner, completely

19  different package.

20          This one has a triangular cutout on the bottom,

21  different color, completely different style or drop-down box,

22  no athlete in the right-hand -- on the left-hand side.

23          Then you go over to the next one.  Drop-down box is

24  not rectangular, not serrated.  It's semicircular.  No

25  athlete.  It has a distinctive band across the top of the

1    label and then it has a drop-down tag off the bottom of the

2    label.

3            Then the one after that -- I want to show Your

4    Honor this one.  This is the one that takes the cake

5    considering the fact that they're making such a big issue of

6    the drop-down box.  With the Court's permission, I'll

7    approach the bench.

8            This one has no drop-down box at all.  This one is

9    quite similar to the one that they've made such an issue

10   about, this one right here (indicating), except for the fact

11   that you'll see instead of a drop-down box, they simply have

12   two narrow lines that extend down and sort of bracket the

13   text.

14           Then going on, you'll see next to that another

15   GOLDTOE label, which I submit has a completely different

16   appearance, a different type of athlete.  That might be a

17   bicycle rider.  It's hard to tell from here.

18           And then finally moving over to the lower right,

19   you see yet another package, completely different coloration,

20   side panels and front panel, separate drop-down tag, which is

21   separately attached to the sock, and then a round sticker,

22   which has been -- which is formed over the label.

23           But what's consistent about all of this, Your

24   Honor?  In every single case, with the possible exception of

25   the one on the lower right just to the second one from the

44

1  right, you do see the gold toe.  So anyone wanting to go in a
2  Belk's or a Dillard's or anywhere else and buy a pair of
3  GOLDTOE socks, all they've got to do is look past the label,
4  like Your Honor does, and find the sock with the gold toe in
5  it.  So Gildan's athletic sock packaging, contrary to what
6  you've seen to date, is highly inconsistent.
7      So looking at an example.  This is a display in a
8  Kohl's department store.  In fact, Gildan produced this to
9  us.  There are different labels, different types of labels,
10  several different types of GOLDTOE labels all for athletic
11  socks hanging on the same display rack.  Some of which have
12  separate drop-down tag, some of which are blue, some of which
13  are black, some of which are gray, some of which are narrower
14  than others.
15      Here's another one also taken at Kohl's with the
16  Kohl's private brand hanging directly next to the GOLDTOE
17  socks.  Blue, displayed side-by-side with GOLDTOE athletic
18  socks.  Apparently, Gildan doesn't have a problem with that.
19      So what does the law say about copying?  Well,
20  first of all, Gildan has not offered any evidence that if
21  there was any copying, it was done with an intent to deceive
22  on Dillard's part.  They haven't offered any evidence of
23  intentional copying by Dillard's of the dominant portions of
24  the Gildan trade dress, which is the gold toe on the sock and
25  the prominent GOLDTOE language on the label.  Those are

1    without question the dominant portions of the mark.

2         We'll see in just a few moments under Fourth

3    Circuit law and Supreme Court law that trumps less

4    significant aspects of the label.  At most, what the evidence

5    shows is that Dillard's referenced the Gildan packaging as

6    one, among many others, during the design process.  This is

7    hardly evidence of an intent to deceive.  No one out to

8    deceive someone is going to not put the most dominant parts

9    of the trademark on their product.  And we would be in a

10   completely different situation, of course, if we had

11   manufactured a sock with a gold or a yellow toe.  Obviously,

12   we did not do that.  We never have done that.

13        So what Mr. McElyea said, he says, yeah, it's

14   common practice.  In fact, he also testified in their sort of

15   workshop at Dillard's they have an entire wall which is

16   covered with every sock that they can find no matter whose

17   brand it is.  It's a bit like dress styles changing from year

18   to year and decade to decade.  In one year some color may be

19   in style for one year and another year another style.  The

20   same thing applies to labels.  And I think we will see in

21   just a few moments that, for whatever reason, blue is a

22   dominant color for athletic socks.

23        So he said, well, it's a common practice when we do

24   design work.  We take samples from around the world.  We want

25   to stay current.

46

1    So what Gildan is asking the Court to do is to
2    ignore the gold toe seen on every pair of GOLDTOE socks.  He
3    also asked the Court to ignore the fact that there is the
4    iconic GOLDTOE label on the GOLDTOE pair seen on every
5    GOLDTOE socks.
6        So what happens when you walk in the store?  You
7    look, you'll see on every one of these packages you'll see
8    sticking up above it the gold toe on the sock itself.
9    Clearly, the most dominant aspect of the entire display for
10   those gold toes sticking up out of the top of that label and
11   directly down below it the largest text by far on that label
12   is the registered trademark GOLDTOE.
13       So they're asking us to ignore their registered
14   trademark on the gold toe itself and on the GOLDTOE label.
15   They're asking you to ignore the shadowy athlete.  They're
16   asking you to ignore the triangle.
17       There's a reason for that triangle, Your Honor.
18   That is, if you go back, you can see that these socks are so
19   bunched together, a lot of times you can't see that side
20   panel.  So to make sure it's visible from the front, that red
21   triangle, which is not of course on our product, is actually
22   projected out from the side to the front so it's easier to
23   see.  There it is there (indicating).  So they want you to
24   ignore that as well.
25       So they're saying let's ignore all of these -- all

1    of these things and focus on the color of the packaging,
2    which is blue, and on the small rectangle.  Forget about the
3    iconic gold toe.
4              In fact, we did a little photo shopping.  Here's
5    what they claim their trade dress is on the left.  You see
6    how much they've tried to subtract from the overall
7    appearance.  Remember the overall appearance language in the
8    Supreme Court's *Two Tacos* case.  Remember the requirement for
9    consistency and for viewing the product in the commercial
10   context.  This comes nowhere close to that standard.
11             So let's go back to the *Ale House* case for a
12   minute.  *Ale House* said -- Your Honor has got to read that
13   case because it says a lot about how this case ought to come
14   out.  "Trade dress should be considered generic" -- this is
15   the Fourth Circuit talking -- "if well-known or common, a
16   mere refinement of commonly-adopted and well-known form of
17   ornamentation, or a common basic shape or design, even if it
18   has not been refined in precisely the same way."
19             There is a specific reason why I quoted this
20   language, which we'll see in just a moment.  Look at all of
21   the blue socks that we were able to find -- blue labels that
22   we were able to find very quickly just by doing a little bit
23   of shopping.  Columbia, Adidas, Nike.  The Nike color blue is
24   almost the same color as ours.  Quite a bit lighter than the
25   GOLDTOE.

1          How about the rectangular boxes?  Totally generic.

2          Asics, drop-down box on the right-hand side of the

3   label.  One next to it, Champion, two drop-down boxes on the

4   right-hand side of the label.  Hanes, three drop-down boxes

5   on the side of the label.  Wolverine, two drop-down boxes on

6   the side of the label.

7          The rectangular information boxes are functional.

8   Why do I say that?  Because they say it.  Right in their

9   complaint they admit that it's functional.  They put it there

10  as a distinctive standout to, quote, "For informing consumers

11  of how many pairs of socks are included in the package."

12         Now, even though as the Fourth Circuit said, it

13  might not have been -- even if it had not been refined and

14  precisely the same way, look at what we're seeing here, Your

15  Honor.  The same -- the same basic color, drop-down boxes.

16  And, again, this was just a very short shopping trip.  We

17  have some of these samples here.

18         So let's look at some more.  Let's take them at

19  their own argument for a minute and let's look at their

20  drop-down boxes.  Just the GOLDTOE.

21         This one says "Cushioned cotton liner, six pair."

22  This other one it looks like it has a piece that's a flap

23  folding down, not serrated, on the bottom and conveys

24  different information.  Another GOLDTOE.  This one is not

25  serrated.  It's a different color.  It has different

49

1    information on it.  Another GOLDTOE drop down.  This one
2    looks like a box within a box.  It has a larger black box and
3    inside it is a smaller blue box that has serrated.  This
4    looks like one we may have seen today.  No, I don't think
5    this is even -- this one is not even on the board.  This is a
6    different one yet.  Another drop-down box with a big "G" on
7    it.  And then another one, a black box within a box.  I guess
8    that's the black box on a gold band.  Yet another difference,
9    "Cushion Tec, acrylic crew, three pair."  Yet another one.
10   This one, again, another athletic sock, but directly down
11   below the iconic GOLDTOE, which everybody sees first when
12   they walk in the store and clearly identifies it only as a
13   GOLDTOE product, you see a swervy -- a dark color swervy
14   band, which is quite narrower than the GOLDTOE band mounted
15   on the wall with a separate box, which is apparently attached
16   to the sock somewhat separated and below the dominant label.
17   Here's another GOLDTOE sock.  No rectangle.  Although it does
18   have a box up at the top that says "New cushioned sole,"
19   which is attached separately.
20           THE COURT:  Was this how you all displayed them in
21   your store where you couldn't see the toes?  Just kidding.
22           MR. ADAMS:  And then on the right-hand side another
23   GOLDTOE label with no rectangle whatsoever, and this is the
24   one I just handed Your Honor.  We showed you some where there
25   were no boxes.  This one, instead of having a box, has a

1  couple of ziggyzag lines down it.

2          THE COURT:  I saw that.

3          MR. ADAMS:  Again, this wasn't produced during the

4  discovery, even though we asked for it.  We found this

5  packaging in the stores and bought it on our own.

6          THE COURT:  Somebody was confused that day on the

7  label making.

8          MR. ADAMS:  So Gildan's alleged trade dress is not

9  distinctive for another reason, the side panels.  Virtually

10  every pair of socks sold in this way has side panels and you

11  see down in the bottom.  You can see across the top there's

12  several pairs that have side panels, and we have samples of

13  these.  Blue here on the left and the bottom center, a blue

14  label with the gold side panel.  Here's a dark gray label

15  with a gold side panel.  Here's another foot joy blue label

16  with gold or yellow side panel and a black and gold front

17  panel with a black and yellow side panel.  So, again, there's

18  nothing unique about side panels.  There's no -- nothing

19  distinctive about the fact that they're gold.

20          Even Gildan's use of their side panel is

21  inconsistent because you see here, I would concede, the one

22  on the left is gold, but the one on the right, as far as I

23  can tell, is not gold.  It may have a gold highlight to it,

24  but that's blue.  And, again, you notice the red arrow that

25  sticks out from the side.  At least on some of their

1   packages.

2           Here's another GOLDTOE product we haven't seen yet,

3   but this one has a black label, a gold drop-down box, but it

4   has a red side panel.  This label is much -- seems, to me,

5   much deeper than some of their other labels.  In addition, it

6   has a separate label hanging down from the label.  It says

7   something.  It says "two to three pair."

8           So the first test that Your Honor has to decide the

9   question is where in the record is there evidence regarding a

10  single consistent overall image to Gildan's athletic record.

11  It's our submission there simply isn't one.

12          So what's the second issue?  Has it shown a

13  substantial likelihood of successfully proving likelihood of

14  confusion.

15          We've already established that they're not entitled

16  to any presumptions.  Why?  Because their trade dress is

17  unregistered.  The Fourth Circuit has made that quite clear

18  in *Shakespeare* and *Ale House* and several other cases.  It has

19  no evidence of actual confusion.  It has no consumer

20  evidence, no expert evidence.  It rests its case almost

21  entirely on this presumption of confusion and damage to which

22  it's not entitled as a matter of law.

23          You need to read Ms. McHale's declaration very

24  carefully, Your Honor, because what's important in that

25  declaration is what's not said, and there's nothing said in

1    that declaration about what they are trying to prevent us
2    from doing.

3         So let's go back -- I want to go back to *Ale House*
4    one more time.  And here the Fourth Circuit is talking about
5    what you have to consider and what you don't.  And they're
6    focusing here on the consistency requirement, on the
7    consistent look and appearance of the product.

8         "There is no evidence that Ale House Management's
9    centrally located rectangular bar with two types of seating
10   on either side and television monitors, arcades, and pool
11   tables, decorated generally in wood and brass, is 'unique or
12   unusual.'  This is particularly so when Ale House
13   Management's own configurations differ from facility to
14   facility, denying it a single model from which to distinguish
15   the numerous similar configurations used by other
16   food-and-beer establishments."

17        Could this be a clearer analogy to the situation
18   here, Your Honor?  But instead of talking about television
19   monitors and arcades and pool tables, we're talking about
20   different colored side bands.  We're talking about a dozen
21   different types of drop-down boxes in sizes, colors, shapes,
22   and everything else.  We're talking about the absence of side
23   bands.  We're talking about different colors.

24        You could almost take this second line out of the
25   second paragraph or second sentence and transpose it by

1    saying it is particularly so when Gildan's own configurations

2    differ from package to package, denying it a single model

3    from which to distinguish the numerous similar configurations

4    used by other sock manufacturers.  And that is exactly the

5    situation we have here.

6              I want to talk briefly about one or two more cases

7    and then I think we're done.

8              There's a recent case that we spent some time

9    discussing in our brief, Your Honor, and it's the *Kind v.*

10   *Clif Bar* case.  And there, again, that is a very, very

11   comprehensive and extremely well-written opinion by

12   Judge Wood, which covers the entire waterfront of cases like

13   this.

14             THE COURT:  It's amazing how cases goes someone's

15   way are extremely well written.

16             MR. ADAMS:  Well, you're right.  I admit it.

17             THE COURT:  It's okay.  Go ahead.

18             MR. ADAMS:  I'm a paid water carrier, Your Honor.

19   I'm doing the best I can for my client.

20             THE COURT:  Go ahead.

21             MR. ADAMS:  And so what it -- the *Kind Bar* case

22   included -- it was basically a lawsuit between two candy bar

23   manufacturers.  They both made a nut-type bar.  They were

24   both packaged in an elongated package with a clear windows so

25   that you can see the nuts inside.  "That many products share

1    some of the elements Kind seeks to protect here as its trade

2    dress also indicates that it's claim is pitched at an

3    improper level of generality."

4          I want you to focus on that language "an improper

5    level of generality," and go back and think about that slide

6    we showed you where they had taken off of their label all the

7    things they claim weren't their trade dress.  They took off

8    the side band.  They took off the red triangle.  They took

9    off the last half of their trademark GOLDTOE.  They took off

10   the shadowy athlete and said let us focus on these parts.

11         What did the court say?  "It appears then that Kind

12   impermissibly seeks protection for 'a generalized type of

13   appearance.'  Allowing Kind to protect an overly broad trade

14   dress would go against Second Circuit's admonition that

15   courts should be careful not to overextend trade dress law

16   and that trade dress."

17         That is exactly the point *Ale House* was making when

18   it talked about the fact there was no consistent theme by

19   which it could distinguish, you know, one restaurant from the

20   other.

21         Now, I want to address specifically the question of

22   the fact that they have two iconic trademarks everybody

23   acknowledges on their product as it's in its commercial

24   context.  As someone sees it in the store.

25         In evaluating similarity, the Court must consider

1    whether the two products "create the same general overall
2    impression."  "The presence and prominence of markings
3    tending to dispel confusion as to the origin, sponsorship or
4    approval of the goods in question is highly relevant to an
5    inquiry concerning the similarity of the two dresses.  When
6    prominently displayed it can go far towards eliminating any
7    possible confusion," and it cites a famous case, *Nora*
8    *Beverages* case, which had to do with some water bottles.
9         "The likelihood of confusion analysis must consider
10   the elements for which protection is claimed in the context
11   of the entire trade dress."  Not separated out and dug down
12   as Gildan's would ask the Court to do.
13        And they're quoting from *Nora* here.  "Therefore,
14   Nora can claim protection for its bottle shape if it is
15   distinctive and non-functional, but defendant's labels must
16   be considered in the analysis."
17        That same principle applies here.  They can claim
18   whatever they want to as their trade dress, but you couldn't
19   ignore the other elements in the commercial context when
20   making the confusion analysis.
21        Now, let's address the issue of national versus
22   house brands.  This has been litigated repeatedly, and we've
23   got some interesting slides, I think, that will illustrate
24   this.  This happens to be from the *Conopco v. May Department*
25   *Stores,* but it could have been from any number of cases.

1       "With the rise of regional and national discount
2   retailers with established names and logos, retailers who
3   market both national brands and their own private label
4   brands in direct competition, this form of competition has
5   become commonplace and well known in the marketplace.  When
6   such packaging is clearly labeled and differentiated we are
7   unwilling to apply a rule that would make such competition
8   presumptively unlawful."

9       Here I want to address the issue they raised about
10  our product being placed next to theirs.  You'll find in the
11  case law that they're exactly wrong.  The best possible way
12  to avoid any possibility of confusion is to place two
13  products next to each other.  That way the consumer when they
14  walk in they can stand in one position and simply by turning
15  their head they can see whatever differences there are
16  thereby slight or substantial as opposed to having perhaps to
17  walk around to another display or even down the mall to
18  another store.  So the fact that our product, at least in
19  some cases, is next to theirs would further mitigate against
20  confusion, not promote it.

21      And so the Court -- I'll just skip over that.
22  Here's some examples.  Again, this has been litigated over
23  and over again.

24      The Venture brand lotion packaging held not
25  confusingly similar to Vaseline trade dress packaging.  This

57

1   is a *Conopco* case.  You can see how similar those bottles
2   are.  What was the distinctive -- what was the critical
3   factor?  One said "Vaseline Intensive Care," one didn't.
4   They reversed the District Court noting, "The prominent
5   placement of black and white diagonally-striped Venture logo
6   on the front of the Venture products."
7              These products you're seeing in the case were
8   sitting directly next to each other in the store.  So the
9   consumer could stand there and look at Vaseline and then look
10  at the price and then moved their eyes about five degrees to
11  the right or left and look at Venture and noticed in all
12  cases the product is less expensive and decide which they
13  want to purchase, the house brand or the more expensive
14  national brand.
15             THE COURT:  Of course, yours says $14 and theirs
16  says 10.
17             MR. ADAMS:  Ours is better than theirs are, Your
18  Honor.  They should be more expensive.
19             THE COURT:  They're actually 20.  Marked them down
20  or somebody marked them down.
21             MR. ADAMS:  Here's a better example, Your Honor.
22             THE COURT:  You're going to have to work me into --
23  show they're more, they're better.  These are pretty good,
24  unless they cut costs for short-term profits at the expense
25  of long-term health of the company.

58

1          MR. ADAMS:  Your Honor, if you take a look at --

2          THE COURT:  I have -- I have no idea they've done

3    that.  I've been totally satisfied with their product.

4          MR. ADAMS:  Your Honor, take a look at this slide.

5    This is the *McNeil Nutritionals* case.  This was a lawsuit

6    involving Splenda and they came out -- Food Lion was the

7    defendant.  They came out with a brand called -- or Heartland

8    came out with a brand called "Sweet Choice."  You can see how

9    similar the packages are.  Splenda right next to it, Sweet

10   Choice.  Both have a cup of coffee.  The coloring is highly

11   similar.  Packaging not confusingly similar.  Why?  Because

12   it was so commonly used by competitors that there was no

13   trade dress.  At that point it didn't matter how similar they

14   were because the consumer is not going to look at one of

15   those brands or another brand and assume it comes from the

16   same source no matter how similar the packaging is.

17          And, again, just to go back over.  This is another

18   view of the Kohl's packaging taken on the same display rack

19   with the GOLDTOE packaging at Kohl's.

20          So we finally take a look at our package.  As Your

21   Honor noted, our package it's not really so much gold as it

22   is red, but there is a side panel that predominately says the

23   word "sport."  "GOLD LABEL" is prominently written in white.

24   Anybody can also see there's no gold toe at the top of the

25   sock.

1    So what -- again, what Gildan is asking us all to
2    believe and of all of those features that they themselves
3    taut as being so famous are not present on this sock,
4    somebody is going to walk in and look at that red label and
5    say, oh, this must be a Gildan sock.  And I submit that's a
6    ridiculous proposition to put forward under these
7    circumstances.  We've been using the GOLD LABEL font on a
8    wide variety of products for many years without any
9    complaint.
10   Here's another example, Excedrin and Tylenol.
11   There was a lawsuit in this case, *Bristol-Meyers* case.  The
12   court said, "In this case, by the far the most prominent
13   feature of the Excedrin PM trade dress is the trade name
14   'Excedrin.'"  There's no surprise.  "At least as prominent on
15   the Tylenol PM packaging is the trade name 'Tylenol.'  These
16   trade names are the major features of otherwise ordinary
17   boxes."
18   Again, you can rewrite this to fit in this case.
19   In this case, by far the most prominent feature of the Gildan
20   trade dress is the trade name GOLDTOE.  At least as prominent
21   on the Dillard's packaging is the trade name GOLD LABEL.
22   These trade names are the major features of otherwise
23   ordinary packaging.
24   So then you come to the question of the entitlement
25   to irreparable harm, and I really don't think we have to go

1   there because, as we've demonstrated, there's no evidence

2   regarding a single consistent overall image to Gildan's

3   athletic sock record.  There's no evidence in the record that

4   there's any similarity -- substantial similarity between

5   Gildan's various designed wrappers and Dillard's actual

6   commercial product.

7           But it is interesting to note that in the *eBay* case

8   the Supreme Court has established a four-factor test and it

9   pretty much have done away with presumptions altogether.

10          The *Winter* case, which is a more recent case, "A

11   plaintiff seeking a preliminary injunction must establish

12   that he is likely to suffer irreparable harm in the absence

13   of preliminary relief."  That language has been taken by

14   virtually almost every case to address this to "must

15   establish" as meaning cannot rely on presumptions.  There has

16   to be actual proof of irreparable harm in the absence of

17   preliminary relief.

18          THE COURT:  And if they win, you'll be able to pay

19   off all the big damages that exist between now and then.  So

20   it won't be any problem there.  Is that what you're saying,

21   part of what you're saying?

22          MR. ADAMS:  I'm saying --

23          THE COURT:  Can't suffer irreparable harm because

24   it's monetary and you'll be able to pay them off?

25          MR. ADAMS:  Yes.  And I think there's an issue of

1  delay here as well, Your Honor.  As we sit here, this
2  product, our product, has been on the shelves for a year.
3  When we first heard about this was in late September.  We
4  received a very unpleasant and officious letter from a valued
5  vendor of ours basically telling us to jump in the lake, go
6  to hell.  They want you to take all of your stuff off the
7  shelf.  They want you to destroy the labels.  They were
8  talking to us like we were some counterfeiter unloading stuff
9  out of the back of a cargo container at midnight in the back
10 of a junkyard.  Despite that fact, our lawyer, it wasn't me,
11 but who was representing Dillard's at the time, wrote a quite
12 sensible letter back saying, well, we don't agree with you
13 and here's why, but we'd be happy to discuss with you any
14 additional information that you've got concerning your trade
15 dress.  In any event, we'll be happy to talk to you, or we'll
16 talk to you about separating the products on the shelf if
17 that's a real concern.
18         They never got back to us until they sued us a
19 month later.  Then they waited another two months to file the
20 preliminary injunction motion.  And by asking for expedited
21 discovery, that simply had the natural effect of delaying the
22 matter even further.
23         So, yes, Dillard's is well established and very
24 profitable company.  It has plenty of money.  If it loses
25 this case, it won't have any trouble paying whatever damages

1    Gildan is able to show.  But I think it would be a thumb in

2    the eye of an upright and respectable business to impose an

3    injunction in a situation like this, and for that reason we

4    ask the Court not to do it.

5              THE COURT:  Rebuttal.

6              MR. JONES:  Your Honor, I'd be glad to address any

7    particular questions.  Otherwise, I thank you for your

8    patience over this long morning.  I'll try to keep this very

9    brief.

10             There are a couple of things, though, that

11   Mr. Adams said.  You recall that when he was talking about a

12   particular feature of that was incorporated in Dillard's

13   trade dress, it was, quote, "completely arbitrary."  Well,

14   Your Honor, if it was completely arbitrary when incorporated

15   in the Dillard's trade dress, then it was completely

16   arbitrary when incorporated amongst the constituents in our

17   trade dress.  That's a two-way street.  We didn't have to

18   choose the elements that we chose to incorporate in our

19   packaging.  They did not have to chose to incorporate the

20   elements that they did in mimicking our packaging.

21             And with respect to the argument by Mr. Adams that

22   the intentional copying presumption is in effect only if the

23   claimant's trademark or trade dress is registered, I am

24   confident that is not the law.  I don't have cases here this

25   morning.  I'd be glad to do a post-hearing brief if you want

1  to, but I'm quite confident that is not the law.

2        THE COURT:  We can -- we'll run all that.  We'll

3  take a look at that ourselves.

4        MR. JONES:  Okay.  And Mr. Adams and Dillard's

5  takes the position that the appearance of the GOLDTOE threads

6  on the product, quote, "trumps everything else."  In other

7  words, it doesn't matter what we did.  If it trumps

8  everything else, we could have copied your packaging to a T

9  as long as we didn't copy the product with the GOLDTOE

10  lettering -- configuration.

11        THE COURT:  I think he's saying -- I understand

12  that was -- that was his "a little bit over the top

13  argument."  But what he was really saying, though, when you

14  look at this whole thing as a whole, this is part of it.  In

15  other words, the confusion is going to come from looking at

16  these things together as opposed to just looking at the

17  label.  Of course, if you do, you see GOLDTOE.  I mean, it's

18  pretty big.

19        MR. JONES:  He didn't show you the packages where

20  the GOLDTOE itself is not on the front.  It doesn't appear

21  from the front the way they are packaged, for instance, in

22  the crew socks.

23        THE COURT:  You ought to put -- you ought to put

24  that out there all the time.  A lot of people look for that.

25        MR. JONES:  I understand that.

64

1          THE COURT:  As long as you don't let people down on

2     the -- on the quality.  That's always a danger is if you

3     let -- you know, it's always a -- you can always make more

4     money by making -- getting somebody to manufacture cheaper or

5     making a lesser product, but that is fool's gold.  Everybody

6     has a big celebration and gets big dividends first year and

7     wonder where the sales are.  Don't stop making a good product

8     or I'll stop buying it.

9          MR. JONES:  Your Honor --

10         THE COURT:  As I say, I'm very happy with GOLDTOE.

11         MR. JONES:  Your Honor, yes, it is possible for a

12    company after decades of success to destroy the good will

13    associated with the product.  They can do it under a number

14    of ways, but the law supports the retention of the good will

15    that's associated with the product and its packaging.

16         THE COURT:  There is no question about it.  I'm

17    going to have to look at all of these arguments, and the

18    packaging is important.

19         MR. JONES:  Okay.  Your Honor, if there were

20    quality control issues associated with our client's product,

21    and I'm sure there are because there are in every

22    manufacturing regime, that is not an excuse for trade dress

23    infringement.  It is not a legal defense for trade dress

24    infringement.

25         And finally, Mr. Adams said that the best way to

65

```
 1   avoid confusion is to put the products side-by-side.
 2   According to Dillard's, then, this mumble-jumbled mess is the
 3   best way to avoid confusion.  Mix them all up, put them
 4   side-by-side.  Notwithstanding the similarities, people will
 5   figure it out.
 6              THE COURT:  I see the gold toe.
 7              MR. JONES:  The gold toe is there, Your Honor.
 8              MR. ADAMS:  Well, Your Honor --
 9              MR. JONES:  It says GOLD LABEL.  See GOLDTOE.
10              THE COURT:  But that's me.  I understand there are
11   other people that might be --
12              MR. ADAMS:  Your Honor --
13              THE COURT:  -- they might have to read everything
14   before they grab something and head out of the store.  I
15   don't go shopping.  I go buying.
16              MR. JONES:  Okay.  That's the way males operate.
17   Thank you, Your Honor.
18              THE COURT:  Yes, sir.  Thank you.
19              MR. ADAMS:  Thank you, Your Honor.
20              THE COURT:  Yes, sir.  Thank you.
21              I would encourage you all to -- let me say this:  I
22   would encourage you all to talk about working things out.  It
23   seems, to me, that the difficulties you all are having with
24   each other could be compromised somewhat to get this done.
25   You really don't want to leave this always to the courts.
```

```
 1              I think there just recently in the last few days we
 2     had a decision come down.  There's eight notes in music, I
 3     think.  I imagine that the heirs of Mozart are going to be
 4     bringing lawsuits here pretty soon with this new decision
 5     that a jury came down and decided that two songs that are --
 6     they in some parts sound a little similar, but I've listened
 7     to both of them.  But the jury -- it was the jury's decision
 8     and left to them they gave $7 million to the heirs of Marvin
 9     Gaye.  Now, that might have been the right decision; that
10     might have been the wrong decision.  Somebody wins in these
11     things and somebody loses, and you just don't know how that
12     really is going to turn out.
13              It really seems to me both sides are trying to sell
14     things.  In this case, Dillard's has a large product line and
15     sell these socks, which do have high quality.  Checking them
16     out over here.  People might try it once, but if they don't
17     have it, they'll never try them again.
18              And it's really -- I mean, the packaging -- the
19     packaging is important, but there are -- you know, you all
20     can probably find a way to work this out between the two of
21     you.  And I would think that was something that would be
22     beneficial to both sides rather than to continue to go down
23     this line, because I don't think there's going to be -- if I
24     thought there was something that couldn't be done without
25     doing violence to one side or the other, I wouldn't say what
```

67

1    I'm saying.  But it seems to me that ought to be something
2    everybody ought to think about.  From my decisions, I will
3    follow the law and nothing else.
4              MR. ADAMS:  Thank you, Your Honor.
5              MR. JONES:  Thank you, Your Honor.
6                   (Concluded at 11:10 a.m.)
7                        *    *    *

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NORTH CAROLINA

CERTIFICATE OF COURT REPORTER

     I, Jillian M. Turner, RMR, CRR, CLR, Official Court Reporter, certify that the foregoing transcript is a true and correct transcript of the proceedings taken and transcribed by me in the above-entitled matter.

     Dated this the 18th day of March 2015.

```
                    /s/ Jillian M. Turner
                    Jillian M. Turner, RMR, CRR, CLR
                    U.S. Official Court Reporter
```

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:14-cv-00590-MOC-DSC

| | | |
|---|---|---|
| **GILDAN USA INC.,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| Vs. | ) | ORDER |
| | ) | |
| **DILLARD'S, INC.,** | ) | |
| | ) | |
| Defendant. | ) | |

**THIS MATTER** is before the court on plaintiff's Motion for Preliminary Injunction. Finding that plaintiff has not shown a likelihood of success, irreparable harm, that the balance of the hardships favors granting relief, or that the public interest supports injunctive relief, the court will deny the Motion for Preliminary Injunction.

### FINDINGS AND CONCLUSIONS

#### I.    Background

Defendant operates a chain of department stores and sells, among other items, apparel manufactured by plaintiff, including men's GOLDTOE brand athletic socks.  In addition to selling plaintiff's socks, defendant also sells men's athletic socks under its own GOLD LABEL brand.  It is undisputed that both plaintiff and defendant sell a number of items under their respective marks in addition to men's athletic socks.

In seeking a preliminary injunction, plaintiff contends that the packaging used by defendant infringes its trade dress rights under the *Lanham Act* and, for purposes of the instant motion for injunctive relief, claims trade dress protection for the following packaging elements:

-1-

(1) a colored band with contrasting white or gold lettering for its wordmark having two components, the first of which is the term "GOLD"; (2) a rectangle of contrasting color in the upper-right portion of the front of the packaging; and (3) side panels which incorporate the color gold. Defendant contends that its accused packaging does not infringe plaintiff's trade dress as it is composed of design and graphical features that are conventional and commonly used in sock packages and labels.

At the hearing, plaintiff presented a display of its full line of GOLDTOE socks. The court noted that while all the packaging included the word GOLDTOE, the colors and graphical elements used varied across the entire product line, with some wrappers having little similarity to the GOLDTOE packaging used in men's athletic socks. In most samples, the most prominent feature was the "gold toe" of the socks, which typically protruded from the top of the package.

Plaintiff also presented exhibits demonstrating the genesis of defendant's packaging from a point in time when plaintiff considered that it did not infringe to the current version of the GOLD LABEL men's athletic sock packaging, which plaintiff contends does offend protections afforded under the Lanham Act. Based on such exhibits, plaintiff argued that defendant's management intentionally steered its graphic artist toward a design which essentially copied plaintiff's packaging.

Defendant also presented a display of its socks as well as other manufacturer's socks in a PowerPoint presentation. Defendant demonstrated that despite serving a request for production, plaintiff failed to provide it with all iterations of its men's athletic sock packaging. Defendant's presentation was compelling as it demonstrated that plaintiff had not consistently used the elements for which it claims trade dress protection; equally, it was troubling to the court that

-2-

plaintiff failed to produce those packages, which were unfavorable, when requested to do so. Further, defendant demonstrated that other sock purveyors used various shades of blue in their men's athletic sock packaging, arguing that the use of labels with blue fields was simply what was popular in current packaging of men's athletic socks.

## II.     Preliminary Injunction Standard

A preliminary injunction is an extraordinary remedy, the primary function of which is to protect the *status quo* and to prevent irreparable harm during the pendency of a lawsuit. In re Microsoft Corp. Antitrust Litigation, 333 F.3d 517, 525 (4th Cir.2003). A plaintiff seeking a preliminary injunction must give notice to the opposing party under Federal Rule of Civil Procedure 65 and, at the hearing, must establish the following: (1) plaintiff is likely to succeed on the merits; (2) plaintiff is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of the equities/hardships tips in plaintiff's favor; and (4) an injunction is in the public interest. Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7 (2008); Moore v. Kempthorne, 465 F.Supp.2d 519, 525 (E.D.Va.2006) ("[t]he standard for granting either a TRO or a preliminary injunction is the same").

The most recent Rule 65 test was adopted by the Court of Appeals for the Fourth Circuit in The Real Truth About Obama, Inc. v. Fed. Election Comm'n, 575 F.3d 342, 346–47 (4th Cir.2009), *vacated on other grounds*, 130 S.Ct. 2371, 176 L.Ed.2d 764 (2010)(memorandum opinion), *reissued in pertinent part*, 607 F.3d 355 (4th Cir.2010), *overruling* Blackwelder Furniture Co. v. Selig Mfg. Co., 550 F.2d 189 (4th Cir.1977) (providing a four-pronged balance of the hardships test). The Winter Court emphasized that a plaintiff must demonstrate more than

-3-

just a "possibility" of irreparable harm and make a strong showing of likelihood of success on the merits. <u>Winter</u>, 129 S.Ct. at 375.

### III.    Discussion

#### A.    Likelihood of Success on the Merits

Based on the briefs and presentations at the hearing, the court finds that plaintiff is not likely to prevail on the merits of its claim. To prevail on its unregistered trade dress claim, plaintiff must be able to prove three elements: "(1) the alleged trade dress is primarily non-functional; (2) its alleged trade dress is inherently distinctive or has acquired a secondary meaning; and (3) the alleged infringement creates a likelihood of confusion." <u>Tools USA & Equip. Co. v. Champ Frame Straightening Equip., Inc.</u>, 87 F.3d 654, 657 (4th Cir.1996).

Despite the court's initial concerns, which were based in great part on the coloration of the band -- an element claimed in the Complaint -- plaintiff has apparently abandoned its "blue band" claim in its arguments on the instant motion.  While plaintiff properly cites the court to J. Thomas McCarthy, *McCarthy On Trademarks And Unfair Competition* § 8:1, at 8-3 (2009), for the proposition that a trade dress claimant is free to define the set of packaging elements for which it claims protection, the court does not agree that plaintiff can, after making such election in the Complaint, pick and choose from those elements in formulating its request for preliminary injunction.  The reason is simple: the likelihood of success of the merits test asks whether plaintiff is likely to prevail on the claim it has asserted in its Complaint, not a subset of that claim as expressed in the request for injunctive relief.

#### 1.  Burden of Showing that Trade Dress is Non-Functional

-4-

In any event, what was made plain to this court at the hearing is that plaintiff will be unlikely able to show that its claimed trade dress is primarily non-functional. "[T]rade dress protection may not be claimed for product features that are functional." TrafFix Devices, Inc. v. Mktg. Displays, Inc., 532 U.S. 23, 29 (2001). Put another way, the Lanham Act does not afford protection to functional aspects of product packaging or to commonplace design elements. Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 775 (1992). Where it is common practice in a particular industry or segment of that industry to package like goods in a similar style, trade dress which simply follows or mimics that style is unlikely to be infringing and more likely to be generic, making such packaging "functional." Mana Prods., Inc. v. Columbia Cosmetics Mfg., Inc.,

65 F.3d 1063, 1069-70 (2d Cir. 1995).

Even if the court were to include the "blue band" in its consideration, defendant has demonstrate that the use of a blue band in the packaging of men's athletic socks is nothing in which plaintiff can claim any proprietary interest. Indeed, defendant provided the court will multiple examples of other men's athletic sock purveyor's use of varying shades of blue in their bands. Indeed, "color…can *never* be inherently distinctive, although they can be protected upon a showing of secondary meaning." Wal-Mart Stores, Inc. v. Samara Bros., 529 U.S. 205, 206 (2000) (emphasis in the original). Here, plaintiff's own display at the hearing clearly indicated that there is no association between GOLDTOE socks and the color blue as it used a wide range of colors in the packaging of its products. Further, as it appears that plaintiff is seeking trade dress protection for an entire product line, plaintiff's in-court demonstration raises concerns that plaintiff will be unable to show that its claimed trade dress signifies an overall look which is

-5-

"consistent" throughout the line. Yurman Design, Inc. v. PAJ, Inc., 262 F.3d 101, 115 (2d Cir. 2001). Across its entire line of socks, plaintiff clearly uses an assortment of labels that utilize a spectrum of colors and design features, with some identical socks being displayed in different color packages based on store preferences. Within the men's athletic socks which are primarily at issue here, defendant demonstrated to the court that plaintiff fails to consistently use the very elements it now claims are at issue in this action.

As to the use of the word GOLD, its use is likely functional as an attempt to identify its product as being of high quality. While plaintiff certainly has protection for its famous GOLDTOE mark, it has no trademark protection for only the word "gold" as this term is frequently used in a functional sense to identify the product as expensive, high quality or luxurious. Platinum Home Mortgage Corp. v. Platinum Fin. Grp., Inc., 149 F.3d 722, 728 (7th Cir. 1998) ("platinum" is a "self-laudatory term" which "describes the quality of plaintiff's…services").

As to the claimed rectangle in the upper right corner of the package, such element is also likely to be found to be functional as defendant has presented evidence that such device is commonly used to inform consumers how many pair of socks are in the package. Plaintiff admits as much in its Complaint (#1), at 19.

As to the gold side panels, defendant has presented a number of exhibits showing that the use of side panels on sock packages is commonplace in the industry. In addition, defendant has shown a number of examples where plaintiff did not use side panels and cases where the side panels used are not even gold, but red.

-6-

In sum, the court finds it is unlikely that plaintiff will be able to show that its claimed dress is non-functional.

### 2.  Distinctiveness

Plaintiff's next burden is to show that its alleged trade dress is inherently distinctive or has acquired a secondary meaning.  Trade dress packaging is protectable if it is inherently distinctive or if it has acquired distinctiveness, "secondary meaning."

> [T]he relevant inquiry is not whether the individual components of a design are common or not, but rather whether the alleged trade dress as a whole is inherently distinctive.

Ashley Furniture Indus., Inc. v. SanGiacomo N.A. Ltd., 187 F.3d 363, 373 (4th Cir. 1999).

Review of the evidence and arguments reveals that it is unlikely that plaintiff will be able to show that the claimed trade dress is inherently distinctive or has acquired secondary meaning. As is apparently the case in the sock market, "[w]here it is the custom of an industry to package products in a particular manner, a trade dress in that style would be generic and therefore not inherently distinctive." Paddington Corp. v. Attiki Imps. & Distrib., Inc., 996 F.2d 577, 583 (2d Cir. 1993).

While there is a presumption of distinctiveness that applies to the mark GOLDTOE, there is no presumption of distinctive that applies to the word GOLD as that is simply an individual word within a greater word mark.  Victoria's Secret Stores Brand Mgmt., Inc. v. Sexy Hair Concepts, LLC, 2009 WL 959775, at *9 (S.D.N.Y. 2009). As courts have long observed, "dissecting marks often leads to error. Words which would not individually become a trademark may become one when taken together." Union Carbide Corp. v. Ever–Ready, Inc., 531 F.2d 366, 379 (7th Cir. 1976). Such conclusion is buttressed by evidence that defendant's use of the

-7-

brand GOLD LABEL is not just on socks, but on other items of apparel throughout its

department stores. Clearly, defendant is attempting to imply that its full line of private-label

goods are of superior quality, not that they are GOLDTOE products. "The linchpin of both

common law and federal statutory trademark infringement claims is whether consumers in the

relevant market confuse the alleged infringer's mark with the complainant's mark." Z-Man

Fishing Products, Inc. v. Renosky, 790 F.Supp. 2d 418, 431 (D.S.C. 2011) (citation omitted).

Plaintiff's trade dress -- which varies precipitously across its full domestic product line --

does not likely serve as a source identifier for consumers. Instead, plaintiff attempts to show a

presumption of secondary meaning through alleging that defendant copied its packaging.

Plaintiff argues that its trade dress is "descriptive" and that it has, per se, garnered secondary

meaning by defendant allegedly copying its work, making plaintiff's trade dress distinctive.

Clicks Billiards Inc. v. Sixshooters Inc., 251 F.3d 1252, 1264 (9th Cir.2001). However, the

Court of Appeals for the Fourth Circuit has held that the

> presumption [of secondary meaning] arises only where the intentional copying is
> motivated by an intent to exploit the good will created by an already registered
> trademark[.] [A] court should require one who tries to deceive customers to prove
> that they have not been deceived. … In contrast, where the owner of the junior
> mark essentially copies a mark with no intent to exploit the senior mark's
> goodwill—such as to describe a functional aspect of the product—the party
> claiming infringement must prove the likelihood of confusion without the benefit
> of a presumption. [A] likelihood of confusion should not be inferred from proof
> that the actor intentionally copied the other's designation if the actor acted in
> good faith under circumstances that do not otherwise indicate an intent to cause
> confusion or to deceive.

Shakespeare Co. v. Silstar Corp. of Am., 110 F.3d 234, 241 (4th Cir. 1997) (internal citations

omitted). While plaintiff has some evidence of possible copying, such evidence would not give

rise to an inference as plaintiff has not come forward with evidence that defendant acted in bad

-8-

faith under circumstances indicating an intent to deceive or confuse.  Indeed, defendant put on evidence at the hearing that it is routine for graphic artists to reference competitor's work in the clothing industry.

### 3.  Likelihood of Confusion

Plaintiff also has the burden of showing that the alleged infringement creates a likelihood of confusion.  In considering confusion, courts consider (1) the strength or distinctiveness of the plaintiff's mark, (2) the similarity of the two parties' marks, (3) the similarity of the goods and services the marks identify, (4) the similarity of the facilities the two parties use in their businesses, (5) the similarity of advertising used by the two parties, (6) the defendant's intent, and (7) actual confusion.  Pizzeria Uno Corp. v. Temple, 747 F.2d 1522, 1527 (4th Cir.1984). While plaintiff argues that the court should ignore the product and concentrate on the packaging, such is simply not possible when considering the possibility of confusion.

It is not a far stretch to conclude that both plaintiff and defendant each designed packaging to display the quality of the socks.  The most striking aspect of plaintiff's men's athletic sock is not the package, but the gold toe which protrudes from the top, making those socks easily identifiable as GOLDTOE products.  On the other hand, defendant's package also does nothing to hide the fact that its toe is plain and appears intended to draw the consumer's attention to the thickness of its sport sock.  Further, while it is undisputed that GOLDTOE is a strong mark, the evidence presented at the hearing indicated that plaintiff's trade dress was weak as "[i]ts main features are used by a not inconsiderable number of other companies for other products." P.F. Cosmetique, S.A. v. Minnetonka Inc., 605 F. Supp. 662, 668 (S.D.N.Y. 1985). Even when the court limits it review to just the packaging itself and further limits that review to

-9-

the elements plaintiff now claims in its motion as opposed to its Complaint, it is apparent that plaintiff's and defendant's packaging had similar generic or functional design elements. Further, as it appears that plaintiff is seeking trade dress protection for an entire product line, plaintiff's *own* in-court demonstration raises concerns that plaintiff will be unable to show that its claimed trade dress signifies an overall look which is "consistent" throughout the line. Yurman Design, Inc. v. PAJ, Inc., 262 F.3d 101, 115 (2d Cir. 2001). Across its entire line of socks, plaintiff clearly uses an assortment of sized and shaped labels that utilize a spectrum of colors and design features, with some identical socks being displayed in different color packages based on store preferences. As to the men's athletic socks at issue here, defendant demonstrated to the court that plaintiff fails to consistently use on those products the very elements it now claims are protected under the Lanham Act. Further, there is no evidence that defendant has ever represented to its customers that its private label socks were GOLDTOE. While plaintiff has presented a photograph of GOLDTOE socks stocked on a GOLD LABEL rack, which may indicate *employee* confusion, plaintiff has presented no evidence of actual *consumer* confusion. As to the quality of the product, plaintiff has presented no evidence that the socks being sold by defendant as a house brand are inferior to the socks being sold by defendant. The court has also considered the marketplace, and it appears undisputed that defendant sells many items other than socks under its GOLD LABEL brand and that it displays those socks in dedicated GOLD LABEL displays, not mixed in with GOLDTOE socks.

<div align="center">***</div>

<div align="center">-10-</div>

After considering the arguments and exhibits, the court finds that it is unlikely that plaintiff will prevail at trial on the merits. This factor weighs heavily against issuance of a preliminary injunction.

**B.      Irreparable Harm**

Based on the memoranda and exhibits presented, the court determines that if the alleged infringing activity were allowed to continue, it is unlikely that plaintiff will suffer irreparable harm in the absence of preliminary injunctive relief. Indeed, even if the court were to assume that some harm could occur, such as loss of market share, those damages could easily be remedied through payment of money damages, making them repairable. As to any potential reputational harm, the court cannot find that such is likely in these circumstances. As discussed above, there is no evidence and the court cannot discern from handling the socks that defendant's brand is anything less than a high quality, comparable product. There is simply no evidence that anyone has mistakenly purchased defendant's socks believing them to be GOLD TOE socks. The court finds that this factor weighs against granting preliminary injunctive relief.

**C.      Balance of the Equities/Hardships**

The court has considered the balance of the hardships. Defendant has shown that if a preliminary injunction were to issue, it would likely lose nearly $1,000,000 during the course of this litigation. Shields Decl., Def. Ex. 1, at ¶ 34. While a preliminary injunction would certainly provide early trade dress protection for plaintiff in the event that a jury finds in its favor, the lack of such protection is likely monetarily quantifiable and could be assessed as actual damages

-11-

In addition to quantifiable damages, the court has also considered the potential for damage to plaintiff's reputation and brand. While damages can be presumed where there is infringement, it appears unlikely that a jury will here find infringement, at least on the evidence this court saw at the hearing. Balancing the hardships and the equities, the court finds that this factor weighs against granting preliminary injunctive relief.

### D.    Public Interest

Finally, the court has considered the public interest. Clearly, the public is interested in being able to rely on packaging to direct them to genuine goods. GOLDTOE is a famous brand that carries tremendous good will, a reputation for quality, and brand loyalty. The public also has an interest in having a competitive market place, where it can purchase products which it may perceive as being of better quality or better value. Courts have long recognized that dominant players in the market cannot suppress such competition simply by pointing to similarities in packaging:

> With the rise of regional and national discount retailers with established names and logos, retailers who market both national brands and their own private label brands in direct competition, this form of competition has become commonplace and well-known in the marketplace. When such packaging is clearly labelled [sic] and differentiated ... we are unwilling to attribute  ... absent clear precedent so requiring, a rule that would make such competition presumptively unlawful.

Conopco, Inc. v. May Dep't Stores Co., 46 F.3d 1556, 1565 (Fed. Cir. 1994). Indeed, "the Lanham Act must be construed in the light of a strong federal policy in favor of vigorously competitive markets." Landscape Forms, Inc. v. Columbia Cascade Co., 113 F.3d 373, 382 (2d Cir. 1997).

With those concerns in mind, the centerpiece of this discreet inquiry is whether the public would be deceived if the court were to allow defendant's packaging to remain on its shelves

-12-

during the pendency of this litigation.  N.Y. City Triathalon, LLC v. NYC Triathalon Club, Inc., 704 F. Supp. 2d 305, 344 (S.D.N.Y. 2010).  As discussed above, the court finds it unlikely that customers *shopping at defendant's stores* will be deceived into thinking that GOLD LABEL socks are GOLDTOE socks as defendant uses its GOLD LABEL brand throughout its store.  In addition, defendant's packaging further identifies the socks as a house brand by including its other proprietary mark ROUNDTREE & YORKE.  Considered in context, the public interest would likely be disserved by granting an injunction as it appears that such would only serve to diminish competition in the absence of any actual confusion.  Put another way, the relief plaintiff seeks at this juncture would be like putting water on a house that was not on fire.

**IV.    Conclusion**

Having carefully considered all four factors, the court finds that the entry of a preliminary injunction is not called for in this particular matter.

**ORDER**

**IT IS, THEREFORE, ORDERED** that plaintiff's Motion for Preliminary Injunction (#16) is **DENIED**.

Signed: March 20, 2015

-13-

Max O. Cogburn Jr.
United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**

GILDAN USA INC.,

      Plaintiff,

v.

DILLARD'S, INC.,

      Defendant.

CIVIL ACTION NO. 3:14-CV-00590-MOC-DSC

## NOTICE OF APPEAL

Notice is given that Plaintiff Gildan USA Inc. ("Gildan") hereby appeals to the United States Court of Appeals for the Fourth Circuit from the Court's March 20, 2015 *Order* denying Gildan's motion for a preliminary injunction.

Respectfully submitted this 16th day of April, 2015.

s/ Larry C. Jones
Larry C. Jones
larry.jones@alston.com
ALSTON & BIRD LLP
Bank of America Plaza
101 South Tryon Street, Suite 4000
Charlotte, NC 28280-4000
Tel: (704) 444-1000
Fax: (704) 444-1111

Uly S. Gunn (*admitted pro hac vice*)
sam.gunn@alston.com
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street NE
Atlanta, GA 30309-3424
Tel: (404) 881-7000
Fax: (404) 881-7777

*Counsel for Plaintiff Gildan USA Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA

GILDAN USA INC.,

     Plaintiff,

v.

DILLARD'S, INC.,

     Defendant.

CIVIL ACTION NO.  3:14-CV-00590-MOC-DSC

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 16, 2015, I electronically filed the foregoing *Notice of Appeal* with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to all attorneys of record.

            _s/ Uly S. Gunn_____
            Uly S. Gunn

- 2 -

**-339-**